# In the United States Court of Federal Claims

No. 14-135L
(Filed: November 2, 2020)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JEFFREY MEMMER, GILBERT EFFINGER, LARRY GOEBEL AND SUSAN GOEBEL, OWEN HALPENY, MATTHEW HOSTETTLER, JOSEPH JENKINS, MICHAEL MARTIN AND RITA MARTIN, McDONALD FAMILY FARMS OF EVANSVILLE, INC., REIBEL FARMS, INC., JAMES SCHMIDT AND ROBIN SCHMIDT, | \* \* \* \* \* \* \* \* \* \* \* |
| Plaintiffs, | \* \* |
| v. | \* \* |
| THE UNITED STATES, | \* \* |
| Defendant. | \* \* |

Trial Decision; Rails-to-Trails; Fifth Amendment Taking; Indiana Law; Vacatur and Remand From Federal Circuit Before Addressing Merits of Cross-Appeals to Make a Record for Applying a Multifactor Test (as directed in Caquelin); Effect of Vacatur; Cognizable Property Interests; Liability for a Taking When No Trail Use Agreement Executed, NITU Expires, and Abandonment Not Consummated; Arkansas Game & Fish; Causation; Extent of Taking; Damages for a Temporary Taking

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thomas S. Stewart and Elizabeth Gepford McCulley, Kansas City, MO, for plaintiffs.

David L. Weigert, Edward C. Thomas, James R. MacAyeal, and Daniel Pinkston, United States Department of Justice, Washington, DC, and Denver, CO, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this Rails-to-Trails case, plaintiffs own real property adjacent to railroad lines in southwestern Indiana. They contend that the United States violated the Just Compensation Clause of the Fifth Amendment to the United States Constitution by authorizing the conversion of the railroad lines into recreational trails pursuant to the National Trail Systems Act ("Trails Act"), thus acquiring their property by inverse condemnation. This case presents an issue of first impression: whether there is a compensable taking in the situation in which the issuance of a Notice of Interim Trail Use or Abandonment ("NITU") did not lead to a trail-use agreement, the NITU expired, and the railroad company did not file a notice of consummation of abandonment despite having no intention to use its line.

The court initially determined liability upon the parties' cross-motions for summary judgment. Thereafter, the parties reached a settlement on the proper amount of damages and the

court entered judgment.  Both plaintiffs and defendant appealed and then, shortly thereafter, jointly requested that the United States Court of Appeals for the Federal Circuit ("Federal Circuit") vacate the court's summary judgment decision and judgment to enable further proceedings consistent with the Federal Circuit's decision in Caquelin v. United States ("Caquelin I"), 697 F. App'x 1016 (Fed. Cir. 2017) (per curiam).  The Federal Circuit granted the parties' request and vacated the court's judgment in its entirety.  Consequently, none of the court's rulings and orders that provided the basis for that judgment survives, requiring the court to approach this case with a blank slate.

In accordance with the Federal Circuit's mandate, the court on remand allowed additional discovery and then conducted a trial on liability and damages.  As explained in more detail below, the court awards damages to plaintiffs in an amount to be determined in accordance with its findings and conclusions.

## TABLE OF CONTENTS

I. BACKGROUND ........................................................................................................................ 3

  A. Statutory and Regulatory Context ........................................................................................ 3

  B. Fifth Amendment Takings and the Trails Act ...................................................................... 6

  C. Procedural History ................................................................................................................ 7

II. LIABILITY:  PROPERTY INTEREST ........................................................................... 11

  A. Legal Standards .................................................................................................................. 11

    1. Deed Construction ........................................................................................................ 12

    2. Scope of Easements ...................................................................................................... 14

  B. Findings of Fact .................................................................................................................. 14

  C. Conclusions of Law ............................................................................................................ 18

    1. Property Interests Acquired by Indiana Southwestern's Predecessors ........................... 18

      a. The Type A Deeds ................................................................................................... 18

      b. The Type A-1 Deeds ............................................................................................... 19

      c. The Smith Deed ....................................................................................................... 19

      d. The Davis Deed ....................................................................................................... 20

      e. The Side Track Deed ............................................................................................... 20

    2. Scope of the Easements Acquired by Indiana Southwestern's Predecessors ................. 21

    3. Existence of the Easements at the Time of the Alleged Taking ..................................... 22

III. LIABILITY:  FIFTH AMENDMENT TAKING ............................................................. 22

  A. Legal Standards .................................................................................................................. 22

    1. Nature of a Taking ........................................................................................................ 23

    2. Causation ....................................................................................................................... 24

3. Abandonment Under Indiana Law ................................................................. 25

B. Findings of Fact ............................................................................................... 28

1. Proceedings Before the Board ...................................................................... 28

2. Actions of Indiana Southwestern During the Proceedings Before the Board and Thereafter ......................................................................................................... 31

3. The Character and Use of Plaintiffs' Properties ......................................... 33

a. The Effinger Property ............................................................................. 33

b. The Goebel Property ............................................................................... 34

c. The Halpeny Property ............................................................................. 36

d. The Jenkins Property .............................................................................. 37

e. The Martin Property ............................................................................... 38

f. The McDonald Family Farms Property .................................................. 39

g. The Memmer Property ............................................................................ 40

h. The Reibel Farms, Inc. Property ........................................................... 41

i. The Schmidt Property ............................................................................. 42

C. Conclusions of Law .......................................................................................... 43

1. The Nature of the Alleged Taking ................................................................ 43

2. Causation ....................................................................................................... 48

IV. DAMAGES: EXTENT OF THE CATEGORICAL TAKING ............................. 51

A. Legal Standard ................................................................................................. 51

B. Findings of Fact ............................................................................................... 52

C. Conclusions of Law .......................................................................................... 52

V. DAMAGES: PRINCIPAL AMOUNT OF JUST COMPENSATION ................. 54

A. Legal Standard ................................................................................................. 54

B. Findings of Fact ............................................................................................... 55

C. Conclusions of Law .......................................................................................... 61

VI. DAMAGES: INTEREST AND COSTS ............................................................. 63

VII. CONCLUSION .................................................................................................. 64

# I. BACKGROUND

## A. Statutory and Regulatory Context

During the last century, the United States began to experience a sharp reduction in rail trackage. Preseault v. Interstate Com. Comm'n ("Preseault I"), 494 U.S. 1, 5 (1990). To remedy this problem, Congress enacted a number of statutes, including the Trails Act, 16 U.S.C. §§ 1241-1251 (2006). The Trails Act, as amended, provides for the preservation of "established

railroad rights-of-way for future reactivation of rail service" by authorizing the interim use of such rights-of-way as recreational and historical trails.  Id. § 1247(d).  This process is referred to as "railbanking," and is overseen by the Surface Transportation Board ("Board"), id., the federal agency with the "exclusive" jurisdiction to regulate "the construction, acquisition, operation, abandonment, or discontinuance" of most railroad lines in the United States, 49 U.S.C. § 10501(b) (2006); accord Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 320-21 (1981) (declaring that the authority of the Interstate Commerce Commission—the Board's predecessor, see 49 U.S.C. § 1302—over abandonments was both exclusive and plenary).

Before railbanking can occur, the railroad company must seek to abandon its line, either by initiating abandonment proceedings with the Board pursuant to 49 U.S.C. § 10903, or by seeking an exemption from such proceedings pursuant to 49 U.S.C. § 10502.[1]  A railroad company that initiates abandonment proceedings may only abandon its line "if the Board finds that the present or future public convenience and necessity require or permit the abandonment . . . ."  49 U.S.C. § 10903(d); accord id. § 10903(e) (providing that the Board "shall" approve applications for abandonment if it "finds public convenience and necessity").  In addition, there is a class exemption from abandonment proceedings for railroad companies that "certif[y] that no local traffic has moved over the line for at least 2 years" and satisfy other specified criteria.  49 C.F.R. § 1152.50(a)-(b), (d)(1); see also id. § 1152.50(c) (finding, in accordance with 49 U.S.C. § 10502, that when the stated criteria are satisfied, abandonment proceedings are unnecessary to implement rail transportation policy or "to protect shippers from abuse of market power").  To invoke this class exemption, a railroad company must file a notice of exemption with the Board, id. § 1152.50(d)(2), and if the notice of exemption is complete, the Board must publish a notice in the Federal Register noting the submission within twenty days of filing, id. § 1152.50(d)(3).

In conjunction with the railroad company's abandonment application or notice of exemption, the Board will entertain protests and comments from interested third parties.  Id. §§ 1152.25, .28(a), .29(a).  Of particular relevance in this case, interested third parties may submit a request for the interim use of the railroad line as a trail pursuant to 16 U.S.C. § 1247(d), seek a public-use condition pursuant to 49 U.S.C. § 10905, and make an offer of financial assistance ("OFA") pursuant to 49 U.S.C. § 10904.  Id.

If an interested third party submits a trail-use request to the Board that satisfies the requirements of 16 U.S.C. § 1247(d), the Board makes the necessary findings pursuant to 49 U.S.C. § 10502(a) or 49 U.S.C. § 10903(d), and the railroad company agrees to negotiate a trail-use agreement, the Board will issue one of two documents:  if the railroad company initiated abandonment proceedings, the Board will issue a Certificate of Interim Trail Use or Abandonment ("CITU"), and if the railroad company is exempt from abandonment proceedings, the Board will issue a NITU.  Id. § 1152.29(b)-(d).  The effect of both documents is the same:  to "permit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and materials, consistent with interim trail use and rail banking . . . ; and permit the railroad to fully

---

[1]  A railroad company may petition for an individual or class exemption, 49 U.S.C. § 10502(a)-(b), or, as relevant in this case, invoke a previously created class exemption, 49 C.F.R. § 1152.50 (2010).

abandon the line if no agreement is reached 180 days after it is issued, subject to appropriate conditions . . . ." Id. § 1152.29(d)(1); accord id. § 1152.29(c)(1). The Board will entertain requests to extend the 180-day deadline to enable further negotiations. If the railroad company and the interested third party execute a trail-use agreement, then abandonment of the railroad line is stayed for the duration of the agreement. Id. § 1152.29(c)-(d); 16 U.S.C. § 1247(d). If no trail-use agreement is executed, the railroad company is permitted to fully abandon the line. 49 C.F.R. § 1152.29(c)-(d).

Similarly, if an interested third party believes that it would be appropriate for the railroad line to be put to public use, "including highways, other forms of mass transportation, conservation, energy production or transmission, or recreation," 49 U.S.C. § 10905, it can seek the imposition of a public-use condition, 49 C.F.R. § 1152.28(a)(2). If the Board finds that the line is "appropriate for use for other public purposes," the railroad company may dispose of the line "only under the conditions" imposed by the Board, which "may include a prohibition against the disposal of the rail assets for a period of not more than 180 days from the effective date of the decision authorizing the abandonment or discontinuance, unless the properties have first been offered, on reasonable terms, for sale for public purposes." Id. § 1152.28(b); accord 49 U.S.C. § 10905.

Abandonment of a railroad line may also be postponed if an interested third party makes an OFA to subsidize or purchase the railroad line to continue rail service. 49 U.S.C. § 10904; 49 C.F.R. § 1152.27. If a railroad company filed an application for abandonment or a petition for an individual exemption, the OFA must be made and filed with the Board within four months of the railroad company's application/petition or ten days of the Board's decision granting the application/petition, whichever is earlier. 49 U.S.C. § 10904(c); 49 C.F.R. § 1152.27(b)(1), (2)(i). If a railroad company invoked a class exemption, the OFA must be made and filed with the Board within thirty days of the Board publishing notice of the exemption in the Federal Register. 49 C.F.R. § 1152.27(b)(2)(ii). "The Board will review each offer submitted to determine if a financially responsible person has offered assistance. If that criterion is met, the Board will issue a decision postponing the effective date of" its abandonment authorization, decision allowing an individual exemption, or notice of exemption, as appropriate. 49 C.F.R. § 1152.27(e)(1)-(2); accord 49 U.S.C. § 10904(d)(1). Abandonment is postponed until the railroad company and "a financially responsible person have reached an agreement on a transaction for subsidy or sale of the line" or, if an agreement is not reached, the Board establishes the conditions and amount of compensation for the transaction. 49 U.S.C. § 10904(d)(2). If an agreement is reached, abandonment of the line will not proceed. 49 C.F.R. § 1152.27(f). If no agreement is reached, the Board will vacate its decision postponing the effective date of its abandonment authorization, exemption decision, or notice of exemption, id. § 1152.27(g)(2), (h)(7), allowing the railroad company to abandon the line.

To exercise its abandonment authority, a railroad company must "file a notice of consummation with the Board to signify that it has . . . fully abandoned the line" either within one year of "the service date of the decision permitting the abandonment (assuming that the railroad intends to consummate the abandonment)" or, if a "legal or regulatory barrier to consummation exists at the end of the 1-year time period, . . . not later than 60 days after the satisfaction, expiration or removal of the legal or regulatory barrier." Id. § 1152.29(e)(2). Upon

the filing of a notice of consummation, the Board is divested of jurisdiction over the abandoned railroad line and "state law reversionary property interests, if any, take effect."  Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004); see also 49 U.S.C. § 10904(g) ("Upon abandonment of a railroad line . . . , the obligation of the rail carrier abandoning the line to provide transportation on that line . . . is extinguished.").  In the absence of a timely filed notice of consummation, the railroad company's authority to abandon the line "automatically expire[s]."  49 C.F.R. § 1152.29(e)(2).

## B. Fifth Amendment Takings and the Trails Act

As described in more detail below, plaintiffs claim that the issuance of a NITU prevented them from obtaining fee simple ownership in the land underlying the railroad lines subject to the NITU and that, consequently, they are owed just compensation under the Fifth Amendment.  The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation.  U.S. Const. amend. V.  The United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction to entertain Fifth Amendment takings claims against the United States, 28 U.S.C. § 1491(a)(1) (2012); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004), such as claims premised upon the conversion of a railroad line into a recreational trail pursuant to the Trails Act, Preseault I, 494 U.S. at 12-13.

To establish a taking, a plaintiff must first "identif[y] a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking."  Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); accord Klamath Irrigation Dist. v. United States, 635 F.3d 505, 520 n.12 (Fed. Cir. 2011) ("It is plaintiffs' burden to establish cognizable property interests for purposes of their takings . . . claims.").  To demonstrate a cognizable property interest in a Trails Act case, a plaintiff must establish ownership in land adjacent to the railroad line described in the NITU and that ownership in that land can be traced to the railroad company's acquisition.  Brooks v. United States, 138 Fed. Cl. 371, 377 (2018).  A plaintiff must also establish that the railroad company acquired an easement for railroad purposes that continued to exist at the time of the alleged taking.  Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009); Preseault v. United States ("Preseault II"), 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc).  With respect to this latter requirement, a court considers:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged

taking so that the property owners at that time held fee simples unencumbered by the easements.[2]

<u>Preseault II</u>, 100 F.3d at 1533 (footnote added); <u>accord</u> <u>Ellamae Phillips Co.</u>, 564 F.3d at 1373.

"[I]f the court concludes that a cognizable property interest exists, it then determines whether the government's action amounted to a compensable taking of that interest."  <u>Casitas Mun. Water Dist.</u>, 708 F.3d at 1348.  In Trails Act cases, a taking occurs when "government action destroys state-defined property rights," either "by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement," <u>Ladd v. United States</u>, 630 F.3d 1015, 1019 (Fed. Cir. 2010), or by compelling the continuation of a railroad-purposes easement to accommodate negotiations for a trail-use agreement, even if the negotiations are ultimately unsuccessful, <u>see</u> <u>id.</u> at 1025; <u>Caquelin v. United States</u> ("<u>Caquelin III</u>"), 959 F.3d 1360, 1364, 1367 (Fed. Cir. 2020).  It is well settled that the Board's issuance of a NITU, which forestalls the full abandonment of the railroad line, "is the government action that prevents the landowners from possession of their property unencumbered by the easement." <u>Ladd</u>, 630 F.3d at 1023; <u>accord</u> <u>Caquelin III</u>, 959 F.3d at 1367 ("The NITU . . . was a government action that compelled continuation of an easement for a time; it did so intentionally and with specific identification of the land at issue; and it did so solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer, indeed indefinitely, by an actual trail conversion."); <u>Barclay v. United States</u>, 443 F.3d 1368, 1374 (Fed. Cir. 2006) ("The barrier to reversion is the NITU, not physical ouster from possession."); <u>Caldwell</u>, 391 F.3d at 1233-34 ("The issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way."); <u>cf.</u> <u>Marvin M. Brandt Revocable Tr. v. United States</u>, 572 U.S. 93, 104-05 (2014) (explaining that an easement is terminated when it is abandoned, leaving the owner of the servient estate with an "unencumbered interest in the land").

## C.  Procedural History

On February 18, 2014, Jeffrey Memmer filed a complaint seeking just compensation under the Fifth Amendment for himself and as representative of a class of similarly situated individuals.  In a subsequently filed amended complaint, Mr. Memmer was joined by additional plaintiffs:  Gilbert Effinger; Larry and Susan Goebel ("the Goebels"); Owen Halpeny; Matthew Hostettler; Joseph Jenkins; Michael and Rita Martin ("the Martins"); McDonald Family Farms of Evansville, Inc. ("McDonald Family Farms"); Reibel Farms, Inc.; and James and Robin Schmidt

---

[2]  The "alleged taking" in <u>Preseault II</u> was not a CITU or NITU, but was instead the conversion of the railroad-purposes easements to trails, because the agreement to allow the easements to be used as trails predated the Interstate Commerce Commission's order allowing the discontinuation of railroad service.  100 F.3d at 1549-52; <u>see also</u> <u>id.</u> at 1552 ("Whether, at the time a railroad applies to abandon its use of an easement limited to railroad purposes, a taking occurs under an [Interstate Commerce Commission] order to 'railbank' the easement for possible future railroad use, and allowing in the interim for use of the easement for trail purposes, is a question not now before us.  We offer no opinion at this time on that question.").

("the Schmidts").  In support of their claim for just compensation, plaintiffs allege that they own their property in fee simple; that prior to the Board's issuance of the NITU, Indiana Southwestern Railway Company ("Indiana Southwestern") owned an easement across each of their properties; that their properties would no longer be burdened by that easement if the easement was abandoned or authorized for use beyond its scope; and that but for the issuance of the NITU, they "would have the exclusive right to physical ownership, possession, and use of their property free of any easement for recreational trail use or future railroad use."[3]  In its answer to the amended complaint, defendant admits only one allegation:  the existence of the NITU.  Defendant also asserts five affirmative defenses:  (1) plaintiffs fail to state a claim upon which relief can be granted; (2) plaintiffs without an interest in the property allegedly taken lack standing; (3) plaintiffs who have had their interest in the subject property adjudicated in another action are estopped from adjudicating those interests in this case; (4) the claims of plaintiffs who have received compensation for their interest in the subject property are "extinguished by accord and satisfaction, payment, and/or release"; and (5) the claims that have been waived are barred.

After engaging in discovery regarding liability, the parties filed cross-motions for partial summary judgment.  The parties generally contested two issues in those motions:  (1) whether Indiana Southwestern's predecessors in interest acquired easements to construct and operate their railroads and (2) whether the issuance of the NITU could effect a taking under the circumstances presented in the case (in other words, when a trail-use agreement is not executed, the NITU expires on its own terms, and the railroad company fails to consummate the abandonment of its line).  The court rendered its liability decision in a July 10, 2015 Opinion and Order.  See generally Memmer v. United States, 122 Fed. Cl. 350 (2015).

First, after acknowledging the undisputed facts that the plaintiffs owned property adjacent to Indiana Southwestern's railroad lines and that Indiana Southwestern's predecessors acquired a portion of those lines—adjacent to property owned by Reibel Farms, Inc.—via a prescriptive easement, id. at 354 & n.1, the court analyzed sixteen deeds through which Indiana Southwestern's predecessors acquired the other relevant portions of the lines and determined that three of those deeds conveyed fee simple estates, id. at 358-64.  Consequently, it dismissed the claims that derived from those deeds:  Mr. Hostettler's claim, part of the claim of Reibel Farms, Inc., and part of the Martins' claim.  Id. at 361-62, 364.  Then, with respect to the claims derived from the thirteen deeds that conveyed an easement and the claim derived from the acquisition of a prescriptive easement, the court concluded that the scope of those easements did not encompass recreational trail use.  Id. at 364.  Finally, the court determined that binding precedent, including the Federal Circuit's decision in Ladd, compelled the conclusions that the issuance of the NITU effected a taking and that "the taking is temporary, spanning from May 23, 2011, the effective date of the NITU, to November 8, 2013, the date the NITU expired."  Id. at 365-66.

After the court issued its liability decision, the parties engaged in discovery on the issue of damages and ultimately reached a settlement of the amount due for the claims that survived summary judgment.  On April 11, 2017, the court, "[p]ursuant to [its] Opinion and Order, filed July 10, 2015, and Order, filed April 10, 2017, granting the parties' request to enter judgment in

---

[3]  The amended complaint does not contain class allegations.

accordance with the Stipulation, filed April 7, 2017," entered judgment pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims ("RCFC").[4]

On June 9, 2017, defendant filed a notice of appeal indicating that it was appealing from the court's summary judgment decision and the RCFC 54(b) judgment. Plaintiffs similarly cross-appealed the summary judgment decision and RCFC 54(b) judgment on June 21, 2017. In the docketing statement it filed with the Federal Circuit, defendant provided a "[b]rief statement of the issues to be raised on appeal": "Whether the United States is liable for a taking of plaintiffs' property where no trail use agreement was reached and the railroad ultimately elected not to abandon its line." Docketing Statement of Appellant 2, Memmer v. United States, No. 17-2150 (Fed. Cir. July 13, 2017). In their docketing statement, plaintiffs identified the following issue for appeal: "Whether the lower court correctly ruled that the railroad owned fee simple in certain segments of the railroad corridor." Docketing Statement of Cross-Appellant 2, Memmer v. United States, No. 17-2150 (Fed. Cir. July 13, 2017).

On the same day that plaintiffs filed their cross-appeal, the Federal Circuit issued its decision in Caquelin I. In that case, several months after the NITU expired on its own terms without the execution of a trail-use agreement, the railroad company consummated the abandonment of its line. Caquelin I, 687 F. App'x at 1018. On appeal, the government advanced an argument in tension with the Federal Circuit's controlling precedent: that the "blocking of [the state law] reversion" that occurred for the 180 days between the issuance of the NITU and the expiration of the NITU "was not a categorical taking but instead calls for a multi-factor takings analysis." Id. at 1019; see also id. (remarking that the government invoked the regulatory takings framework set forth in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978), and the temporary takings analysis set forth in Arkansas Game & Fish Commission v. United States, 568 U.S. 23, 38-40 (2012)). Although it recognized that its controlling precedent dictated the result reached by the trial court, the Federal Circuit vacated the trial court's judgment and remanded the case to the trial court to create "a fully developed record applying the multi-factor analysis the government urges" to enable the Federal Circuit to have "a concrete basis for comparison of the competing legal standards as applied." Id. at 1020. Specifically, the Federal Circuit instructed the Caquelin trial court:

> On remand, the Court of Federal Claims should conduct such proceedings—pre-trial, trial, and post-trial—as are necessary for an adjudication of how the government-advanced multi-factor analysis applies in this case, on the assumption that such an analysis is the governing standard. An opinion containing findings of fact and conclusions of law under such a standard—and also discussing what facts invoke which of the Supreme Court's standards—would sharpen the focus of appellate consideration of the issues raised by the government in this case.

Id.

---

[4]  The only outstanding issue was the payment of costs pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which was deferred until any appeals were resolved.

Because the issue on appeal in <u>Caquelin I</u> was also present in this case, the parties, before filing their opening appellate briefs, jointly moved the Federal Circuit to vacate this court's judgment and remand the case for proceedings "consistent with" the ruling in <u>Caquelin I</u>. Corrected Joint Mot. to Vacate and Remand to the Ct. of Federal Claims 1, <u>Memmer v. United States</u>, Nos. 17-2150, 17-2230 (Fed. Cir. Oct. 12, 2017).  Specifically, they asserted:

> [P]rinciples of judicial economy are best served by vacating the Court of Federal Claims' decision in this case and remanding for further proceedings like those ordered by this Court in <u>Caquelin</u>.  Such a remand would allow development of a record that would further prime the case for this Court's review.

<u>Id.</u> at 5.  The Federal Circuit granted the joint motion.  In its order, it noted that in <u>Caquelin I</u>, "the Court of Federal Claims was asked to create a record applying the multi-factor analysis the government urged, so that this court could have a basis for comparison of the competing legal standards."  <u>Memmer v. United States</u>, Nos. 17-2150, 17-2230, 2017 WL 6345843, at *1 (Fed. Cir. Nov. 16, 2017).  It therefore ordered that "[t]he Claims Court's judgment is vacated and this case is remanded for further proceedings consistent with this order."[5]  <u>Id.</u>

On remand, the parties engaged in additional discovery related to the multifactor analysis and then filed pretrial briefs.  The court conducted a pretrial conference in Washington, DC on November 27, 2018.  It then held a trial from April 29 to May 2, 2019, in Evansville, Indiana, and on May 7, 2019, in Peoria, Illinois.  The parties filed posttrial briefs, after which the court heard closing arguments on October 28, 2020.

The remainder of this opinion sets forth the court's findings of fact and conclusions of law, as required by RCFC 52(a)(1),[6] with respect to both liability and damages.[7]

---

[5]  On May 29, 2020, the Federal Circuit issued its decision in <u>Caquelin III</u>, rejecting the multifactor analysis urged by the government and affirming the trial court's conclusion that the standard set forth in <u>Ladd</u> "remains governing precedent."  959 F.3d at 1366-70.  Nevertheless, because the Federal Circuit's mandate requires the court to engage in a multifactor analysis, it will do so.

[6]  The court derives the facts from the parties' Joint Stipulations of Fact for Trial ("Jt. Stip."), the transcript of testimony elicited during trial ("Tr."), and the exhibits admitted into evidence as part of the trial record ("PX," "DX," or "JX").  Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness.

[7]  As reflected in the procedural history, this case is back before the court after the Federal Circuit granted the parties' joint motion to (1) vacate the court's summary judgment decision and RCFC 54(b) judgment and (2) remand the case for proceedings similar to those ordered in <u>Caquelin I</u>.  As a consequence of the Federal Circuit's vacatur, during trial, plaintiffs were required to establish all elements of a taking—possession of cognizable property interests, that the government's action constituted a compensable taking, and the amount of damages— after which the burden of persuasion shifted to defendant to rebut plaintiffs' evidence.  <u>See, e.g.</u>, <u>Falcon v. Gen. Tel. Co.</u>, 815 F.2d 317, 320 (5th Cir. 1987) ("When the Supreme Court vacated [the trial court's] decision, it swept away all that was tied to that judgment.");  <u>In re Joy Glob.</u>,

Case 1:14-cv-00135-MMS   Document 186   Filed 11/02/20   Page 11 of 64

# II.  LIABILITY:  PROPERTY INTEREST

The court begins its analysis, as it must, by determining whether plaintiffs have cognizable property interests that were the subject of the alleged taking.  Casitas Mun. Water Dist., 708 F.3d at 1348.

## A.  Legal Standards

In general, state law governs the determination of the property interest acquired by a railroad company.  See Preseault II, 100 F.3d at 1534 ("The question of what estates in property were created by these turn-of-the-century transfers to the Railroad requires a close examination of the conveying instruments, read in light of the common law and statutes of [the state] then in effect.").  Moreover, the acquisition of property rights is governed by the law in effect at the time the rights were acquired.  See id.; Hash v. United States, 403 F.3d 1308, 1315 (Fed. Cir. 2005); accord Clark v. CSX Transp., 737 N.E.2d 752, 758 (Ind. Ct. App. 2000) (remarking that, "in construing a deed," courts in Indiana "consider[] the instrument relative to the statutes in effect at the time of the conveyance").

---

Inc., 381 B.R. 603, 612 (D. Del. 2007) (holding that when a grant of summary judgment had been vacated, "the situation is as if there were no prior proceedings" on summary judgment); see also Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1332 (Fed. Cir. 2003) (holding that when a judgment is vacated, the "vacated judgment 'has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case,'" and therefore the tribunal whose judgment was vacated is "free to come to different factual conclusions the second time around without revisiting its decision in the earlier vacated decision" (quoting U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 598 (Fed. Cir. 1995)); Exxon Corp. v. United States, 931 F.2d 874, 877 (Fed. Cir. 1991) ("Law of the case . . . merely requires a trial court to follow the rulings of an appellate court.  It does not constrain the trial court with respect to issues not actually considered by an appellate court, and thus has long been held not to require the trial court to adhere to its own previous rulings if they have not been adopted, explicitly or implicitly, by the appellate court's judgment." (footnote and citation omitted)); McGowan v. Sec'y of HHS, 31 Fed. Cl. 734, 737 (1994) ("The law of the case doctrine does not affect the power of a court to reconsider its interlocutory decisions.  The court may change any interlocutory decision up until the entry of final [judgment]." (citing Jamesbury Corp. v. Litton Indus. Prods., Inc., 839 F.2d 1544, 1551 (Fed. Cir. 1988), overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020 (Fed. Cir. 1992) (en banc))).  This is not to say that the court would reach different conclusions on the title issues that were in dispute during the summary judgment stage and to which the parties did not stipulate for purposes of trial, namely, the interpretation of the deeds through which Indiana Southwestern's predecessors acquired their property interests in the railroad lines.  But absent that analysis, there would be no grounds to consider whether the Board's issuance of the NITU constituted a taking and the amount of damages to which plaintiffs might be entitled.

-11-

## 1. Deed Construction

At the time the deeds were executed, Indiana law provided:

> Any conveyance of lands worded in substance as follows:  "A.B. conveys and warrants to C.D." [here describe the premises] "for the sum of" [here insert the consideration] the said conveyance being dated and duly signed, sealed and acknowledged by the grantor, shall be deemed and held to be a conveyance in fee simple to the grantee, his heirs and assigns . . . .

Ind. Rev. Stat. ch. 23, § 12 (1852) (recodified at Ind. Rev. Stat. ch. 18, § 2927 (1881)).  Further, "if it be the intention of the grantor to convey any lesser estate, it shall be so expressed in the deed."  Id. § 14 (recodified at Ind. Rev. Stat. ch. 18, § 2929 (1881)).  Of course, not all deeds conform to the statutory language.  With respect to such deeds:

> There are several rules of construction to be used when construing the meaning of a particular deed.  The object of deed construction is to ascertain the intent of the parties.  In so doing, a deed is to be regarded in its entirety and the parts are to be construed together so that no part is rejected.  Where there is no ambiguity in the deed, the intention of the parties must be determined from the language of the deed alone.  . . .

> A deed that conveys a right generally conveys only an easement.  The general rule is that a conveyance to a railroad of a strip, piece, or parcel of land, without additional language as to the use or purpose to which the land is to be put or in other ways limiting the estate conveyed, is to be construed as passing an estate in fee, but reference to a right-of-way in such a conveyance generally leads to its construction as conveying only an easement.

Brown v. Penn Cent. Corp., 510 N.E.2d 641, 643-44 (Ind. 1987) (citations omitted); accord Ross, Inc. v. Legler, 199 N.E.2d 346, 348 (Ind. 1964) ("A deed, when the interest conveyed is defined or described as a 'right of way,' conveys only an easement in which title reverts to the grantor, his heirs or assigns upon the abandonment of such right-of-way."); Richard S. Brunt Tr. v. Plantz, 458 N.E.2d 251, 256 (Ind. Ct. App. 1983) (considering a deed in which the grantors "convey[ed] and quit claim[ed] . . . , for railroad purposes, the following real estate," and holding that "[r]eference to the intended use of the land indicate[d] that an easement was conveyed" because "the grantors would have no reason to specify the use if conveying a fee simple").  But see Poznic v. Porter Cnty. Dev. Corp., 779 N.E.2d 1185, 1190-92 (Ind. Ct. App. 2002) (holding that a deed that conveyed to the railroad company "[f]orever, a strip of land for railroad purposes" conveyed a fee simple and, in so holding, declined to treat the phrase "for railroad purposes" as limiting language, noted that the deed did not include a statement indicating that the deed would be void if the strip of land was not used for railroad purposes, and remarked that the deed did not include the term "right-of-way").

"Deeds generally contain three important clauses:  the granting clause, the habendum clause, and the descriptive clause."[8]  Clark, 737 N.E.2d at 758.  Reference to a "right-of-way" may appear in any of them.  See, e.g., Ross, Inc., 199 N.E.2d at 349 (rejecting, as "an overrefinement of the rules of construction," the contention that use of the term "right-of-way" in the descriptive clause of a deed is meaningless when the term is not included in the deed's granting clause or habendum clause, and holding that "[t]he description clause of a deed may be employed to describe the quality as well as the dimensions and quantity of the estate conveyed"); CSX Transp., Inc. v. Rabold, 691 N.E.2d 1275, 1278 (Ind. Ct. App. 1998) (holding that when the term "right-of-way" is used in the descriptive clause "in reference to the subject matter of the deed," and the deed does not contain the term "fee simple," the deed conveys an easement); see also Prior v. Quackenbush, 29 Ind. 475, 478 (1868) ("The office of the habendum is properly to determine what estate or interest is granted by the deed, though this may be performed, and sometimes is performed, by the premises, in which case the habendum may lessen, enlarge, explain, or qualify, but not totally contradict or be repugnant to the estate granted in the premises." (internal quotation marks omitted)); Claridge v. Phelps, 11 N.E.2d 503, 504 (Ind. App. 1937) ("[W]hen the granting clause of a deed is general or indefinite respecting the estate in the lands conveyed, it may be defined, qualified, and controlled by the habendum.").  But see Clark, 737 N.E.2d at 758 (remarking that when the term "right-of-way" appears "outside of the granting clause, the term is of limited value because it has two meanings[:] 1) a right to cross over the land of another, an easement, and 2) the strip of land upon which a railroad is constructed").  Indeed, even if the granting clause "favors the construction of the deed as conveying a fee simple absolute to the railroad company, such language is just a factor in determining whether the parties intended to grant a fee or an easement"; courts will also examine "other parts of the deed to see if the grantor expressed an intention to convey a lesser estate than fee simple."  Tazian v. Cline, 686 N.E.2d 95, 98 (Ind. 1997).

In addition to language expressly defining or describing the interest conveyed, evidence of the parties' intent to convey an easement may appear in the title of the deed.  See Clark, 737 N.E.2d at 758 (remarking that although "the cover and title of the instrument" are not considered "where the granting language is clear and unambiguous[,] . . . the title may provide additional evidence of intent where the language of the deed is unclear").  Such evidence may also include the amount or type of consideration described in the deed.  See Tazian, 686 N.E.2d at 99 ("When attempting to ascertain the intent of the parties to a conveyance to a railroad, appellate courts of this state look at the consideration paid to the grantee railroad."); Richard S. Brunt Tr., 458 N.E.2d at 255 ("[W]here the consideration is nominal or where the only consideration is the benefit to be derived by the grantor from the construction of the railroad rather than the full market value for the interest acquired reflects the intent to create an easement.").  However, neither the title of the deed nor the consideration described therein conclusively establishes the conveyance of an easement.  See Clark, 737 N.E.2d at 758 ("[T]he title . . . is not dispositive of the nature of the conveyance."), 759 ("[L]ack of consideration or nominal consideration alone is

---

[8]  The granting clause contains "[t]he words that transfer an interest in a deed or other instrument," Granting Clause, Black's Law Dictionary 845 (11th ed. 2019); the habendum clause is the part of a deed or other instrument "that defines the extent of the interest being granted and any conditions affecting the grant," Habendum Clause, id. at 854; and the descriptive clause contains "the dimensions and quantity of the estate conveyed," Ross, Inc., 199 N.E.2d at 349.

not sufficient cause for setting aside a deed. . . .  [N]ominal monetary consideration, alone, does not make the instrument ambiguous, nor does it create an easement."); Richard S. Brunt Tr., 458 N.E.2d at 255 ("Although such consideration is not by itself persuasive that the parties intended to convey an easement, it is just one more factor held to indicate an easement    . . . .").

Ultimately, in construing deeds purporting to convey property interests to a railroad company, courts must be cognizant that:

> Public policy does not favor the conveyance of strips of land by simple titles to railroad companies for right-of-way purposes, either by deed or condemnation. This policy is based upon the fact that the alienation of such strips or belts of land from and across the primary or parent bodies of the land from which they are severed, is obviously not necessary to the purpose for which such conveyances are made after abandonment of the intended uses as expressed in the conveyance, and that thereafter such severance generally operates adversely to the normal and best use of all the property involved.  Therefore, where there is ambiguity as to the character of the interest or title conveyed such ambiguity will generally be construed in favor of the original grantors, their heirs and assigns.

Ross, Inc., 199 N.E.2d at 348; see also Penn Cent. Corp. v. U.S. R.R. Vest Corp., 955 F.3d 1158, 1160 (7th Cir. 1992) ("The presumption is that a deed to a railroad . . . conveys a right of way, that is, an easement, terminable when the acquirer's use terminates, rather than a fee simple.").

## 2.  Scope of Easements

If the court concludes that Indiana Southwestern's predecessors acquired easements to construct and operate their railroads, it must then ascertain whether the scope of those easements includes their use for recreational trails.  "[S]tate law controls the basic issue of whether trail use is beyond the scope of the right-of-way."  Barclay, 443 F.3d at 1374 n.4 (citing Toews v. United States, 376 F.3d 1371, 1376-77 (Fed. Cir. 2004)).  The Indiana Supreme Court has held that recreational trails are not within the scope of easements created for railroad purposes.  Howard v. United States, 964 N.E.2d 779, 784 (Ind. 2012).  Furthermore, under Indiana law, when a railroad company acquires a right-of-way through adverse possession, it obtains a prescriptive easement for railroad purposes.  See Hoffman v. Zollman, 97 N.E. 1015, 1017 (Ind. App. 1912) ("A prescriptive right, where there is no color of title, cannot be broader than the claims which the user evidences.  Ordinarily there is no user by a railroad company beyond a user for the purposes of a right of way."); accord Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 734-35 (2011) ("[U]nder Indiana law when a railroad acquires property by prescription or by condemnation, a railroad generally obtains an easement for railroad purposes.").

## B.  Findings of Fact

The following facts are relevant to determining whether plaintiffs have cognizable property interests that were the subject of the alleged taking.

The interconnecting railroad lines at issue in this case are located in Posey and Vanderburgh Counties, Indiana, situated (1) between milepost 227.5 at Poseyville, Indiana and milepost 240.2 near German Township, Indiana and (2) between milepost 277.5 at Cynthiana, Indiana and milepost 282.0 at Poseyville, Indiana.  JX 1 at 3-4.  The railroad was constructed by predecessors of the current owner of the lines, Indiana Southwestern,[9] Jt. Stip. ¶¶ 1-4, which is a subsidiary of Pioneer Railcorp, id. ¶ 4.

Indiana Southwestern's predecessors acquired the segments of the railroad lines relevant in this case by one of two means.  First, they acquired a 4.42-acre segment through adverse possession; Reibel Farms, Inc. owns a parcel of land adjacent to this segment.  JX 61; JX 62 at 11; JX 63 at 2; see also Jt. Stip. ¶ 26 (indicating that the parcel owned by Reibel Farms, Inc. is adjacent to the railroad lines).  Second, they acquired the remaining segments by deed.  JX 63 at 2.  All of the plaintiffs own parcels adjacent to these segments.  Id.  The deeds, all dated between 1880 and 1882, JX 39 to JX 54, can either be grouped into one of two categories or assessed individually.[10]

The first seven deeds ("Type A deeds") contain language that is substantially similar to the following:

Right of Way Deed

Know all men by these Presents that [grantor(s)] for and in consideration of the construction of the [railroad] and for the further consideration of [amount], do grant, warrant and convey to the said [predecessor railroad company] its successors and assigns a strip of land [number] feet in width, being a strip [number] feet wide on each side of the center line of said Railway as it now is located through his land . . . described as follows to wit:  [Description of land].  It being distinctly understood that this grant is for the purpose of construction, maintenance and operation of said Railway.

JX 39; accord JX 40 to JX 44; JX 45 (containing similar language, but with the last sentence instead providing:  "It being distinctly understood that the above described Real Estate is to be used exclusively for Railroad purposes.").  The amounts of consideration set forth in these deeds and the approximate land area conveyed are as follows:

---

[9]  The railroad lines were constructed by Evansville and Peoria Railroad, which subsequently became the Peoria, Decatur & Evansville Railway.  Jt. Stip. ¶ 1.  The Peoria, Decatur & Evansville Railway became part of the Illinois Central Railroad in 1900.  Id. ¶ 2.  Thereafter, the lines were operated by a series of railroad companies.  Id. ¶ 3.  In March 2000, Indiana Southwestern acquired the lines from Evansville Terminal Company, Inc. and AB Rail Investments, Inc.  Id. ¶¶ 3-4.

[10]  For convenience, the court uses certain category and deed names suggested by plaintiffs in their motion for partial summary judgment.

| Grantor(s) | Amount | Area |
|---|---|---|
| Wm. Marquis | $100.00 | 2.75 acres |
| N. Marquis et al. | $100.24 | Unspecified portion of 3.5 acres |
| A.H. Fretageot et al. | $20.05 | Unspecified portion of 3.5 acres |
| Jane Owens et al. | $60.14 | Unspecified portion of 3.5 acres |
| Moses Endecott | $1000.00 | 8.24 acres |
| L. Williams et al. | $1.00 | 1.44 acres |
| Leroy Williams & wife | $250.00 | 0.97 acres |

JX 62 at 6, 8-9, 12.  Mr. Halpeny, Mr. Memmer, and Mr. Jenkins own parcels adjacent to the land conveyed by the Type A deeds.  JX 39 to JX 45; JX 63 at 2; see also Jt. Stip. ¶¶ 19, 22-23 (indicating that the parcels owned by these plaintiffs are adjacent to the railroad lines).

The next six deeds ("Type A-1 deeds") contain language that is substantially similar to the following:

Know all men by these Presents that [grantor(s)] for and in consideration of the construction of the [railroad] and for the further consideration of [amount], do grant, warrant and convey to the said [predecessor railroad company], its successors and assigns, a strip of Land [number] feet in width, being a Strip [number] feet wide on each side of the center line of said Railway as it now is Located through his Land . . . , described a follows, to wit:

[Description of land].

It being distinctly understood that this grant is for the purpose of construction, maintenance and operation of said Railway.

JX 46; accord JX 47 to JX 51.  The amounts of consideration set forth in these deeds and the approximate land area conveyed are as follows:

| Grantor(s) | Amount | Area |
|---|---|---|
| H. Hillenbrand and wife | $400.00 | 4.45 acres |
| H. Goebel and wife | $75.00 | 2.04 acres |
| S. McDonald et al. | $100.00 | 1.92 acres |
| A.N. Martin and wife | $700.00 | 6.04 acres |
| H.L. Graff and wife | $175.00 | 3.07 acres |
| A.R. Grimm | $257.50 | 5.16 acres |

JX 62 at 1-5.  The Goebels, McDonald Family Farms, the Martins, Mr. Effinger, and the Schmidts own parcels adjacent to the land conveyed by the Type A-1 deeds.  JX 46 to JX 51; JX 63 at 2; see also Jt. Stip. ¶¶ 20-21, 25, 27 (indicating that the parcels owned by the Goebels, McDonald Family Farms, Mr. Effinger, and the Schmidts are adjacent to the railroad lines); id. ¶ 24 (indicating that two of the parcels owned by the Martins are adjacent to the railroad lines).

Finally, there are three deeds that do not belong to a group.  The first such deed ("the Smith deed") provides:

### Right of Way Deed

Know all men by these presents, that Elizabeth Smith for and in consideration of the Benefits to be derived from the construction of the [railroad] and for the further consideration of one hundred Dollars . . . do grant, warrant and Convey to the said [predecessor railroad company] its successors and assigns a Strip of land sixty six feet in width being a Strip thirty three feet wide on Each Side of the center line of said Rail Road as it now is located through her land . . . described as follows to wit:  [Description of land] it is hereby understood that Said Rail Road Company shall make one good farm crossing for the use and benefit of Said Elizabeth Smith said crossing to be made at a point to be designated by the Said Elizabeth Smith.

JX 52.  With this deed, Ms. Smith conveyed approximately 1.22 acres, JX 62 at 11, and this acreage is adjacent to a parcel owned by Mr. Hostettler, JX 52; JX 63 at 2.

The second individual deed ("the Davis deed") provides:

### Right of Way Deed

Know all men by these Presents, That Joseph Davis and Mary C. Davis . . . for and [in] consideration of the benefits to be derived from the construction of the [railroad], and for the further consideration of One Hundred and Seventy-five Dollars . . . do grant, warrant and convey to the said [predecessor railroad company], its successors and assigns, a strip of Land sixty-six feet in width, being a strip thirty-three feet wide, in each side of the center line of said Railroad as it now is located through his land . . . , described as follows to wit:  [Description of land] and it is hereby understood that the said Joseph Davis shall have the right to a water canal along said line on the south side of said R.R. on said strip of land [and] that said Joseph Davis reserves the timber on said right of way and that said R.R. Co. shall make one good crossing for the use and benefit of said Davis wherever he may designate.

JX 53.  With this deed, the Davises conveyed approximately 2.4 acres, JX 62 at 11, and this acreage is adjacent to a parcel owned by Reibel Farms, Inc., JX 53; JX 63 at 2.

The third individual deed ("the side track deed") provides:

This Indenture Witnesseth That Abner N. Martin and Cynthia Martin . . . Convey and Warrant to [predecessor railroad company] for the sum of One Dollar the following Real Estate . . . to wit:

Commencing at a point on the West boundary of their right of way of the E.D.&E [sic] Road where said Railway crosses the Base Line on the South side of the South East quarter of Section (31) . . . , thence running in a North Westerly direction along the right of way of said [railroad] 900 feet, thence West 50 feet[,] thence South Easterly 900 feet, thence 50 feet to place of beginning.  The same to be theirs and their own as long as said Side track and Depot are in use any failure or removal will make this Deed none and void.

JX 54.  With this deed, the grantors conveyed either 1.03 acres, id., or 0.65 acres, JX 62 at 4-5, and this acreage is adjacent to a parcel owned by the Martins, JX 54; JX 63 at 2.  As of March 1993, no side track or depot existed on or near the acreage.  JX 64.

### C.  Conclusions of Law

#### 1.  Property Interests Acquired by Indiana Southwestern's Predecessors

As noted above, plaintiffs have established that they own land adjacent to the railroad lines and that their property interests trace back to the land acquired by Indiana Southwestern's predecessors for the construction of a railroad.  Thus, the court turns to the first factor described in Preseault II and Ellamae Phillips Co.:  whether Indiana Southwestern's predecessors acquired easements or fee simple estates.

Determining the property interest acquired by Indiana Southwestern's predecessors through adverse possession is straightforward:  As previously noted, such an acquisition results in a prescriptive easement for railroad purposes.  However, ascertaining the nature of the property interests conveyed by the sixteen deeds at issue requires a more searching analysis.

#### a.  The Type A Deeds

The seven Type A deeds share the following characteristics:  (1) they bear the title "Right of Way Deed"; (2) they "grant, warrant and convey . . . a strip of land"; and (3) they indicate either that the "grant is for the purpose of construction, maintenance and operation" of a railroad or that the "Real Estate is to be used exclusively for Railroad purposes."  The granting clauses in the deeds conveyed strips of land to Indiana Southwestern's predecessors for varying amounts of consideration.  If the deeds contained nothing more than the granting clauses, then they would have conveyed fee simple interests in the strips of land.  See Ind. Rev. Stat. ch. 23, § 12 (1852).  However, the deeds also included habendum clauses indicating that the strips of land were to be used for railroad purposes.  The habendum clauses qualify, without contradicting, the estates conveyed in the granting clauses.  See Prior, 29 Ind. at 478; Claridge, 11 N.E.2d at 504.  Indeed, had the parties intended to convey fee simple interests in the strips of land, they would have had no reason to specify the use of the land in the habendum clauses.  See Richard S. Brunt Tr., 458 N.E.2d at 256.  Because deeds should be construed so that no part is superfluous, Brown, 510 N.E.2d at 643, the court concludes that the parties intended to convey easements, and not fee simple interests, in the strips of land.  This conclusion is buttressed by the fact that these deeds

-18-

were recorded with the title "Right of Way Deed."[11]  See Clark, 737 N.E.2d at 758.  Moreover, to the extent that the "railroad purposes" language in the habendum clause renders the deed ambiguous, public policy favors construing the deeds as conveying easements.  See Ross, Inc., 199 N.E.2d at 348.

The Indiana Supreme Court's decision in Tazian does not compel a different result.  In Tazian, the deed's granting clause provided:  "[The grantors] do grant and convey and warrant . . . a strip of land . . . ."  686 N.E.2d at 96.  The habendum clause provided that the railroad company was "to have and to hold all and singular the said premises in and by these presents released and conveyed unto the [railroad company] forever for the uses and purposes therein expressed."  Id.  As the Indiana Supreme Court explained, the phrase "for the uses and purposes therein expressed" referred to the uses and purposes described in the granting clause, and the granting clause contained no limitation on the uses and purposes of the strip of land.  Id. at 101; accord id. ("[T]his deed does not describe the interest conveyed as a railroad right of way nor does the language limit the conveyance as for railroad purposes or railroad uses.").  In contrast, the habendum clauses in the seven Type A deeds specified the uses and purposes of the strips of land that were the subjects of the granting clauses.  The court in Tazian found further support for its conclusion that the deed conveyed a fee simple interest to the railroad company in the use of the word "forever" in the habendum clause.  Id.  The Type A deeds do not specify that the grants to Indiana Southwestern's predecessors were to be in perpetuity.  In sum, the decision in Tazian does not control the outcome in this case.  The Type A deeds conveyed easements.

### b.  The Type A-1 Deeds

The six Type A-1 deeds share the following characteristics:  (1) they "grant, warrant and convey . . . a strip of Land" and (2) they indicate that the "grant is for the purpose of construction, maintenance and operation" of a railroad.  But for the lack of titles identifying them as right-of-way deeds, the Type A-1 deeds are substantially the same as the Type A deeds previously described.  Consequently, the court concludes that the parties to the Type A-1 deeds intended to convey easements, and not fee simple interests, in the strips of land.

### c.  The Smith Deed

The Smith deed possesses the following characteristics:  (1) it is titled "Right of Way Deed"; (2) it reflects that the grantor did "grant, warrant and Convey . . . a Strip of land"; and (3) it does not indicate that the strip of land would be used for railroad purposes.  The body of the deed—the granting clause, the habendum clause, and the descriptive clause—does not include any language that describes the strip of land being conveyed as a right-of-way or limits

---

[11]  The monetary consideration paid by Indiana Southwestern's predecessors for the rights-of-way described in the Type A deeds (and, in fact, in all of the deeds at issue) ranged from $1 to $1000.  Although the payment of a nominal amount of consideration can suggest the conveyance of an easement, Tazian, 686 N.E.2d at 99; Richard S. Brunt Tr., 458 N.E.2d at 255, the court is unable to determine whether the consideration paid was nominal (aside from the two deeds indicating the payment of $1) because the record lacks any evidence regarding the value of land in southwestern Indiana in the late 1800s.

the use of the strip of land to railroad purposes.  In such circumstances, the deed conveys a fee simple estate.  See Brown, 510 N.E.2d at 644; accord Ind. Rev. Stat. ch. 23, §§ 12, 14 (1852).  The fact that the deed is titled "Right of Way Deed" does not alter the unambiguous nature of the conveyance.  See Clark, 737 N.E.2d at 758.  Nor can public policy override an unambiguous grant.  See Ross, Inc., 199 N.E.2d at 348.  In short, the Smith deed conveys a fee simple estate in the described strip of land.  And because Indiana Southwestern owns the strip of land in fee simple, the issuance of the NITU could not have disturbed the property rights of the adjacent property owner—Mr. Hostettler.  Defendant is therefore entitled to judgment in its favor with respect to Mr. Hostettler's claim.

### d.  The Davis Deed

The Davis deed possesses the following characteristics:  (1) it is titled "Right of Way Deed"; (2) it reflects that the grantors did "grant, warrant and Convey . . . a Strip of land"; (3) it indicates in the habendum clause that the grantors had "the right to a water canal along said line on the south side of said R.R. on said strip of land" and "reserve[d] the timber on said right of way"; and (4) it does not indicate that the strip of land would be used for railroad purposes.  In contrast to the Smith deed, the Davis deed refers to the strip of land as a right-of-way in the habendum clause.  The presence of the term "right-of-way" in the body of a deed can signal that the deed conveys an easement.  See id. at 348-49; Brown, 510 N.E.2d at 644; CSX Transp., Inc., 691 N.E.2d at 1278.  However, the term "right-of-way" has two meanings; it can refer to both the right to cross land and the land itself.  Clark, 737 N.E.2d at 758; CSX Transp., Inc., 691 N.E.2d at 1278.  In the Davis deed, the habendum clause indicates that the grantors reserved the right to a water canal on the south side of the railroad "on said strip of land," and the right to the timber "on said right of way."  Thus, a plain reading of the habendum clause reveals that "right of way" is being used as a synonym for "strip of land," and therefore refers to the land itself, and not the right to cross it.

Because the body of the deed does not include any language that describes the strip of land being conveyed as a right-of-way (in the easement sense of the phrase) or limits the use of the strip of land to railroad purposes, the deed conveys a fee simple estate.  See Brown, 510 N.E.2d at 644; accord Ind. Rev. Stat. ch. 23, §§ 12, 14 (1852).  As with the Smith deed, the fact that the Davis deed is titled "Right of Way Deed" does not alter the unambiguous nature of the conveyance.  See Clark, 737 N.E.2d at 758.  Nor can public policy override an unambiguous grant.  See Ross, Inc., 199 N.E.2d at 348.  In short, the Davis deed conveys a fee simple estate in the described strip of land.  And because Indiana Southwestern owns the strip of land in fee simple, the issuance of the NITU could not have disturbed the property rights of the adjacent property owner—Reibel Farms, Inc.  Defendant is therefore entitled to judgment in its favor with respect to the portion of the claim of Reibel Farms, Inc. that derives from the Davis deed.

### e.  The Side Track Deed

The side track deed reflects that (1) the grantors did "Convey and Warrant . . . Real Estate" to the railroad company, (2) the consideration paid by the railroad company was one dollar, (3) the real estate would remain with the railroad company "as long as said Side track and Depot are in use," and (4) "any failure or removal will make this Deed none and void."  Unlike

the easement-conveying deeds in <u>Macy Elevator, Inc.</u>, which provided that "[w]hen said land herein released Shall cease to be used for Rail Road purposes, it shall revert back to the original tract" and "Said land 66 feet wide to be held and enjoyed by Said RailRoad Company So long as it shall be used for a Rail Road & no longer," 97 Fed. Cl. at 716, the side track deed lacks any of the typical language suggesting that it conveys an easement rather than a fee simple; the term "right-of-way" is not used, there is no statement that the "Real Estate" being conveyed is to be used for "railroad purposes," and the existence of nominal consideration, on its own, does not create an easement. <u>See</u> <u>Brown</u>, 510 N.E.2d at 644; <u>Clark</u>, 737 N.E.2d at 759; <u>Richard S. Brunt Tr.</u>, 458 N.E.2d at 255. Rather, the form of the side track deed follows the contemporaneous statutory language deemed to convey a fee simple estate. <u>See</u> Ind. Rev. Stat. ch. 23, §§ 12, 14 (1852). Because the deed did not convey an easement to the railroad company, the current owners of the adjacent parcel—the Martins—could not have any property rights that would have been affected by the issuance of the NITU.

But even if the side track deed conveyed an easement to the railroad company, the Martins would not prevail because the deed included a contingency that (1) rendered the easement determinable and (2) would have led to the termination of the easement before the Board issued the NITU. A determinable easement, like a determinable fee, "terminate[s] upon the happening of the event upon which its existence is conditioned without any action by the grantor of the estate or his successors in interest." <u>Erie-Haven, Inc. v. First Church of Christ</u>, 292 N.E.2d 837, 841 (Ind. Ct. App. 1973); <u>see also</u> <u>Lindsay v. Wigal</u>, 250 N.E.2d 755, 756 (Ind. App. 1969) ("[T]he words[] 'as long as' create a determinable fee which reverts ipso facto on the happening of the stated event."). The evidence in the trial record reflects that at some point in time prior to March 1993, one of Indiana Southwestern's predecessors removed the side track and depot from or near the parcel conveyed by the side track deed. This removal terminated the interest held by the railroad company—whether it was an easement or fee simple estate—leaving Indiana Southwestern with no interest in the parcel at the time the Board issued the NITU.[12] Thus, the issuance of the NITU would have had no effect on the property rights of the adjacent property owners, such as the Martins. Defendant is therefore entitled to judgment in its favor with respect to the portion of the Martins' claim that derives from the side track deed.

## 2. Scope of the Easements Acquired by Indiana Southwestern's Predecessors

Having concluded that Indiana Southwestern's predecessors obtained easements through adverse possession and the Type A and Type A-1 deeds, the court proceeds to the next inquiry set forth in <u>Preseault II</u> and <u>Ellamae Phillips Co.</u>: what is the scope of those easements? Specifically, are the easements limited to use for railroad purposes, or are they broad enough to encompass use for recreational trails? All thirteen of the deeds reflect that the conveyances were for the purposes of constructing, maintaining, and operating a railroad, and under Indiana law,

---

[12]   Relatedly, the trial record lacks evidence that the Martins are the heirs of Abner N. Martin and Cynthia Martin, such that they would be the beneficiaries of the reversion. <u>See also</u> JX 26 (reflecting that the Martins purchased their parcels in October 2008 from Eugene W. Kuehn, Charlotte A. Kuehn, Jerry W. Schmidt, and Shirley A. Schmidt); Tr. 268-69 (Martin) (stating that the Martins purchased their parcels in a private sale from a mentee of Mr. Martin's father).

recreational trails are not within the scope of such easements.  Moreover, a railroad company obtains a railroad purposes easement when it acquires property to construct and operate its railroad by prescription.  Accordingly, the easements possessed by Indiana Southwestern at issue in this case are limited to use for railroad purposes.

### 3.  Existence of the Easements at the Time of the Alleged Taking

The final inquiry under Preseault II and Ellamae Phillips Co. is whether Indiana Southwestern's easements terminated before the alleged taking.  Plaintiffs contend that the taking occurred when the Board issued the NITU, and further contend that thereafter, Indiana Southwestern took actions that, under state law, constituted the abandonment of the railroad lines.  The trial record lacks any evidence that Indiana Southwestern or its predecessors abandoned the easements, or that the easements were otherwise terminated, prior to the issuance of the NITU.  Thus, the court concludes that at the time of the alleged taking, the parcels held in fee simple by adjacent landowners were encumbered by the easements.  Accordingly, those plaintiffs who own parcels adjacent to the easements conveyed by the Type A and Type A-1 deeds—Mr. Halpeny, Mr. Memmer, Mr. Jenkins, the Goebels, McDonald Family Farms, the Martins, Mr. Effinger, and the Schmidts—and obtained through adverse possession—Reibel Farms, Inc.—have cognizable Fifth Amendment property interests.[13]

## III.  LIABILITY:  FIFTH AMENDMENT TAKING

Having determined the existence of cognizable property interests at the time of the alleged taking, the next inquiry is whether those interests were, in fact, taken.  Casitas Mun. Water Dist., 708 F.3d at 1348.  In its vacated summary judgment decision, the court, relying on the Federal Circuit's decision in Ladd, treated the Board's issuance of the NITU as a categorical physical taking.  However, the Federal Circuit's remand order in this case and the Federal Circuit's decision in Caquelin III require the court to revisit its holding.

### A.  Legal Standards

The court must address two overarching issues to determine whether the government is liable for a taking in the circumstances presented in this case:  (1) the nature of the alleged taking and (2) whether the government's action—the NITU—caused a taking.  The resolution of the

---

[13]  By deed, Mr. Halpeny's parcel extends to the centerline of the adjacent railroad line, JX 20 (deed), and the parcel owned by McDonald Family Farms encompasses the entire relevant segment of the adjacent railroad line, JX 17 (deed); JX 19 (map).  The remaining named plaintiffs did not acquire the land underlying the adjacent railroad line when they acquired their parcels.  JX 11 (Memmer deed); JX 14 (Goebel deed); JX 23 (Reibel Farms, Inc. deed); JX 26 (Martin deed); JX 29 (Effinger deed); JX 32 (Jenkins deed); JX 34 (Jenkins map); JX 35 (Schmidt deed).  Under Indiana law, their parcels extend to the centerline of the adjacent railroad lines.  See Macy Elevator, Inc., 97 Fed. Cl. at 719-20 (noting that it is well settled in Indiana that when deeds do not include the railroad right-of-way, the adjoining fee owners own to the centerline of the right-of-way, subject to the easement).

first issue is dictated by the Federal Circuit's decisions in <u>Ladd</u> and <u>Caquelin III</u>, but must be addressed due to the Federal Circuit's mandate.

## 1.   Nature of a Taking

"When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." <u>Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency</u>, 535 U.S. 302, 322 (2002).  Takings in Trails Act cases constitute such categorical physical takings.  <u>See</u> <u>Caquelin III</u>, 959 F.3d at 1367-70; <u>Ladd</u>, 630 F.3d at 1025.  Depending on the circumstances, these takings can be permanent or temporary.  <u>Caquelin III</u>, 959 F.3d at 1367; <u>Ladd</u>, 630 F.3d at 1025; <u>Barclay</u>, 443 F.3d at 1378; <u>Caldwell</u>, 391 F.3d at 1234.

Another type of taking relevant to this case (due to the Federal Circuit's remand order) is temporary noncategorical physical takings.  In <u>Arkansas Game & Fish</u>, the United States Supreme Court ("Supreme Court") held that "government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection" and that "[w]hen regulation or temporary physical invasion by government interferes with private property," a number of factors are relevant to determining whether a "compensable taking" has occurred: (1) the duration of the interference; (2) "the degree to which the invasion is intended or is the foreseeable result of authorized government action," (3) "the character of the land at issue," (4) "the owner's 'reasonable investment-backed expectations' regarding the land's use," and (5) the "[s]everity of the interference . . . ."  568 U.S. at 38-39; <u>see also</u> <u>Ark. Game & Fish Comm'n v. United States</u>, 736 F.3d 1364, 1370 (Fed. Cir. 2013) ("[T]o determine whether a taking has occurred, a court must consider whether the injury was caused by authorized government action, whether the injury was the foreseeable result of that action, and whether the injury constituted a sufficiently severe invasion that interfered with the landowner's reasonable expectations as to the use of the land.").  Although the Federal Circuit held in <u>Caquelin III</u> that the multifactor test set forth in <u>Arkansas Game & Fish</u> did not apply to a Trails Act taking triggered by a NITU, the court must assume that it may apply in such a situation to execute the Federal Circuit's mandate.[14]

---

[14]  In <u>Caquelin</u>, the government argued in the alternative that in a Trails Act case in which the NITU expired without the execution of a trail-use agreement, the alleged taking should be analyzed as a noncategorical regulatory taking.  <u>Caquelin III</u>, 959 F.3d at 1362; <u>see also</u> <u>Penn Central</u>, 438 U.S. at 124 (identifying the relevant factors as "[t]he economic impact of the regulation on the claimant . . . , the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action").  However, as the Federal Circuit reaffirmed in <u>Caquelin III</u>, a taking under the Trails Act is a physical, not a regulatory, taking.  959 F.3d at 1368; <u>accord</u> <u>Ladd</u>, 630 F.3d at 1025.  Thus, although the Federal Circuit's remand instructions require the court to "create a record applying the multi-factor analysis the government urged" in <u>Caquelin</u>, the court, like the trial court in <u>Caquelin</u>, will limit its analysis to the factors described in <u>Arkansas Game & Fish</u>.  Indeed, there is no need to separately address the <u>Penn Central</u> factors since they are, in large part, incorporated into the <u>Arkansas Game & Fish</u> factors.  <u>See</u> <u>Caquelin v. United States</u> ("<u>Caquelin II</u>"), 140 Fed. Cl. 567,

## 2. Causation

In addition to determining the nature of the alleged taking, a court must ascertain whether the government action caused the injury alleged by the plaintiff. As noted above, a taking occurs in a Trails Act case when the government prevents the vesting of a state-law reversionary interest by converting a railroad-purposes easement into a recreational trail or by compelling the continuation of a railroad-purposes easement to accommodate negotiations for a trail-use agreement. Caquelin III, 959 F.3d at 1364, 1367; Ladd, 630 F.3d at 1019; Barclay, 443 F.3d at 1374; Caldwell, 391 F.3d at 1233. The NITU is the government action that prevents the reversionary interest from vesting. Caquelin III, 959 F.3d at 1367; Ladd, 630 F.3d at 1023; Barclay, 443 F.3d at 1374; Caldwell, 391 F.3d at 1233-34.

However, in Caquelin III, the Federal Circuit observed that a NITU is a necessary, but not a sufficient, requirement to establish a taking. It explained:

> It is a fundamental principle of takings law that a government action is not a taking of property if, even in the absence of the challenged government action, the plaintiff would not have possessed the allegedly taken property interest. St. Bernard Parish Gov't v. United States, 887 F.3d 1354, 1359-60, 1362 (Fed. Cir. 2018); see United States v. Archer, 241 U.S. 119, 132 (1916). That causation principle focuses on comparing the plaintiff's property interest in the presence of the challenged government action and the property interest the plaintiff would have had in its absence. See Preseault I, 494 U.S. at 24 (O'Connor, J., concurring) (endorsing the proposition, acknowledged by the government, that "the existence of a taking will rest upon the nature of the state-created property interest that [the landowners] would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest"). It reflects a causation principle hardly unique to takings law. See, e.g., Babb v. Wilkie, 140 S. Ct. 1168, 1178 (2020) (explaining general but-for rule governing damages and certain other result-altering relief).

Caquelin III, 959 F.3d at 1371. The Federal Circuit then applied this "causation principle" to the situation presented in the case before it—in which the railroad company fully abandoned its line by filing a notice of consummation after the NITU expired without the execution of a trail-use agreement:[15]

---

581-82 (2018), aff'd, 959 F.3d at 1360 (observing that two of the Arkansas Game & Fish factors are similar to or derived from the Penn Central factors); Def.'s Posttrial Br. 56-62 (merging, in the legal contentions, the "economic impact" factor of Penn Central and the "severity" factor of Arkansas Game & Fish).

[15]  The issuance of a NITU can result in three general outcomes. First, the railroad company and potential trail operator could reach a trail-use agreement, leading to the conversion of the railroad-purposes easement into a trail. See, e.g., Barclay, 443 F.3d at 1372; Caldwell, 391 F.3d at 1231-32, 1234 n.7. Second, the railroad company and potential trail operator could allow the NITU to expire without reaching a trail-use agreement and, thereafter, the railroad

> The challenged government action is the legally mandated maintenance of the easement through denying abandonment authority to the railroad.  It is undisputed that, without abandonment by the railroad, the easement would remain.  It follows that the NITU would not have altered the continuation of the easement during the NITU period—i.e.—would not have caused the only alleged taking of property—if the railroad would not have abandoned the rail line during that period even in the absence of the NITU.

Id.  It therefore held "that there is no taking until the time as of which, had there been no NITU, the railroad would have abandoned the rail line, causing termination of the easement that the NITU continued by law."[16]  Id. at 1372; see also id. at 1370 ("The precise timing [of abandonment] is immaterial to liability if abandonment would have occurred during the NITU period . . . .").

### 3. Abandonment Under Indiana Law

Plaintiffs, in addressing causation, argue that Indiana Southwestern abandoned the railroad lines under state law.  "Property law in Indiana provides that, upon abandonment by the railroad, a railroad easement terminates and the fee simple interest in the land reverts to the grantor, or the grantor's heirs, assigns or devisees."  Consol. Rail Corp. v. Lewellen, 682 N.E.2d 779, 782 (Ind. 1997).  By statute, "a right-of-way is considered abandoned if":

---

company exercises its abandonment authority and fully abandons the railroad line by filing a notice of consummation.  See, e.g., Caquelin III, 959 F.3d at 1362.  Third, as in this case, the railroad company and potential trail operator could allow the NITU to expire without reaching a trail-use agreement and, thereafter, the railroad company does not exercise its abandonment authority and fully abandon the line by filing a notice of consummation.

[16]  The Federal Circuit explained that its holding was consistent with its analyses and conclusions in Caldwell, Barclay, and Ladd.  Caquelin III, 959 F.3d at 1371-72 (observing that the holdings in all three prior cases "incorporate[d] the causation inquiry" it described).  Specifically, it noted that "nothing in those opinions suggests that a party in those cases argued to this court that, even in the absence of the NITU, the railroad would not have abandoned the rail line until some date that would make a difference to the outcome of the issue on appeal— whether timeliness, in Caldwell and Barclay, or liability for a taking, in Ladd . . . ."  Id. at 1372.  It is clear that the Federal Circuit intended its "clarification of [its] case law on the timing of a NITU-based taking" to be binding on the Court of Federal Claims, see id. at 1371-72, and this court intends to treat it as binding.  However, it is worth noting that the Federal Circuit's holding appears to be inconsistent with its prior holding in Ladd that a plaintiff has a complete cause of action when a NITU is issued (in other words, the plaintiff's claim accrued) and subsequent events "cannot be necessary elements of the claim," 630 F.3d at 1024, suggesting that the holding in Ladd remains binding, see Barclay, 443 F.3d at 1373 ("Panels of this court are bound by previous precedential decisions until overturned by the Supreme Court or this court en banc.").

-25-

(2)  After February 27, 1920, both of the following occur:

(A)  The Interstate Commerce Commission or the United States Surface Transportation Board issues a certificate of public convenience and necessity relieving the railroad of the railroad's common carrier obligation on the right-of-way.

(B)  The earlier of the following occurs:

(i)  Rails, switches, ties, and other facilities are removed from the right-of-way, making the right-of-way unusable for continued rail traffic.

(ii)  At least ten (10) years have passed from the date on which the Interstate Commerce Commission or the United States Surface Transportation Board issued a certificate of public convenience and necessity relieving the railroad of its common carrier obligation on the right-of-way.

Ind. Code § 32-23-11-6(a) (2011); see also Lewellen, 682 N.E.2d at 783 (noting that "the common law on whether abandonment has occurred was superseded by" statute in 1987). However, "[a] right-of-way is not considered abandoned if the Interstate Commerce Commission or the United States Surface Transportation Board imposes on the right-of-way a trail use condition under 16 U.S.C. 1247(d)."[17]  Ind. Code § 32-23-11-7; see also 16 U.S.C. § 1247(d) (2006) ("[I]f such interim use [as a trail] is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.  If [an entity] is prepared to assume full responsibility for the management of such rights-of-way . . . , then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use . . . and shall not permit abandonment . . . inconsistent or disruptive of such use.").

At the time that the original version of Indiana Code section 32-23-11-6 was enacted,[18] federal law provided that "rail carrier[s]" could abandon their railroad lines through formal abandonment proceedings if the Interstate Commerce Commission found "that the present or future public convenience and necessity require[d] or permit[ted] the abandonment" and "issue[d] to the rail carrier a certificate describing the abandonment," 49 U.S.C. § 10903 (1982), or upon the Interstate Commerce Commission recognizing that the rail carrier was exempt from

_____

[17]  This provision was added to the Indiana Code as section 32-5-12-7 in 1995, see 1995 Ind. Acts 2100, 2124-25 (section 4 of Public Law 40-1995), and recodified as section 32-23-11-7 in 2002, see 2002 Ind. Acts 187, 280, 295 (section 8 of Public Law 2-2002).

[18]  The original version of the statute provided that abandonment occurred when "the Interstate Commerce Commission issues a certificate of public convenience and necessity" and the railroad company removes the "rails, switches, ties, and other facilities . . . from the right-of-way." Lewellen, 682 N.E.2d at 783 & n.7; see also id. at 783, 784 n.9 (reflecting that these two requirements were included in the subsequent version of the statute enacted in 1995).

formal abandonment proceedings, id. § 10505; 49 C.F.R. § 1152.50(d)(3) (1986).  These actions—issuance of a certificate of public convenience and necessity (also referred to as a certificate of abandonment) and the recognition of an exemption—constituted authorization for the rail carrier to abandon its line.  See 49 C.F.R. §§ 1152.26(a)(1), .50(d)(2)-(3) (1986); see also id. § 1152.29(c)(1), (d)(1) (providing that a CITU and a NITU authorized abandonment 180 days after issuance); Preseault I, 494 U.S. at 7 n.5 (observing that if a trail-use agreement is not reached within 180 days of the issuance of a CITU or NITU, the CITU or NITU "automatically converts into an effective certificate or notice of abandonment").  That authorization relieved the rail carrier "of its obligation to furnish rail service."  Hayfield N. R.R. Co. v. Chi. & N.W. Transp. Co., 467 U.S. 622, 635 (1984).  It was then up to the rail carrier to take the steps necessary to fully abandon its line.  See Black v. Interstate Com. Comm'n, 762 F.2d 106, 112-13 (D.C. Cir. 1985) (discussing what a rail carrier was required to do to fully abandon its line after receiving a certificate of public convenience and necessity,[19] as well as the "more searching and functional inquiry about the actual intent" of the rail carrier employed by many federal courts to determine whether a line had been abandoned).  Once a rail carrier fully abandoned its line, the Interstate Commerce Commission no longer possessed jurisdiction over the line.  Preseault I, 494 U.S. at 6 n.3 (citing Hayfield N. R.R. Co., 467 U.S. at 633; Rail Abandonments, 54 Fed. Reg. 8011, 8012 (Feb. 24, 1989)).[20]

The requirement that a certificate be issued at the conclusion of formal abandonment proceedings was removed from federal law effective January 1, 1996.[21]  See ICC Termination

_____

[19]  To fully abandon its line, a rail carrier was required to cease operations and cancel tariffs.  See Black, 762 F.2d at 112.  A prior requirement that the rail carrier file a letter with the Interstate Commerce Commission indicating that the abandonment was consummated was eliminated in 1984.  See, e.g., Consol. Rail Corp. v. Surface Transp. Bd., 93 F.3d 793, 798 (D.C. Cir. 1996); Abandonment and Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. 10903, 61 Fed. Reg. 67,876, 67,879 n.10 (Dec. 24, 1996) (to be codified at 49 C.F.R. pts. 1105, 1152).

[20]  In Hayfield N. R.R. Co., the Supreme Court stated that the Interstate Commerce Commission's "authorization of an abandonment" in a nonconditional certificate of abandonment brought the Commission's "regulatory mission to an end" and that "issuing a certificate of abandonment terminate[d] the Commission's jurisdiction . . . ."  467 U.S. at 633.  However, in so stating, it relied on Interstate Commerce Commission precedent reflecting that it was the "exercise" of the authority granted in the certificate of abandonment (or the full abandonment of the railroad line after a certificate was issued) that terminated the Commission's jurisdiction.  Id. at 634.  Indeed, in Preseault I, decided six years later, the Supreme Court relied on the entirety of the discussion in Hayfield N. R.R. Co. for its conclusion that "[o]nce a carrier 'abandons' a rail line pursuant to authority granted by the Interstate Commerce Commission, the line is no longer part of the national rail system, and . . . as a general proposition [Interstate Commerce Commission] jurisdiction terminates."  494 U.S. at 6 n.3; accord 54 Fed. Reg. at 8012 ("[O]nce a carrier exercises the authority granted in a regular abandonment certificate the line is no longer part of the national transportation system.").

[21]  No such certificate had been required at the conclusion of exemption proceedings.  See 49 C.F.R. § 1152.50 (1986); Modification of Procedure for Handling Exemptions Filed Under 49

Act of 1995, Pub. L. No. 104-88, §§ 2, 102(a), 109 Stat. 803, 804, 823-25.  Therefore, the Board "dispense[d] with the issuance of certificates and instead simply issue[d] 'decisions granting' an application."  61 Fed. Reg. at 67,880.  However, the Board decided that it would "continue to refer to 'Certificates of Interim Trail Use or Abandonment' in the trail use context in part to distinguish an application proceeding from an exemption proceeding."  Id.  In other words, when ruling on an abandonment application, the Board will issue either a decision (when not imposing a trail-use condition) or a CITU (when imposing a trail-use condition).  Although the Indiana legislature recodified section 32-23-11-6 in 2002, it did not amend the statute's language to reflect this change in federal law.  Compare Ind. Code § 32-23-11-6 (2003), with Ind. Code § 32-5-12-6 (2001).

## B. Findings of Fact

The following facts are relevant to determining the nature of the alleged taking and whether the NITU caused a compensable taking.

### 1. Proceedings Before the Board

Indiana Southwestern determined that it no longer needed the railroad lines at issue in this case for rail service.  Tr. 955 (LaKemper); accord id. at 958 ("We did not want to maintain the line in place.").  It therefore began to discuss removing the track from the lines.  See DX 108 at 531 (addressing, on July 28, 2010, "the section of track we are going to pull up"), 558 (reflecting an offer, dated July 27, 2010, to "pay Pioneer Railcorp $1,040,000 for all rail, plates, joint bars, turnouts and miscellaneous scrap steel [and other track material] from said line," leaving behind the ties, signal appurtenances, and bridges); see also Tr. 912 (Cullen) (stating an assumption that the discussions began in the July 2010 time frame), 956 (agreeing that the intent to salvage the track materials was formed during the spring or summer of 2010).

On October 25, 2010, Indiana Southwestern submitted to the Board a notice of exemption pertaining to the railroad lines in which it represented that it had satisfied all of the requirements for seeking a class exemption from abandonment proceedings and declared that it would consummate the abandonment of the lines "on or after January 15, 2011."  JX 1 at 3-6; see also Tr. 962 (LaKemper) ("The purpose of the filing is to terminate [the] common carrier obligation and abandon the line . . . .").  In particular, it certified "that no local traffic has moved over the subject . . . lines . . . for at least two years" and "that there is no overhead traffic on the Lines that has been, or would need to be, rerouted as a result of the proposed abandonment."  JX 1 at 8; accord id. at 5 (remarking that "the Lines have been dormant for over two years," that "no traffic has moved over the Lines for some time," and that "the Lines have not been used for local rail shipments for over twenty-four (24) months").  Indeed, the last loaded revenue train ran on the lines in 2004.  Tr. 901 (Cullen); accord id. at 151 (Reeves), 196 (Memmer), 235 (Jenkins); see also id. at 58 (Effinger) (stating that it had "been many years" since trains ran along the lines), 85 (McDonald) (stating that trains did not run "too often" as of ten years before trial), 123-24 (Goebel) (stating that a few trains had run on the lines since early 2000), 207-08 (Siebert)

---

U.S.C. 10505, 45 Fed. Reg. 85180 (Dec. 24, 1980) (setting forth the exemption procedure that was later codified at 49 C.F.R. part 1121 in September 1991).

(stating that it had "been a long time" since trains ran on the lines and when they did, it was usually only one per week), 255 (Schmidt) (stating that he remembered last seeing a train go by in 2000 or 2002), 272 (Martin) (stating that it had "been a long time" since trains ran along the lines). In subsequent correspondence with the Board, Indiana Southwestern noted that "there was weekly (or less) train service over the line" over the prior two years that "was to move empty rail cars over and onto the line for rail car storage purposes only." DX 2.29; accord Tr. 893, 896-99 (Cullen) (stating that after 2004 and until 2009, there was storage traffic on the lines, both empty cars and cars that were not empty, for which Indiana Southwestern received payment). It asserted, and the Board later agreed, that such movements did not disqualify it from invoking the class exemption. DX 2.8 at 1; DX 2.29.

On November 12, 2010, the Board published a notice in the Federal Register in which it acknowledged Indiana Southwestern's representations in its notice of exemption, indicated that in the absence of an OFA the exemption would be effective on December 14, 2010, and noted that the deadlines for making a trail-use/railbanking request and requesting a public-use condition were November 22, 2010, and December 2, 2010, respectively. Indiana Southwestern Railway Co.—Abandonment Exemption—in Posey and Vanderburgh Counties, IN, 75 Fed. Reg. 69,520, 69,520 (Nov. 12, 2010); accord JX 2 at 1-2; see also 49 C.F.R. § 1152.50(d)(3) (describing the applicable submission deadlines). The Board further provided:

> Pursuant to the provisions of 49 C.F.R. § 1152.29(e)(2), [Indiana Southwestern] shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line. If consummation has not been effected by [Indiana Southwestern's] filing of a notice of consummation by November 12, 2011, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire.

75 Fed. Reg. at 69,520; JX 2 at 3.

Two interested third parties sought to prevent abandonment. On November 17, 2010, Indiana Trails Fund, Inc. filed a request for a public-use condition and the interim use of the railroad lines for a trail. Jt. Stip. ¶ 7. The following day, the Town of Poseyville, Indiana ("Poseyville") submitted a notice of its intent to file an OFA. Id. ¶ 8. Indiana Southwestern responded to both submissions. On November 18, 2010, it advised the Board that it was "willing to negotiate interim trail use/rail banking with . . . Indiana Trails Fund, Inc." JX 5. Not long thereafter, it provided Poseyville with the information and documentation necessary for Poseyville to prepare its OFA. DX 2.8 at 2.

With respect to the OFA, Indiana Southwestern supplied Poseyville with information indicating that the value of the railroad lines was $3,812,580—$1,008,000 for the land and $2,804,580 for the track materials. Id. at 3. To arrive at the latter amount, Shane Cullen, Vice President of Mechanical Operations for Pioneer Railroad Services, Inc., a subsidiary of Pioneer Railcorp, Tr. 836-37 (Cullen), calculated the retail value of the rails, ties, and ballast on the lines, id. at 858, 861, 868; DX 108 at 607. He estimated that the value of the rails and related steel material was $2,480,000, the value of the ties was $174,580, and the value of the ballast was $150,000. DX 108 at 607; cf. id. at 607 (reflecting an estimated scrap value of the rails and

related steel material of $1,040,000), 619 (reflecting that Indiana Southwestern received an offer on November 18, 2010, to purchase the reusable ties for $45,000 or, in the alternative, to provide for the disposal of all ties for $83,193). To estimate the value of the ties, Mr. Cullen made certain assumptions regarding the quality of the ties and the number of ties of each quality that existed on the lines, Tr. 868-69, 871 (Cullen), with those assumptions based on both his experience and his knowledge that the ties would need to be of a particular quality to support empty storage traffic on the lines, id. at 879-81; accord id. at 878 (stating that he did not inspect the lines when making his assumptions). Poseyville filed its OFA on December 20, 2010, seeking to purchase the lines for $376,600—$240,000 for the land and $136,600 for the net salvage value of the track materials. DX 2.8 at 2-3.

The Board's Director of the Office of Proceedings issued a decision regarding the OFA on December 23, 2010. Id. at 1. The Director concluded that Poseyville was financially responsible and therefore it postponed the effective date of the abandonment exemption. Id. at 3. With respect to the trail-use and public-use-condition requests, the Director noted that because Indiana Trails Fund, Inc. had satisfied the statutory requirements and that Indiana Southwestern had agreed to negotiate a trail-use agreement, the imposition of a public-use condition and issuance of a NITU "would be appropriate commencing with the effective date of the exemption." Id. at 5. "However," the Director noted,

> an OFA takes priority over a request for issuance of a NITU or for a public use condition. Therefore, issuance and effectiveness of the NITU and the public use condition will be delayed until the OFA process has been completed. If agreement is reached on the sale of the line, the NITU and the public use condition would be unnecessary and unavailable. If no agreement is reached on the OFA, the appropriate decision will be issued.

Id.

Indiana Southwestern appealed the Director's determination that Poseyville was a financially responsible offeror. JX 6 at 1. In a decision bearing a service date of April 8, 2011, the Board concluded that Poseyville was not financially responsible for the purpose of proceeding with the OFA process. Id. The Board then declared that its decision would become effective on May 23, 2011, and that it would "impose the trail use condition and make effective the public use condition" on the decision's effective date. Id. at 7. Specifically, the Board ordered:

> 3. The abandonment exemption will become effective on May 23, 2011, subject to . . . the condition that [Indiana Southwestern] shall keep intact the right-of-way, including potential trail-related structures, . . . and shall refrain from disposing of the corridor (other than the track, ties and signal equipment), for a period of 180 days from May 23, 2011, until November 19, 2011, to enable any state or local government agency, or other interested person, to negotiate the acquisition of the lines for public use. . . .
>
> . . . .

> 7.  If an agreement for interim trail use/rail banking is reached by November 19, 2011, and notice [sic], trail use may be implemented.  If no agreement is reached by that time, [Indiana Southwestern] may fully abandon the line . . . .

Id. at 7-8.  Thus, the Board's decision—served on April 8, 2011, and made effective on May 23, 2011—constituted a NITU.  Jt. Stip. ¶ 10; see also DX 2.15 (reflecting that the Board, in a decision served on September 23, 2011, denied Poseyville's request for reconsideration).

Indiana Trails Fund, Inc. sought and received four extensions of the initial 180-day period to negotiate a trail-use agreement, culminating in a deadline of November 8, 2013.  Jt. Stip. ¶¶ 11-18; see also 49 C.F.R. § 1152.29(d) (reflecting that a NITU can be issued only with the agreement of the railroad company); Tr. 814 (counsel for the parties) (stipulating that Indiana Southwestern agreed to each of these extensions).  It did not seek a further extension.  Tr. 967 (LaKemper); see also id. (stating that it was Indiana Trails Fund, Inc.'s responsibility to seek an extension).  Consequently, the NITU expired on its own terms, and Indiana Southwestern had sixty days—or until January 7, 2014—within which to file a notice of consummation to signify that it fully abandoned the railroad lines.  See 49 C.F.R. § 1152.29(e)(2).  However, Indiana Southwestern did not file a notice of consummation with the Board.[22]  Tr. 816 (Kitay), 939, 953, 968 (LaKemper).  Nevertheless, Indiana Southwestern's intent remained to either finalize the abandonment or execute a trail-use agreement.  Id. at 967-68 (LaKemper); accord id. at 970 (agreeing that at the time of trial, Indiana Southwestern did not intend to reinstall the tracks that had been removed).

## 2.  Actions of Indiana Southwestern During the Proceedings Before the Board and Thereafter

Indeed, Indiana Southwestern's discussions with Indiana Trails Fund, Inc. to sell the railroad lines continued after the expiration of the NITU, id. at 969; accord DX 117 at 1, but had not been "reduced to offers or draft documents," Tr. 942 (LaKemper).  See also id. at 971 (stating that the discussions were temporarily "on hold" due to the "potential buyout" of Pioneer Railcorp); cf. id. (stating that Indiana Southwestern also engaged in on-and-off discussions with Poseyville to sell the lines that were never "reduced to offers or draft documents").  In addition,

---

[22]  In addition, as of the last day of trial, no one had filed an adverse abandonment application to request that the Board deem the railroad lines abandoned notwithstanding Indiana Southwestern's decision not to file a notice of consummation to signify that it had fully abandoned the lines.  Tr. 816-17 (Kitay); see also id. at 786 (stating that the Board has a process in which "a third party can come in and ask the Board to find that there's no further need for the line as part of the national rail transportation system," and that if such a request is granted, "the Board's jurisdiction over the right-of-way ceases").  However, after trial, the Board rejected a request by landowners in another case before the court to direct Indiana Southwestern to show cause why these same lines should not be deemed abandoned, Pls' Notice of Decision Ex. A, ECF No. 166-1 (indicating that the request was made on September 11, 2019, and denied on January 24, 2020).

on April 4, 2019, plaintiffs' counsel sent an electronic-mail message to Daniel A. LaKemper, General Counsel for Pioneer Railroad Services, Inc., Tr. 935-36 (LaKemper), offering to purchase what was characterized as the easement interest in the corridor for $100,000 and seeking to reach a deal before the commencement of trial on April 29, 2019.  Id. at 942-43; DX 117 at 2-3.  Indiana Southwestern did not pursue the expression of interest, Tr. 943 (LaKemper), because Pioneer Railcorp was "in discussions about a possible buyout and [its] buyer . . . prohibited [it] from engaging in those kinds of transactions or discussions pending arriving at a deal with them," id. at 944.  Accord DX 117 at 1-2; see also Tr. 944-45 (LaKemper) (stating that the buyer intended to purchase Pioneer Railcorp and all of its subsidiaries, including Indiana Southwestern).

In the meantime, as authorized by regulation and the NITU, Indiana Southwestern took steps to dispose of the track and other materials on the railroad lines.  On August 2, 2011, Indiana Southwestern executed a Scrap Rail Sales Agreement with A&K Materials Inc. ("A&K") in which A&K agreed to pay Indiana Southwestern $1.2 million to purchase and remove "the switches, rail and other metallic track materials" from the lines.  DX 113 at 3-8; accord Tr. 844-45 (Cullen) (stating that "materials" included "[a]ll the steel rail track material, which is the rails, joint bars, plates, spikes and bolts and nuts"); cf. Tr. 913 (Cullen) (stating that A&K had been one of three bidders for the project).  A&K was to "leave all bridges, culverts, signal systems, road crossings, and other structures, fixtures, and facilities intact and undamaged."  DX 113 at 7; accord id. at 3; see also Tr. 888-89 (Cullen) (stating that there is "additional cost" with removing a road crossing due to the need to close the road and then replace the road surface).  In addition, it could move the ties "away from the center of the right of way" but not from the right-of-way itself, and was prohibited from allowing the ties or "other materials . . . to obstruct, block, or alter the drainage of the right of way or any surrounding property."  DX 113 at 7.  Indeed, although Mr. Cullen estimated that there were approximately 48,160 ties on the lines with a total value of $174,580,[23] DX 108 at 607, he determined that "[i]t was not economically viable to go back and pick them up," Tr. 905 (Cullen); accord id. at 906-07 (agreeing that the condition of the ties left in the railroad corridor was "extremely deficient for operating trains" and that the sole reason they were left behind was because they were not part of the agreement with A&K), 982-83 (LaKemper) ("If [the ties] had had value to . . . A&K or some other contractor, [Indiana Southwestern] probably would have sold the ties as well. . . . These were old branch line ties and . . . it's unlikely that after they've been removed from the rails there would[] be much usable surface left.").  The deadline for the removal work was April 1, 2012.  DX 113 at 4.

A&K complied with the terms of the contract, removing all rails (except those in road crossings) and moving the ties from the center of the railroad lines by the deadline.  Tr. 849-54 (Cullen); accord id. at 920 (stating that the work was completed by early February 2012); DX 114 (reflecting a $1.2 million payment to Indiana Southwestern); cf. Tr. 976 (LaKemper) (stating

---

[23]  Based on his experience, Mr. Cullen assumed that half of the ties were junk and would need to be sent to a landfill at a cost of $120,400, that a quarter of the ties were reusable on railroad tracks (relay number one grade) and could be sold for $174,580, and that the remaining quarter of the ties were reusable—but perhaps not in railroad tracks—and could be sold for $120,400.  Tr. 870-71, 873-75, 878-82 (Cullen).

that Indiana Southwestern apparently sent a train to the lines in September 2011 to "assist in the salvage of the rail"). Indeed, a number of the testifying plaintiffs (or plaintiffs' representatives) recalled that the tracks were removed in the 2010-2012 time period. See Tr. 85-86 (McDonald), 152, 162 (Reeves), 190 (Memmer), 208 (Siebert), 235 (Jenkins), 255 (Schmidt), 272 (Martin). And all of them noted that the ties were left behind in piles or stacks. See id. at 58, 73 (Effinger), 85-86 (McDonald), 108-09, 128 (Goebel), 153, 162 (Reeves), 176, 190-91 (Memmer), 208 (Siebert), 235-36 (Jenkins), 255-56 (Schmidt), 273 (Martin). After A&K completed its work, Indiana Southwestern performed no maintenance along the railroad lines, such as spraying for weeds or removing vegetation. Id. at 916 (Cullen); accord id. at 58-59 (Effinger), 87 (McDonald), 105 (Goebel), 150 (Reeves), 174 (Memmer), 209 (Siebert), 256 (Schmidt), 271 (Martin); see also PX 1.D (photo of the railroad corridor adjacent to the Memmer property); PX 2.D (photo of the railroad corridor adjacent to the Goebel property); PX 3.D (photo of the railroad corridor adjacent to the McDonald Family Farms property); PX 4.D (photo of the railroad corridor adjacent to the Halpeny property); PX 5.D (photo of the railroad corridor adjacent to the Reibel Farms, Inc. property); PX 6.D (photo of the railroad corridor adjacent to the Martins' property); PX 7.D (photo of the railroad corridor adjacent to the Effinger property); PX 8.D (photo of the railroad corridor adjacent to the Jenkins property); PX 9.D (photo of the railroad corridor adjacent to the Schmidts' property). Rather, many of the plaintiffs or their lessees performed such maintenance. Tr. 82, 87 (McDonald), 105, 114, 131 (Goebel), 147, 149-50, 154-55 (Reeves), 174 (Memmer), 207, 209 (Siebert), 236, 245 (Jenkins), 256 (Schmidt), 270-71 (Martin).

### 3. The Character and Use of Plaintiffs' Properties

Finally, to comply with the Federal Circuit's mandate to apply the multifactor test described in Arkansas Game & Fish, the court finds the following facts regarding the parcels involved in this case.

### a. The Effinger Property

The property owned by Mr. Effinger is a 47.45-acre parcel, roughly rectangular in shape, with the railroad line running along its western boundary. Id. at 57 (Effinger); JX 30; JX 31. But see Tr. 52 (Effinger) (stating that the parcel includes 44 acres). The only structure on the parcel is a cell phone tower. Tr. 55 (Effinger). The parcel is hilly and mostly wooded, but has three areas of tillable land. Id. at 55, 67-68; see also JX 30 (reflecting that the parcel is classified as agricultural land that includes 12 acres of tillable land and 35.45 acres of woodland). Mr. Effinger does not farm the tillable areas himself; at the time of trial someone else farmed the eastern tillable area, and up until two years prior to trial, his brother farmed the western tillable area. Tr. 55, 69, 72 (Effinger). Due to ditches being washed out on the property at the time of trial, the middle and western tillable areas could not be accessed for farming purposes, but a neighbor kept the western tillable area mowed. Id. at 69-70, 72. Mr. Effinger uses the land primarily for hunting deer, squirrels, rabbits, and turkeys; recreational activities such as hiking; and obtaining firewood. Id. at 56-57, 72.

The parcel has been in Mr. Effinger's family for over 100 years. Id. at 52. Mr. Effinger was deeded the parcel from his father on January 31, 2006, for a small sum, id. at 53-54, 65-66;

JX 29; the parcel had been part of a larger parcel that his father divided among his children, Tr. 66 (Effinger). The parcel has sentimental value for Mr. Effinger, and thus he does not intend to sell it even though he has "had offers to sell half of that property . . . for a lot of money . . . ." Id. at 53; accord id. at 74. Mr. Effinger has insurance in case someone gets injured on the parcel. Id. at 60. Indeed, there have been trespassers, some of whom have dumped trash in the railroad corridor. Id. at 59-60.

Mr. Effinger would like to get the railroad corridor back. Id. at 60. He would plant cover crops so that the wildlife could have something to eat and also sees value in erecting a fence along the centerline of the corridor to keep trespassers off of the parcel. Id. at 60-61; cf. id. at 59 (stating that there is a barbed-wire fence between the western boundary of the parcel and the corridor). Prior to this lawsuit, Mr. Effinger had heard that there was a plan to put a trail in the corridor, but he had never seen the NITU. Id. at 75. He understands that he may need to buy the corridor from Indiana Southwestern to use it. Id. at 62.

### b. The Goebel Property

The property owned by the Goebels consists of two nonadjacent parcels classified as agricultural land: an irregularly shaped, 59.81-acre parcel and a triangular, 3-acre parcel.[24] JX 15; JX 16; see also JX 15 (reflecting that the larger parcel includes 60.42 acres of tillable land and 1.66 acres of nontillable land, while the smaller parcel includes 3 acres of tillable land); JX 16 (reflecting that all but a small portion of the triangular parcel is farmed). The railroad line runs diagonally through roughly the middle of the larger parcel, with an approximately 30-acre portion to the west of the line and a 38-acre portion to the east of the line, and along the longest side of the triangular parcel. JX 16; Tr. 101, 106, 116 (Goebel). The larger parcel is flat, Tr. 106 (Goebel), and the triangular parcel has a steep bank and a stream running through it, id. at 132, 136. The parcels are part of a 630-acre farm operated by Mr. Goebel and his son. Id. at 100, 104, 115 (Goebel). Mr. Goebel grows corn, wheat, soybeans, and pumpkins, with average yields of 210 bushels of corn per acre, 55 bushels of soybeans per acre, and 4000 pumpkins per season. Id. at 102-04; see also PX 11 at 5-6 ("Average yield is as follows: corn 225-250 bushels per acre; soybeans 70-80 bushels per acre single crop and 50 bushels per acre double crop . . . ; winter wheat 100 bushels per acre; and . . . 3,000-4,000 pumpkins per acre."). The soil "Productivity Index is 149 which is average to good for the area."[25] PX 15 at 29.

---

[24] The total acreage of each parcel is set forth in the tax assessor's records as the "legal acres" and the "parcel acreage." JX 15. The totals are less than the "measured acreage" in the same records. Id. In addition, the totals differ from those offered by Mr. Goebel during trial. See Tr. 116-18 (Goebel) (stating that the larger parcel includes approximately 68 acres and the triangular parcel includes "probably" 5 to 6 acres).

[25] The "Productivity Index" is a measurement developed by the United States Department of Agriculture; the scale "probably" goes up to "200." Tr. 381 (Matthews).

The two parcels, and the larger farm of which they are a part,[26] have been in Mr. Goebel's family for a long time. Tr. 110-11, 120 (Goebel). Mr. Goebel initially leased the parcels from his cousin in 1979. Id. at 100, 121. At that time, he understood that the railroad line could be abandoned at some time in the future. Id. at 123-25. Then, when he purchased the parcels in February 2000, JX 14; accord Tr. 122 (Goebel), his understanding evolved to believing that the line might be abandoned, based on the small number of trains being run. Tr. 123-25 (Goebel). He first learned that Indiana Southwestern was considering abandoning the line approximately five or six years before his May 2018 deposition, when the tracks were being removed. Id. at 127; accord id. at 109 (stating that the tracks were removed "probably" six years before trial).

Mr. Goebel witnessed the removal of the tracks; the rails were taken from the railroad corridor, the ties were piled up to the side of the line, and the ballast was left in place. Id. at 107-09, 128, 130-31. Subsequently, someone took all of the "good" ties that remained, leaving the bad ones and other "junk" behind. Id. at 108, 128.

An individual helping to remove the tracks told Mr. Goebel that no one was permitted on the railroad corridor, and "no trespassing" signs were posted where the corridor intersects with roads. Id. at 108-11, 129. Nevertheless, there is a problem with trespassers on the corridor that has worsened since the tracks were removed: trespassers hunt, ride their four-wheelers along the corridor and into the adjacent fields, and, during pumpkin season, pick the pumpkins and then take them to throw at houses and off of trestles. Id. at 107, 112-13. In addition, Mr. Goebel crosses the corridor at one location to access the two sides of the larger parcel. Id. at 133.

The existence of the railroad corridor has required Mr. Goebel to expend greater efforts and incur greater expenses to farm his parcel. For example, he must use point rows to farm his parcel, which "wastes fertilizer and . . . wastes seed[,] and it's hard to harvest and hard to plant . . . ."[27] Id. at 108.

Mr. Goebel has always understood that when trains stopped running along the railroad line, he would get that land back. Id. at 111, 139. If he owned the railroad corridor, he would also be able to exclude the trespassers. Id. at 114. In addition, he would level it where he could and farm on it, which would increase his crop yields. Id. at 108-09, 111-12, 114; accord id. at 132 (stating that it would not be difficult to level the corridor on the large parcel, but that leveling the triangular parcel would not be feasible due to a ditch along the line; nevertheless, he could still farm up to the ditch). One of plaintiffs' expert witnesses, David Matthews,[28] opined that converting the corridor from nontillable land to tillable land would have cost approximately

---

[26] Mr. Goebel's 630-acre farm includes a farm previously owned by his great-grandfather and a 140-acre farm previously owned by his cousin. Tr. 111, 115-16 (Goebel).

[27] Point rows are created when planting an irregularly shaped field. See Tr. 93-94 (McDonald). Point rows will overlap with the end rows that surround a field, leading to double planting on the overlap. Id.

[28] The court qualified Mr. Matthews as an expert appraiser. Tr. 313 (court).

$1750 on the date the NITU was issued:  $33 to chisel plow the railroad bed and $1716 to cut and fill the ditches alongside the railroad bed with a bulldozer.[29]  Id. at 408 (Matthews); PX 15 at 33; see also PX 11 at 6 (indicating that "[s]ome ballast would need to be removed or buried").  Further, plaintiffs' other expert witness, James B. Kliebenstein,[30] opined that there would be a return of approximately $13 to $17 for every dollar spent on converting the corridor.  PX 11 at 8; Tr. 623 (Kliebenstein).  However, defendant's expert on what a reasonable buyer of agricultural land might consider, Charles McCarty,[31] opined that reclaiming a corridor is not quick or easy due to (1) the need to remove ballast from the corridor, a costly process; (2) the severe compacting caused by the operation of the railroad; (3) the length of time it takes for soil productivity to improve; (4) drainage concerns; and (5) the potential need to coordinate with owners of neighboring parcels.  Tr. 752-59 (McCarty).

Mr. Goebel first heard that the railroad corridor might be converted to a trail around the time the track was removed.  Id. at 128 (Goebel).  He was aware that Indiana Southwestern wanted the adjacent landowners to buy back the corridor.  Id. at 113.

### c.  The Halpeny Property

The property owned by Mr. Halpeny is a 34-acre parcel classified as agricultural land that is split into two parts by a county road:  a large acute-trapezoid-shaped area on the east side of the road and a very small triangular-shaped area on the west side of the road.  JX 21; JX 22; see also JX 21 (reflecting that the parcel includes 33.6 acres of tillable land); JX 22 (reflecting that the entire parcel is farmed); Tr. 202 (Siebert) (stating that the parcel includes 33 acres), 204-05 (stating that the triangular portion of the parcel is likely farmed by a neighbor).  The railroad line runs along the southern boundary of the parcel perpendicular to the county road.  JX 22; Tr. 207 (Siebert).  Corn and soybeans are grown on the parcel in rotation, with yields of "a little over 200" bushels of corn per acre and "from 60 to 70, maybe 75" bushels of soybeans "on a really, really good year."  Tr. 205 (Siebert); accord PX 11 at 9 ("Average yield is as follows:  corn 240 bushels per acre and soybeans 65 bushels per acre.").  The soil "Productivity Index is 148 which is average for the area."  PX 17 at 31.

Mr. Halpeny acquired the parcel from his mother in September 1993, JX 20, and has leased the parcel to Patrick Siebert since 2016, Tr. 213 (Siebert).  Mr. Siebert's family has farmed the parcel as long as Mr. Siebert can remember; before Mr. Siebert, the parcel was

---

[29]  A chisel plow uses "deep tines that . . . dig up and fluff up the ground" that may have been compacted by the operation of a railroad.  Tr. 390 (Matthews).  Using a chisel plow costs $25 per acre, id. at 391, and using a bulldozer costs approximately $2 per cubic yard of earth moved, id. at 388, 391.

[30]  The court qualified Dr. Kliebenstein as an expert in agricultural economics and farm management.  Tr. 594-95 (court).

[31]  The court allowed Mr. McCarty to testify only on the topic of what a reasonable farmer would do with a railroad corridor.  Tr. 743 (court); see also id. at 742-43 (government counsel), 746-48 (colloquy between the court and government counsel).

farmed by his father and brother, and before that, by his father's uncle.  Id. at 202-03; see also id. at 203 (stating that Mr. Siebert's father and brother leased the parcel on a crop-share basis with Mr. Halpeny, retaining three-fifths of the proceeds).  Mr. Siebert rents the parcel for $200 per acre.  Id. at 202; see also id. at 332 (Matthews) (suggesting that this rent "may be a sweetheart deal").  In a good year, he realizes a profit of "maybe" $200 per acre.  Id. at 206 (Siebert).

Mr. Siebert does not cross the corridor to access the parcel because access is possible from the county road.  Id. at 207, 209.  However, there have been trespassers on the railroad corridor—people on four-wheelers and hunters.  Id. at 209, 211-12.

Mr. Siebert does not want a trail on the railroad corridor because it would create more traffic and more trash.  Id. at 209-10.  In fact, he would like to get the corridor back.  Id.  If he owned the corridor, he would also have better access to the parcel.  Id. at 210.  In addition, he would dispose of the ties, dig out the gravel, cut down the trees and brush, and plant additional crops.  Id. at 210-11.  Mr. Matthews opined that converting the corridor from nontillable land to tillable land would have cost approximately $6500 on the date the NITU was issued:  $25 to chisel plow the railroad bed and $6481 to cut and fill the ditches alongside the railroad bed with a bulldozer.  Id. at 433 (Matthews); PX 17 at 25; see also PX 11 at 9 (indicating that "[s]ome ballast would need to be removed or buried").  Further, Dr. Kliebenstein opined that there would be a return of approximately $2 for every dollar spent on converting the corridor.  PX 11 at 11; Tr. 638 (Kliebenstein).  But cf. Tr. 752-59 (McCarty) (stating the difficulties involved in reclaiming the land), 762-63 (stating that a tenant might be reluctant to incur the expenses of reclamation without assurances from the landowner that he or she could farm the land for long enough to recover the expenses).

### d.  The Jenkins Property

The property owned by Mr. Jenkins is a 66-foot-by-165-foot residential lot with the railroad line running along its eastern boundary.  JX 33; JX 34; Tr. 233, 247 (Jenkins).  Mr. Jenkins purchased the lot on contract for $8000, fulfilling the contract around 1995 or 1996.  Tr. 232, 240; see also JX 32 (reflecting that in October 2001, the lot was conveyed to Mr. Jenkins pursuant to a dissolution decree).  He finished building his house on the lot in 2006 and then built a separate garage.  Tr. 233-34, 247 (Jenkins).  It cost Mr. Jenkins approximately $70,000 to build the house.  Id. at 247.

When Mr. Jenkins purchased the lot, there were trains running along the railroad line.  Id. at 241, 246.  The presence of the line reduced the price that Mr. Jenkins paid for the lot, as did the presence of a mobile home and two tin buildings on the lot.  Id. at 241-43.  Upon the removal of the tracks, ballast or smaller rocks (now covered by grass) and some partial ties (subsequently burned by Mr. Jenkins) were left behind.  Id. at 235-36, 244-45.  Trespassers are a concern for Mr. Jenkins, especially with respect to the possible theft of property from his yard or his garage.  Id. at 237-38.  Indeed, people on four-wheelers used to trespass on the corridor until "no trespassing signs" were posted, and other people walk their dogs on the corridor.  Id. at 236-37.

Although Mr. Jenkins did not purchase the lot with the understanding that he owned the railroad corridor or the expectation that he would eventually obtain the corridor, id. at 243, 246,

"over a period of time when [he] learned that they were going to give it up, [he] thought it would be nice to have to extend [his] property out," id. at 247-48.  In fact, if the corridor was returned to Mr. Jenkins, he has considered possibly drilling for oil on it.  Id. at 238.  If, on the other hand, the corridor was converted into a trail, Mr. Jenkins would be concerned, but would not erect a privacy fence because it would be too costly and would make it more difficult to mow his lawn.  Id. at 238, 246-47; cf. id. at 234 (stating that there used to be a chicken-wire fence separating the corridor from his lot, but that the town removed it when it buried a sewer pipe along the railroad line).  Prior to his deposition, Mr. Jenkins had not seen the NITU.  Id. at 248.

### e.  The Martin Property

The property owned by the Martins consists of two adjacent parcels:  a rectangular, 64.35-acre parcel classified as agricultural land, and an irregularly shaped, 112.39-acre parcel used as agricultural land (but classified as residential land).  Id. at 268-69, 276-78 (Martin); JX 27; JX 28; see also JX 12 (reflecting that the smaller parcel includes 42.48 acres of tillable land and 20.1 acres of woodland, and that the larger parcel, which is deemed to be "residential," includes 98.06 acres of tillable land); JX 28 (reflecting that all but the wooded area of the parcels and the railroad corridor are farmed).  But see Tr. 268 (Martin) (indicating that the parcels include 197 acres), 277 (same).  The railroad line runs diagonally through the parcels.  JX 28; Tr. 271 (Martin).  The parcels are a portion of the little more than 1000 acres farmed (and roughly 300 acres owned) by Mr. Martin.  Tr. 267 (Martin).  Mr. Martin grows corn, soybeans, and wheat on the parcels.  Id. at 270.  The quality of the soil is good.  Id. at 269; accord PX 19 at 29 (noting that the soil "Productivity Index is 150 which is average to good for the area").  Consequently, Mr. Martin can achieve yields of 200 bushels of corn per acre, 55 to 70 bushels of soybeans per acre, and 80 to 100 bushels of wheat per acre.  Tr. 269-70 (Martin); accord PX 11 at 12 ("Average yield is as follows:  corn 200 bushels per acre[]; double crop soybeans 62-65 bushels per acre; winter wheat 80-90 bushels per acre.").

Mr. Martin began leasing the parcels around 2004 on a crop-share basis, retaining two-thirds of the proceeds.  Tr. 280-81 (Martin).  Then, in October 2008, the Martins purchased the parcels in a private sale.  Id. at 268-69; JX 26.  They paid $5500 per acre, for a total of $1.1 million—probably one half of the parcels' value if sold at auction.  Tr. 269 (Martin).  They then sold the portion of the larger parcel north of the railroad line—88 acres of farm land—for $10,000 per acre, but retained the right to the railroad corridor.  Id. at 278-80, 288.  The existence of the railroad line running through the parcels did not affect the price the Martins paid for them, id. at 281, but does increase the costs involved in farming the land because of the additional seeds and fertilizer Mr. Martin needs due to the point rows, id. at 271-72; cf. id. at 284-85 (stating that a stream on the larger parcel also requires the use of point rows).

Mr. Martin had seen trespassers on the railroad corridor "for a couple of years," but not since trees starting growing on the corridor.  Id. at 273.  Mr. Martin himself crosses the corridor using one of three legal crossings.  Id. at 281-82.

Mr. Martin would like to get the railroad corridor back and join his parcels.  Id. at 272.  If he owned the corridor, he would be able to plant his fields with longer and straighter rows, increasing his productivity.  Id. at 272, 274.  But see id. at 283-84 (stating that he had not thought

-38-

about how he would plant his fields in the absence of the corridor). To accomplish this result, he would need to remove the rock and any structure lying underneath, and then use a bulldozer to level the area (which is pretty flat). Id. at 273-74. Mr. Matthews opined that converting the corridor from nontillable land to tillable land would have cost approximately $16,300 on the date the NITU was issued: $3960 to remove small and medium trees, $118 to chisel plow the railroad bed, and $12,243 to cut and fill the ditches alongside the railroad bed with a bulldozer. Id. at 416 (Matthews); PX 19 at 33; see also PX 11 at 12 (indicating that "[s]ome ballast would need to be removed or buried"). Further, Dr. Kliebenstein opined that there would be a return of approximately $2.50 to $3 for every dollar spent on converting the corridor. PX 11 at 14; Tr. 628 (Kliebenstein). But cf. Tr. 752-59 (McCarty) (stating the difficulties involved in reclaiming the land). Prior to his deposition, Mr. Martin had not seen the NITU. Tr. 284 (Martin).

### f. The McDonald Family Farms Property

The property owned by McDonald Family Farms is a square, 38-acre parcel classified as agricultural land. Id. at 91 (McDonald); JX 18; JX 19; see also JX 18 (reflecting that the parcel includes 24.1 acres of tillable land and 13.9 acres of woodland); JX 19 (reflecting that all but a small portion of the parcel is farmed); Tr. 93 (McDonald) (agreeing that there are woods on a small portion of the parcel). The railroad line runs diagonally across the southwest portion of parcel, splitting the parcel into a 31-acre portion north of the line and a triangular, 7-acre portion south of the line. JX 19; Tr. 91-92 (McDonald). The parcel is part of a 160-acre farm owned by McDonald Family Farms, which in turn is owned by David McDonald and his three children in equal shares. Tr. 78, 83, 92, 95 (McDonald). Mr. McDonald currently grows corn and soybeans in rotation, and has previously planted wheat and alfalfa on the parcel. Id. at 80. The soil quality is "very good." Id. at 81-82; accord PX 16 at 29 (noting that the soil "Productivity Index is 149 which is average to good for the area"). Consequently, Mr. McDonald has obtained good yields for his crops: 242 bushels of corn per acre and 71 to 72 bushels of soybeans per acre. Tr. 82 (McDonald); see also PX 11 at 15 ("Average yield is as follows: corn 180-200 bushels per acre and soybeans 60-70 bushels per acre.").

The parcel has been in Mr. McDonald's family since 1829, when Andrew Jackson deeded it to one of Mr. McDonald's ancestors. Tr. 78 (McDonald). In fact, Mr. McDonald's great-great-grandfather conveyed the easement to a predecessor of Indiana Southwestern. Id. at 97. Mr. McDonald's father inherited the parcel from his mother in 1968, and then deeded the parcel to McDonald Family Farms in 1981 for nominal consideration. Id. at 79, 96; JX 17. McDonald Family Farms did not acquire the parcel because it believed that it ultimately would get back the railroad corridor. Tr. 97-98 (McDonald).

After the tracks were removed, Mr. McDonald eventually burned the ties that were left behind upon discovering that trespassers has used them to construct hunting blinds on his parcel. Id. at 86-87. Trespassers—people on four-wheelers, dirt bikes, and horses—have become more prevalent since the tracks were removed. Id. at 87.

The presence of the railroad corridor has required Mr. McDonald to expend greater efforts and incur greater expenses to farm his parcel. For example, Mr. McDonald created two crossings over the corridor to access the smaller portion of the parcel, one before the tracks were

removed and one thereafter.  Id. at 83, 90-91.  In addition, he must use point rows to farm his parcel, which requires him to overplant and overfertilize.  Id. at 84.  Consequently, it costs him fifteen percent more to farm the parcel with the corridor than it would without the corridor.  Id. at 84-85.

Mr. McDonald would like to get the railroad corridor back.  Id. at 88.  His father told him that when the trains stopped running along the railroad line, the corridor would revert back to the owner of the parcel.  Id.  If he owned the corridor, he would dispose of the ballast by burying it in a ditch alongside the corridor, level the railroad bed, and farm the land.  Id.  Doing so would alleviate the need to use point rows.  Id.  Mr. Matthews opined that converting the corridor from nontillable land to tillable land would have cost approximately $1750 on the date the NITU was issued:  $23 to chisel plow the railroad bed and $1877 to cut and fill the ditches alongside the railroad bed with a bulldozer.  Id. at 391-93 (Matthews); PX 16 at 33; see also PX 11 at 15 (indicating that "[s]ome ballast would need to be removed or buried").  Further, Dr. Kliebenstein opined that there would be a return of approximately $7 for every dollar spent on converting the corridor.  PX 11 at 17; Tr. 633 (Kliebenstein).  But cf. Tr. 752-59 (McCarty) (stating the difficulties involved in reclaiming the land).

### g.  The Memmer Property

The property owned by Mr. Memmer consists of two adjacent parcels classified as agricultural land:  a right-trapezoid-shaped, 78.75-acre parcel and a right-trapezoid-shaped, 1-acre parcel.  JX 12; JX 13; see also JX 12 (reflecting that the two parcels include 76.9929 acres of tillable land); JX 13 (reflecting that almost the entirety of the two parcels is farmed).  But see Tr. 184 (Memmer) (estimating that the larger parcel includes 87 acres).  The railroad line runs along the entire northern boundary of the parcels, and Water Tank Road runs parallel to a portion of the other side of the line.  Id. at 175, 181; JX 13.  The parcels are part of a 170.3-acre farm that Mr. Memmer leases to Pathway Family Farms.  DX 11 at 7; Tr. 173 (Memmer).  For the ten years preceding trial, the sole crop grown on the parcels was corn.  Tr. 173 (Memmer).  The soil quality is "[v]ery good."  Id. at 174; accord PX 14 at 31 (noting that the soil "Productivity Index is 170 which is average to good for the area").  In 2018, the farm obtained a yield of up to 300 bushels of corn per acre.  Tr. 174 (Memmer); see also PX 11 at 18 ("Average corn yield is 240 bushels per acre.").

The farm has been in Mr. Memmer's family for four generations.  Tr. 170 (Memmer); accord id. at 170 (stating that Mr. Memmer's great-grandfather purchased the farm), 185 (same).  Mr. Memmer's maternal grandparents sold the farm to Mr. Memmer's parents for $300 per acre.  Id. at 185.  Mr. Memmer began working for his parents on the farm in 1973.  Id. at 170-71, 186.  He inherited a one-half interest in the farm in 1999 when his father died, id. at 185, and continued to farm the land until 2006, id. at 171, 173, 187.  Thereafter, the farm was leased to Harold Bender Farms.  Id. at 173, 187.  In the meantime, in November 2007, his mother conveyed the remaining one-half interest in the farm to him, reserving for herself a life estate.  JX 11.  Mr. Memmer obtained full ownership of the farm when his mother died in 2010.  Id.; Tr. 171 (Memmer); accord Tr. 186 (Memmer) (stating that his mother's estate settled in 2011).  He began leasing the farm to Pathway Family Farms in 2013.  Tr. 173 (Memmer); see also id. at 187 (stating that the last year of the lease to Harold Bender Farms was 2012).  For the 2018 crop

year, the rent was $450 per tillable acre, id. at 189; DX 11 at 7; the rent for 2013 through 2016 was similar, Tr. 189 (Memmer); see also id. at 175-76 (stating that the rent has been "about $425 an acre per year"), 332 (Matthews) (stating that this rent is "really high"). Mr. Memmer has not attempted, and has no plans, to sell the farm. Id. at 190 (Memmer).

Mr. Memmer would like to get the railroad corridor back, but was not sure that he would be able to do so when the trains stopped running. Id. at 175. If he owned the corridor, he would be able to access his parcels from Water Tank Road and exclude people from the parcels. Id. at 175-77; see also id. at 176 (stating that trespassers—mostly just people on four-wheelers—have accessed the corridor and entered his land). In addition, he would remove the dirt and overburden—a task that could take a couple or a few years, id. at 177, 194, 196—and then plant crops on it, increasing the farm's productivity. Id. at 177; see also id. at 177 (indicating that he would reuse or give away the dirt and overburden), 194 (stating that he would give away the overburden). Mr. Matthews opined that converting the corridor from nontillable land to tillable land would have cost approximately $1300 on the date the NITU was issued: $34 to chisel plow the railroad bed and $1300 to cut and fill the ditches alongside the railroad bed with a bulldozer. Id. at 444 (Matthews); PX 14 at 33; see also PX 11 at 18 (indicating that "[s]ome ballast would need to be removed or buried"). Further, Dr. Kliebenstein opined that there would be a return of approximately $11 for every dollar spent on converting the corridor. PX 11 at 20. But cf. Tr. 752-59 (McCarty) (stating the difficulties involved in reclaiming the land).

### h. The Reibel Farms, Inc. Property

The property owned by Reibel Farms, Inc. is an irregularly shaped (roughly, a right trapezoid), 79.159-acre parcel classified as agricultural land. JX 24; JX 25; see also JX 24 (reflecting that the parcel includes 78.1849 acres of tillable land); JX 25 (reflecting that the entire parcel is farmed). But see Tr. 160 (Reeves) (estimating that the parcel includes "probably 95" acres, "give or take"). The railroad line runs along the entire northern boundary of the parcel.[32] JX 25; Tr. 149 (Reeves). The parcel is part of a 119-acre farm leased to Reeves Grain Farm LLC, which is owned by Chris Reeves and his wife. Tr. 142, 144, 159 (Reeves). Mr. Reeves currently grows corn and soybeans in rotation. Id. at 147-48. The soil is high quality. Id. at 149; accord PX 18 at 31 (noting that the soil "Productivity Index is 164 which is average to good"). Consequently, Mr. Reeves has obtained, on average, 240 bushels per acre of corn. Tr. 148-49 (Reeves); accord PX 11 at 20-21 ("Average yield is as follows: corn 230-240 bushels per acre; soybeans 68 bushels per acre.").

The parcel has been in Mr. Reeves's wife's family since 1910. Tr. 144, 163 (Reeves). Mr. Reeves's in-laws purchased the parcel from his father-in-law's parents in 1960, id. at 163, and in October 1993, transferred the parcel to Reibel Farms, Inc., JX 23. Reibel Farms, Inc. is owned by Mr. Reeves's mother-in-law, Treva Reibel. Tr. 142, 163-64 (Reeves). Mr. Reeves

---

[32] Indiana Southwestern holds roughly one-half of the railroad line bordering the parcel as an easement and owns the remainder of the line bordering the parcel in fee simple. See supra Section II.C.1; see also PX 18 at 30 (depicting the locations of the two parts of the line); JX 60 to JX 61 (containing valuation maps that depict the two parcels acquired by Indiana Southwestern's predecessors and describe how those parcels were acquired).

began farming the parcel in 2005, paying a minimum of $250 per acre, but usually more, to lease the land.[33]  Id. at 144, 149-50.  Due to its proximity to Poseyville, people have wanted to purchase the parcel, but it is not for sale so long as Mr. Reeves is farming it or owns it.  Id. at 151.

After the tracks were taken up, the good ties were eventually removed, id. at 152, and Mr. Reeves burned the remaining ties, which were rotten, id. at 153.  Trespassers—mostly just people drinking beer, but occasionally people on all-terrain vehicles—have accessed the railroad corridor.  Id. at 147, 154-55; see also id. at 154 (stating that there used to be rabbit hunters on the corridor, but that he had not seen one in at least five years), 155-56 (expressing concern that trespassers could get injured on the parcel or steal from his machinery shed).  In addition, Mr. Reeves was exploring hiring someone to fill in the ditch along the bottom of the railroad bed because water drains from his parcel to the ditch and the ditch stays wet, promoting unwanted tree and weed growth.  Id. at 147, 151.

Mr. Reeves does not want a trail on the railroad corridor and would like to get the corridor back.  Id. at 156.  His father-in-law told him that when the trains stopped running along the railroad line, the corridor would revert back to the owner of the parcel.  Id. at 164.  If he owned the corridor, he would remove the rocks and dirt (the railroad bed is raised approximately four to five feet above the parcel, id. at 151), and farm it.  Id. at 156-57.  Mr. Matthews opined that converting the corridor from nontillable land to tillable land would have cost approximately $2000 on the date the NITU was issued:  $26 to chisel plow the railroad bed and $1950 to cut and fill the ditches alongside the railroad bed with a bulldozer.  Id. at 427 (Matthews); PX 18 at 25; accord Tr. 156 (Reeves) (stating his estimate that it would cost less than the $13,000 to $15,000 per acre that the land is worth to reclaim the corridor); see also PX 11 at 6 (indicating that "[s]ome ballast would need to be removed or buried").  Further, Dr. Kliebenstein opined that there would be a return of approximately $5 for every dollar spent on converting the corridor.  PX 11 at 23; Tr. 646 (Kliebenstein).  But cf. Tr. 752-59 (McCarty) (stating the difficulties involved in reclaiming the land), 762-63 (stating that a tenant might be reluctant to incur the expenses of reclamation without assurances from the landowner that he or she could farm the land for long enough to recover the expenses).  Mr. Reeves was not aware that Indiana Southwestern wanted landowners to purchase the corridor to reclaim it.  Id. at 58 (Reeves).

### i.  The Schmidt Property

The property owned by the Schmidts is an irregularly shaped, 20-acre residential lot with the railroad line running in a gradual curve along the lot's eastern boundary.  Id. at 255, 260 (Schmidt); JX 36; JX 37.  But see Tr. 259 (Schmidt) (stating that the lot contains 21.7 acres), 264 (same).  The Schmidts purchased the lot in 1998 for $155,000 with the intent of building a house on it.  Tr. 252, 258-59, 264 (Schmidt); accord JX 35.  They ultimately did not build a house because they were able to buy a nearly new house from some friends instead.  Tr. 252, 262 (Schmidt).  However, they do not plan to sell the lot because they would like to see it preserved in its natural state.  Id. at 262-63.

---

[33]  The evidence in the trial record does not indicate when Reibel Farms, Inc. began to lease the parcel to Reeves Grain Farm LLC.

The lot has a pond, but otherwise is completely wooded, id. at 252-53, 259-60, 264; JX 37, and at the time the Schmidts purchased it, it had an "estimated wooded value" between $10,000 and $12,000, Tr. 252-53 (Schmidt). Mr. Schmidt has planted some oak and walnut trees on the lot, and has in the past used the lot for firewood, id. 254-55, but has no plans to harvest the wood, id. at 264. In addition, the lot has "[l]ots of ups and downs," id. at 252-53; access to the railroad corridor requires traversing a ravine with a steep slope, id. at 256-57, 261-62.

The Schmidts have allowed their oldest son and a family friend to hunt deer on the lot, id. at 254, and Mr. Schmidt is concerned that he might encounter other hunters who might have accessed the lot via the railroad corridor notwithstanding the "no trespassing" signs he posted, id. at 257.

If the Schmidts obtained the railroad corridor, Mr. Schmidt could plant more trees or feed the deer. Id. at 258. Mr. Schmidt could not recall seeing the NITU prior to his deposition. Id. at 263.

### C. Conclusions of Law

The facts elicited during trial inform both of the issues the court must address to determine whether plaintiffs with cognizable property interests have established a taking: (1) the nature of the alleged taking and (2) causation. Although the resolution of the causation issue could render the other issue moot, the court addresses it second to facilitate compliance with the Federal Circuit's mandate.

### 1. The Nature of the Alleged Taking

As an initial matter, binding Federal Circuit precedent provides that the type of taking involved in Trails Act cases is a categorical physical taking. See Caquelin III, 959 F.3d at 1367-70; Ladd, 630 F.3d at 1025. Accordingly, to the extent that a taking occurred in this case, it was a categorical physical taking.

Notwithstanding this conclusion, the court must apply the multifactor test set forth in Arkansas Game & Fish for the assessment of temporary noncategorical physical takings to comply with the Federal Circuit's mandate.[34] The first factor identified by the Supreme Court is the duration of the government's interference with the property interest at issue.[35] Ark. Game & Fish, 568 U.S. at 38. In this case, the Board issued the NITU on May 23, 2011, preventing Indiana Southwestern from exercising its authority to fully abandon the railroad lines. The bar to

---

[34] Given the Federal Circuit's subsequent determination that the multifactor test set forth in Arkansas Game & Fish is not applicable to a Trails Act taking triggered by a NITU, see Caquelin III, 959 F.3d at 1369-70, the court's analysis, while complete, is concise.

[35] In Trails Act cases, duration is a factor that bears upon the compensation owed to a landowner, not to the government's liability for a taking. Ladd, 630 F.3d at 1025; Caquelin II, 140 Fed. Cl. at 579.

abandonment remained in place for almost two-and-one-half years, until the NITU's expiration on November 8, 2013.[36]  During this period, the affected plaintiffs were unable to reclaim the land underlying the easements and use it for their own purposes—whether it be to farm, plant trees or other vegetation, or explore for oil—or to take steps to exclude others.  Such an extended deprivation of the use of the land weighs in favor of concluding that a taking occurred.  Accord Caquelin II, 140 Fed. Cl. at 579-80 (concluding that a 180-day total deprivation of the use of land weighed in the landowner's favor); see also Banks v. United States, 138 Fed. Cl. 141, 149 (2018) (observing that "[t]emporary takings of less than six years have been held to be compensable").

The second factor identified in Arkansas Game & Fish is "the degree to which the invasion is intended or is the foreseeable result of authorized government action."  568 U.S. at 39.  There can be no dispute that the affected plaintiffs' inability to use the land underlying the easements was both intended and the foreseeable result of the Board's issuance of the NITU. Accord Caquelin III, 959 F.3d at 1367 ("The NITU . . . compelled continuation of an easement . . . intentionally and with specific identification of the land at issue; and it did so solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer . . . by an actual trail conversion."); Caquelin II, 140 Fed. Cl. at 580 ("The [Board] issued the NITU with intent to block [the plaintiff] from any use of the corridor segment while a potential trail use was being negotiated. . . .  [T]he result of the NITU was foreseeable, as the very point of a NITU is to prevent a landowner's reversionary interest from taking effect so the trail negotiating process can take place."); Banks, 138 Fed. Cl. at 150 ("The owners of the underlying fee are precluded from using their own land.  That result requires no great foresight to anticipate.").  Accordingly, this factor weighs in favor of concluding that a taking occurred.

The third Arkansas Game & Fish factor is "the character of the land at issue . . . ."[37]  568 U.S. at 39.  Most of the land bordering or surrounding the railroad lines is farm land with good soil and crop yields.  Mr. Goebel described average yields of 210 bushels of corn per acre, 55 bushels of soybeans per acre, and 4000 pumpkins per season.  Mr. Siebert described yields of more than 200 bushels of corn per acre and from 60 to 75 bushels of soybeans per acre.  Mr. Martin agreed that the soil quality is good and described yields of 200 bushels of corn per acre, 55 to 70 bushels of soybeans per acre, and 80 to 100 bushels of wheat per acre.  Mr. McDonald stated that the soil quality was very good and described good yields of 242 bushels of corn per acre and 71 to 72 bushels of soybeans per acre.  Mr. Memmer stated that the soil quality was very good and described a yield in 2018 of up to 300 bushels of corn per acre.  And, Mr. Reeves agreed that the soil quality is high and described average yields of 240 bushels of corn per acre.

---

[36]  Plaintiffs contend that the duration of the taking is indefinite.  Because interference that lasts for two-and-one-half years is sufficient to support the conclusion that a taking occurred under the Arkansas Game & Fish multifactor test, the court defers addressing plaintiffs' contention until it reaches the issue of the extent of the alleged taking.

[37]  As noted by the trial court in Caquelin II, this factor is not relevant in determining liability in a Trails Act case since liability in such a case does not depend upon the nature of the land; rather, this factor is relevant to determining just compensation.  See 140 Fed. Cl. at 581 n.22; accord Banks, 138 Fed. Cl. at 150.

Indiana Southwestern does not maintain the railroad corridor adjacent to any of the farm land, but the farmers all take steps to ensure that weeds and other vegetation do not grow on the corridor and then spread into their fields.  Thus, the corridor mainly consists of residual ballast or rocks, with a limited amount of weeds and other vegetation.  Reclamation of the corridor would allow the land to be used to grow crops.

The remaining land bordering the railroad lines is wooded or residential in nature.  With respect to the Effinger and Schmidt parcels, the line borders woodland and is suitable for planting trees or cover crops for wildlife to feed on.  With respect to the Jenkins parcel, the line runs along the rear of the backyard of a small, unwooded lot in a residential neighborhood.  Indiana Southwestern does not maintain the railroad corridor adjacent to these parcels.  Mr. Jenkins maintains the portion of the corridor adjacent to his parcel, and it mainly consists of residual ballast or rocks, with a limited amount of weeds and other vegetation.  However, neither Mr. Effinger nor Mr. Schmidt maintains the portions of the corridor adjacent to their parcels and they are therefore overgrown with vegetation.

In short, the portions of the railroad corridor adjacent to the parcels at issue do not exhibit any characteristics that would prevent the NITU from triggering a taking.  Therefore, the third Arkansas Game & Fish factor weighs in favor of concluding that a taking occurred.

The fourth factor identified by the Supreme Court is "the owner's 'reasonable investment-backed expectations' regarding the land's use."  Ark. Game & Fish, 568 U.S. at 39.  It is unclear whether this factor has any relevance for an alleged physical taking outside of the flooding context presented in Arkansas Game & Fish.  See In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs, 146 Fed. Cl. 219, 261 (2019) ("[F]looding cases can pose an exception to the quotidian rule that physical takings do not involve consideration of 'reasonable investment-backed expectations.'  . . .  Despite the evident tension of transposing this factor from the regulatory to the physical takings context, Arkansas Game & Fish clarifies that reasonable expectations are a relevant consideration in connection with physical takings cases of this particular nature."); see also Banks, 138 Fed. Cl. at 150 ("In Arkansas, the Court noted that distinct investment-backed expectations are a matter often informed by the law in force in the State in which the property is located.  There can be no need for further consideration here.  The only issue is whether plaintiffs owned a fee estate.  If so, then the entire premise behind Preseault II is that they have a right under state law to expect the return of unfettered access when a railroad easement comes to an end." (citation omitted)).  Nevertheless, because the court has been instructed to apply the Arkansas Game & Fish factors in this case, it will endeavor to assess plaintiffs' reasonable investment-backed expectations.

Under this factor, the court examines whether plaintiffs had investment-backed expectations for the use of the land underlying the railroad lines and whether such expectations were reasonable.  See Cienega Gardens v. United States, 331 F.3d 1319, 1345-46 (Fed. Cir. 2003).  But see Caquelin III, 959 F.3d at 1370 (rejecting the proposition that the government could "mandate an easement, without giving rise to takings liability, so long as, during the time of the easement, the landowner could or would not have made productive use of the land on which the easement ran"); In re Upstream Addicks & Barker, 146 Fed. Cl. at 261 n.23 ("Perhaps the Supreme Court's inclusion of the words 'investment-backed' [in Arkansas Game & Fish]

invites too strong a reference to regulatory takings law. Simply referring to 'reasonable expectations' would capture the context in which the Court used the factor in Arkansas Game & Fish."). Further, although the Supreme Court in Arkansas Game & Fish did not specify precisely when, in the case of a temporary physical invasion of land, a plaintiff's expectations should be measured, it implied that they need not be measured as of the time the plaintiff acquired the land.[38] See 568 U.S. at 39 (observing that the flooding caused by the government had no historical precedent, thereby implying that events that occurred between the time of acquisition and the time of the government action were relevant to assessing the plaintiff's expectations); see also Caquelin II, 140 Fed. Cl. at 582-84 (analyzing the plaintiff's expectations for the use of her land during the time the NITU was in effect and disregarding the government's contentions that the plaintiff lacked any expectation regarding the use of her land at the time she acquired it and that the plaintiff lacked an investment-backed expectation because she inherited the land).

In this case, the railroad lines are adjacent to land used by six plaintiffs for agricultural purposes. The four plaintiffs who farm the parcels themselves or lease the parcels to others to farm testified that they would reclaim the railroad corridor if they could and then farm the reclaimed land. Similarly, the individuals leasing the other two agricultural parcels testified that they would like to see the corridor reclaimed for farming. The soil quality on all six parcels is average or better and the land in the corridor could therefore be put to productive use for growing crops. Mr. Kliebenstein testified that these six plaintiffs would receive a positive return on their reclamation investment. And although Mr. McCarty testified as to the general difficulties in reclaiming railroad corridors for farming purposes, he did not state that these six plaintiffs would not receive a positive return on their reclamation investments. Based on this evidence, the owners of the agricultural parcels had a reasonable expectation that the land in the corridor could have been made into productive farm land but for the Board's issuance of the NITU. Thus, the fourth Arkansas Game & Fish factor weighs in favor of concluding that a taking of the corridor adjacent to the parcels owned by the Goebels, Mr. Halpeny, the Martins, McDonald Family Farms, Mr. Memmer, and Reibel Farms, Inc. occurred.

With respect to the portions of the railroad corridor adjacent to the wooded and residential parcels, the plaintiffs who owned those parcels testified that they would reclaim the corridor if they could: Mr. Effinger would plant cover crops to provide food for wildlife, Mr. Schmidt would either plant trees or feed the deer, and Mr. Jenkins would incorporate it into his parcel and possibly drill for oil. Although these are all productive uses, the trial record lacks any

---

[38] In contrast, a plaintiff alleging a regulatory taking must "establish a reasonable investment-backed expectation in the property at the time it made the investment." Cienega Gardens v. United States, 503 F.3d 1266, 1288 (Fed. Cir. 2007). Such an analysis "is designed to account for property owners' expectation that the regulatory regime in existence at the time of their acquisition will remain in place, and that new, more restrictive legislation or regulations will not be adopted." Love Terminal Partners, L.P. v. United States, 889 F.3d 1331, 1345 (Fed. Cir. 2018). Because this case does not concern the imposition of "new, more restrictive legislation or regulations," id., but instead concerns government action causing a physical appropriation of property, the court need not consider Mr. McCarty's testimony regarding how the existence of a railroad corridor might affect a purchaser's view of an adjacent parcel (i.e., the purchaser's reasonable expectation), see Tr. 745-46 (McCarty).

evidence regarding the financial return that these three plaintiffs could realize upon their proposed uses of the adjacent corridor.[39]   Accordingly, the fourth <u>Arkansas Game & Fish</u> factor does not tilt in either direction in the determination of whether a taking of these portions of the corridor occurred.

The fifth and final <u>Arkansas Game & Fish</u> factor is the "[s]everity of the interference" in the use of the land caused by the government's action.  568 U.S. at 39.  The issuance of the NITU compelled the continuation of Indiana Southwestern's easements, preventing all use of the railroad corridor adjacent to plaintiffs' parcels.  Plaintiffs could not farm the corridor, build on the corridor, exclude trespassers from the corridor, or exercise any other rights inherent in owning land in fee simple.  Accordingly, the interference was more than severe—it was complete.[40]   <u>Accord</u> <u>Caquelin II</u>, 140 Fed. Cl. at 584; <u>Banks</u>, 138 Fed. Cl. at 150.  This factor therefore weighs in favor of finding that a taking occurred.

In accordance with the above analysis, the court concludes that if the multifactor test described in <u>Arkansas Game & Fish</u> was applicable in Trails Act cases in general, and this case in particular, plaintiffs have established that a taking occurred.  Of course, as confirmed by the

---

[39]   The lack of evidence of financial gain is irrelevant to a categorical physical taking, such as the one that occurred in this case, because in such circumstances the landowners lose all of their property rights, which are, as a whole, inherently valuable.  Indeed, although the value of some of these rights—such as the right to quiet enjoyment and the right to exclude trespassers— may not be easily quantifiable, they provide a clear benefit to the landowner that is diminished or eliminated by a categorical taking such as a forced continuation of an easement.  That the deprivation of these valuable rights may not appropriately analyzed under the rubric of "reasonable investment-backed expectations" demonstrates the difficulty in applying the <u>Arkansas Game & Fish</u> factors to a categorical taking.  <u>Accord</u> <u>infra</u> note 40.

[40]   As alluded to by the trial court in <u>Caquelin II</u>, because a NITU forecloses all use of land underlying a railroad line, the noncategorical takings analysis described in <u>Arkansas Game & Fish</u> is inappropriate.  <u>See</u> 140 Fed. Cl. at 584; <u>accord</u> <u>Caquelin III</u>, 959 F.3d at 1367, 1369-70.  Moreover, because a NITU results in a physical taking, the court rejects defendant's suggestion that it must assess the severity of the government's interference using the parcel-as-a-whole approach.  <u>Accord</u> <u>Tahoe-Sierra</u>, 535 U.S. at 322 ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." (citation omitted)); <u>Ideker Farms, Inc. v. United States</u>, 136 Fed. Cl. 654, 680 (2018) ("Nor is the 'parcel as a whole' test applicable or appropriate for determining the severity of government-induced flooding in a physical takings case."), <u>recons.</u> <u>denied</u>, 142 Fed. Cl. 222 (2019); <u>see also</u> <u>Norman v. United States</u>, 429 F.3d 1081, 1091 (Fed. Cir. 2005) ("[A] physical taking of <u>any portion</u> of private property will ordinarily result in compensation, while a regulatory taking becomes 'categorical,' and therefore requires compensation, only if the owner is deprived of all beneficial use of the 'parcel as a whole.'").  However, to the extent that a parcel-as-a-whole analysis is relevant, defendant is correct that the portion of each affected plaintiffs' larger parcel impacted by the NITU is objectively small in terms of land area.

Federal Circuit in <u>Caquelin III</u>, the <u>Arkansas Game & Fish</u> multifactor test is inapplicable in Trails Act cases.  <u>See</u> 959 F.3d at 1369-70.  Rather, as noted above, the compelled continuation of an easement caused by the issuance of a NITU is a categorical physical taking.

## 2. Causation

The sole remaining question with respect to liability is whether the Board's issuance of the NITU caused the injury alleged by plaintiffs—a compelled continuation of Indiana Southwestern's easements that prevented plaintiffs from acquiring fee simple interests in the underlying land by operation of state law.  Defendant contends that plaintiffs cannot establish causation.  Specifically, it argues that because the NITU expired without the execution of a trail-use agreement and Indiana Southwestern did not fully abandon the railroad lines by filing a notice of consummation, plaintiffs are in the same position they were in before Indiana Southwestern filed its notice of exemption and therefore suffered no injury.  Plaintiffs counter that they were injured by the Board's issuance of the NITU—at least while the NITU was in effect—because a NITU automatically causes a taking under binding precedent.  Moreover, plaintiffs contend, Indiana Southwestern did, in fact, abandon the lines under state law.

Under the standard articulated by the Federal Circuit in <u>Caquelin III</u>, the Board's issuance of the "NITU would not have altered the continuation of the easement during the NITU period— <u>i.e.</u>, would not have caused the only alleged taking of property—if the railroad would not have abandoned the rail line during that period even in the absence of the NITU."  959 F.3d at 1371.  Accordingly, plaintiffs must establish that Indiana Southwestern would have abandoned the railroad lines in the absence of the NITU.  Plaintiffs have satisfied their burden.

Indiana Southwestern decided that it no longer needed the railroad lines and therefore, on October 25, 2010, initiated the process for abandoning the lines by filing a notice of exemption with the Board.  In its notice, it averred that it had satisfied all of the requirements to be exempt from abandonment proceedings, including having no local traffic move over the lines for at least the preceding two years, and represented that it would consummate the abandonment of the lines "on or after January 15, 2011."  JX 1 at 3-6.  In a November 12, 2010 notice, the Board acknowledged Indiana Southwestern's submission and provided that in the absence of a regulatory barrier, such as an OFA or a NITU, the exemption would become "effective on December 14, 2010," and Indiana Southwestern could fully abandon the lines by filing "a notice of consummation by November 12, 2011 . . . ."  JX 2 at 2-3.

Subsequently, the Board received an OFA and Indiana Southwestern agreed to negotiate a trail-use agreement (ultimately leading to the issuance of the NITU), creating regulatory barriers to Indiana Southwestern's ability to file a notice of consummation.  Nevertheless, Indiana Southwestern continued its efforts to abandon the railroad lines.  On August 2, 2011, while the NITU was in effect and as expressly permitted by regulation, it executed a contract with A&K in which A&K agreed to purchase and remove the rails and other metal material from the lines by April 1, 2012.  A&K completed the work by early February 2012, well before the NITU expired.  In addition, Mr. LaKemper testified that even after the NITU expired, it was Indiana Southwestern's intent to either finalize the abandonment or execute a trail-use agreement.

These facts reflect that Indiana Southwestern had every intent to abandon the railroad lines during the period of time that the NITU was in effect, and was prevented from doing so by the existence of the NITU.  Further, the only evidence possibly suggesting that Indiana Southwestern might not have abandoned the lines between May 23, 2011, and November 8, 2013, is the fact that it did not file a notice of consummation within the sixty-day period following the expiration of the NITU, as legally required.  However, what Indiana Southwestern chose to do (or not do) after the NITU expired is not particularly suggestive of what Indiana Southwestern was planning to do while the NITU was in place because such action (or inaction) might have been prompted by information learned or circumstances that arose after the NITU expired.[41]  See Caquelin III, 959 F.3d at 1370-71 (focusing on whether the railroad company would have abandoned its line "during the NITU" period).  And even if it was suggestive, it is outweighed by the evidence demonstrating Indiana Southwestern's intent to abandon the lines.  Accordingly, the Board's issuance of the NITU injured plaintiffs by compelling the continuation of Indiana Southwestern's easements—despite Indiana Southwestern's expressed intent to abandon the lines—and preventing them from acquiring fee simple interests in the underlying land.

Moreover, the evidence in the trial record reflects that Indiana Southwestern satisfied the requirements for abandonment set forth in Indiana Code section 32-23-11-6(a)(2) and that, in accordance with Indiana Code section 32-23-11-7, the railroad lines would have been considered abandoned under state law in the absence of the trail-use condition imposed in the NITU.  As noted above, Indiana Code section 32-23-11-6(a)(2) sets forth two requirements for abandonment.  First, the Board must "issue[] a certificate of public convenience and necessity relieving the railroad of the railroad's common carrier obligation on the right-of-way."  Ind. Code § 32-23-11-6(a)(2)(A).  Second, as relevant to this analysis, the railroad company must remove the "[r]ails, switches, ties, and other facilities . . . from the right-of-way, making the right-of-way unusable for continued rail traffic."  Id. § 32-23-11-6(a)(2)(B)(i).

The first requirement, when read literally, would prevent any abandonments from occurring under Indiana law after January 1, 1996, because after that date, there was no provision in federal law for the issuance of a certificate of public convenience and necessity.  In other words, the statute ostensibly enacted to describe the requirements for abandonment actually prevents abandonment.  This is an absurd result that cannot possibly reflect the intent of the Indiana legislature; if the legislature meant to foreclose all abandonments, it could have done so more simply.  However, when reading the provision in its entirety, the legislative intent becomes evident.  See Walczak v. Labor Works-Ft. Wayne LLC, 983 N.E.2d 1146, 1154 (Ind. 2013) ("We presume the General Assembly intended the statutory language to be applied logically and consistently with the statute's underlying policy and goals, and we avoid construing a statute so as to create an absurd result." (citation omitted)).  Because a certificate of public convenience

_____

[41]  Similarly, the evidence indicating that Indiana Southwestern continued to negotiate a trail-use agreement with Indiana Trails Fund, Inc. after the NITU expired and declined to entertain plaintiffs' offer to purchase the railroad corridor several years thereafter is irrelevant to whether it would have abandoned the railroad lines between May 23, 2011, and November 8, 2013.

and necessity provided a railroad company with the authority to abandon a railroad line and that authority relieved the railroad company of its obligation to furnish service on the line, Hayfield N. R.R. Co., 467 U.S. at 635, the modern-day equivalent of the certificate of public convenience and necessity is the document issued by the Board that authorizes abandonment—the decision issued in response to an application for abandonment or petition for an individual exemption, or the notice recognizing that a railroad company has invoked a class exemption.

Here, the Board initially authorized Indiana Southwestern to abandon the railroad lines when it published its notice in the Federal Register on November 12, 2010. That authorization was postponed due to Poseyville's OFA and then reinstated when the Board issued the NITU on May 23, 2011. Indeed, in the NITU, the Board provided that Indiana Southwestern could abandon the lines if a trail-use agreement was not executed within 180 days and, in the meantime, could remove the rails, ties, and switches from the lines. Further, the pertinent regulation—49 C.F.R. § 1152.29(c)(1)—provides that the issuance of a NITU permitted Indiana Southwestern to discontinue service and cancel tariffs. Accordingly, by issuing the NITU, the Board authorized Indiana Southwestern to abandon the lines, relieving it of its common carrier obligation to provide rail service.[42]

Defendant's contention that only the filing of a notice of consummation of abandonment would satisfy Indiana Code section 32-23-11-6(a)(2)(A) is not well taken. As noted above, when section 32-23-11-6(a)(2)(A) was initially enacted, federal law required the issuance of a certificate of public convenience and necessity. Although that certificate relieved a railroad company of its obligation to provide rail service on the relevant line, it was not the final step of the abandonment process such that its line was removed from the jurisdiction of the Interstate Commerce Commission. Rather, once a railroad company received the certificate, it needed to actually abandon the railroad line by, at a minimum, ceasing operations and cancelling tariffs. Consequently, the proper analogue to the "certificate of public convenience and necessity" identified in section 32-23-11-6(a)(2)(A) is not the notice of consummation that follows actual abandonment of a line and removes the line from the Board's jurisdiction, but the document providing the railroad company with the authority to abandon the line in the first instance.

Defendant also contests plaintiffs' ability to establish that Indiana Southwestern has satisfied the second requirement of section 32-23-11-6(a)(2). Plaintiffs assert that by removing the rails and switches from the railroad corridor and pulling up (but leaving behind) the ties, Indiana Southwestern rendered the railroad lines unusable for rail traffic. Defendant disagrees, arguing that to comply with the plain language of the provision, Indiana Southwestern was required to remove the rails embedded in the road crossings and the ties from the corridor, but did neither. Defendant's construction of the provision is overly precise.

---

[42]  That Indiana Southwestern did not ultimately perfect the abandonment by filing a notice of consummation with the Board is not relevant to determining whether the requirement described in Indiana Code section 32-23-11-6(a)(2)(A) was satisfied during the pendency of the NITU. However, as explained below, it is relevant to determining the extent of the taking for which defendant is liable.

There is no dispute that A&K, pursuant to its contract with Indiana Southwestern, dismantled the tracks on the railroad lines, removing the rails, switches, and other metallic components from the railroad corridor, but leaving the road crossings intact and leaving the ties alongside where the tracks had been located. Consequently, neither the rails embedded in the road crossings nor the ties were removed from the corridor. Nevertheless, it cannot seriously be contended that leaving these track components in the corridor made the corridor usable for rail traffic. According to Indiana Southwestern's employees, the reason the road crossings were left intact was the costs involved in closing the roads to allow for their removal and reconstructing the roads thereafter, and the primary reason why the ties were left behind was because it was not economically viable to remove them from the corridor. They further explained that it was unlikely that the ties could be used for rail service and that Indiana Southwestern had no intent to use its lines for rail service. Thus, the overwhelming evidence in the trial record reflects that after A&K completed its work in early 2012, the corridor was not, as stated in Indiana Code section 32-23-11-6(a)(2)(A), "usable for rail traffic."

In sum, plaintiffs have established that the Board's issuance of the NITU injured them by compelling the continuation of Indiana Southwestern's easements—despite Indiana Southwestern's expressed intent to abandon the lines and despite Indiana Southwestern's satisfaction of the requirements of Indiana Code section 32-23-11-6(a)(2)—and preventing them from acquiring fee simple interests in the underlying land.

## IV.  DAMAGES:  EXTENT OF THE CATEGORICAL TAKING

Having determined that the government is liable for a categorical taking, the next inquiry concerns the extent of that taking. Plaintiffs urge the court to conclude that the taking extended beyond the expiration of the NITU and ultimately may be permanent because Indiana Southwestern has abandoned the railroad lines under Indiana law, prolonging the blocking of the reversion of state law property interests caused by the NITU. Defendant, on the other hand, contends that Indiana law is irrelevant and, if there is a taking in this case, it is temporary in nature and ended upon the expiration of the NITU.

### A.  Legal Standard

In Trails Act cases, the railroad company's actions subsequent to the Board's issuance of a NITU dictate the extent of the taking and, therefore, the amount of just compensation owed by the government. The Federal Circuit has provided clear guidance regarding the extent of the taking in two factual scenarios. First, when the issuance of a NITU leads to a trail-use agreement and, therefore, the conversion of a railroad-purposes easement to a trail, the taking is permanent because the adjacent fee owners are prevented indefinitely from using the land burdened by easement. Caquelin III, 959 F.3d at 1367; Caldwell, 391 F.3d at 1234. Second, when the issuance of a NITU does not lead to a trail-use agreement, the NITU expires, and the railroad company decides to fully abandon its line by filing a notice of consummation, the taking is temporary because the adjacent fee owners recover the land burdened by easement upon the abandonment by operation of state law. Caquelin III, 959 F.3d at 1362, 1367; Ladd, 630 F.3d at 1018, 1025; see also Barclay, 443 F.3d at 1378 (rejecting the contention that a "NITU should not be viewed as the taking because subsequent events might render the NITU only temporary").

-51-

However, the Federal Circuit has not considered the situation presented in this case, in which the issuance of the NITU did not lead to a trail-use agreement, the NITU expired, and the railroad company did not file a notice of consummation despite having no intention to use its line. Similarly, there is no precedent from the Court of Federal Claims that grapples with this situation. Consequently, this case presents an issue of first impression.

## B. Findings of Fact

The facts relevant to the inquiry regarding the extent of the taking are set forth previously in more detail, but are summarized here for convenience. The last loaded revenue train ran on the railroad lines in 2004, the last local traffic on the lines ran no later than October 2008, and the last use of the lines for railroad car storage was in 2009. On October 25, 2010, Indiana Southwestern submitted to the Board a notice of exemption from abandonment proceedings. On November 12, 2010, the Board published a notice in the Federal Register in which it indicated that in the absence of an OFA, Indiana Southwestern's exemption would be effective on December 14, 2010, allowing Indiana Southwestern to fully abandon its lines by November 12, 2011. That authority was delayed by Poseyville filing an OFA. After disposing of Poseyville's OFA, the Board issued a NITU on May 23, 2011, imposing a trail-use condition and delaying Indiana Southwestern's ability to abandon the lines for an additional 180 days. On August 2, 2011, while the NITU was in effect, Indiana Southwestern contracted with A&K to remove the tracks from the lines by April 1, 2012. By that deadline, A&K took up the rails (except those in road crossings), removing them from the railroad corridor. A&K also took up the ties, leaving them along the lines within the corridor; on some portions of the lines, the good ties were eventually removed and/or the ties were destroyed. Ultimately, the NITU expired on November 8, 2013, no trail-use agreement was executed while the NITU was in effect or thereafter, and Indiana Southwestern did not file a notice of consummation by the January 7, 2014 deadline to signify that it fully abandoned the lines. Nevertheless, Indiana Southwestern's intent remained to either finalize the abandonment or execute a trail-use agreement.

## C. Conclusions of Law

Under these facts, plaintiffs contend that the taking triggered by the NITU has continued beyond the expiration of the NITU and will eventually become permanent. Specifically, they argue that their state law reversionary interests were initially blocked by the Board's issuance of the NITU and continued to be blocked, after Indiana Southwestern abandoned its lines under state law, by the federal regulatory requirement that a railroad company consummate its abandonment of its line.[43]  Defendant, without much elaboration, rejects plaintiffs' argument that

---

[43]  Plaintiffs repeatedly invoke the third prong of the test set forth in Preseault II as bearing upon whether a taking has occurred and the nature of the taking. However, the three-part test in Preseault II merely describes what a court should consider when determining whether a plaintiff has a property interest that was affected by the government's action. See Preseault II, 100 F.3d at 1532-33. The court has already determined, applying the test from Preseault II, that all but one of the plaintiffs have a cognizable property interest, in other words, that Indiana Southwestern acquired easements for railroad purposes that existed at the time that the Board issued the NITU.

a taking exists due to the continuation of Board jurisdiction over the lines after the expiration of the NITU.  Defendant's position is correct as a matter of law.

Pursuant to the Fifth Amendment, the federal government is liable to pay just compensation when it takes private property for public use.  In a Trails Act case, the federal government takes a landowner's right to an unencumbered interest in her land by either permitting a railroad-purposes easement to be converted into a trail easement or, as in this case, by prolonging a railroad-purposes easement beyond the time it would have been extinguished under state law.  In either scenario, the taking accrues when the Board issues a CITU or NITU.  When a trail-use agreement is executed before a CITU or NITU expires, the taking is permanent because the original railroad-purposes easement is replaced by a new easement of an indefinite duration.  When the CITU or NITU does not lead to a trail-use agreement and the railroad company instead consummates the abandonment of its line, the taking is temporary because the CITU or NITU only caused the railroad-purposes easement to be prolonged for a defined period of time, after which the easement was extinguished upon the consummation of abandonment and the landowner regained an unencumbered interest in her land.

In this case, the Board forced the continuation of Indiana Southwestern's railroad-purposes easements when it issued the NITU on May 23, 2011.  The NITU did not lead to a trail-use agreement, and it ultimately expired on November 8, 2013.  Had Indiana Southwestern filed a notice of consummation by the January 7, 2014 deadline, the railroad-purposes easements would have been extinguished and plaintiffs would have been left with unencumbered fee simple estates.  However, Indiana Southwestern did not file such a notice.  This failure had two consequences:  (1) Indiana Southwestern's authority to abandon the lines expired and (2) the Board retained jurisdiction over the lines.

As previously explained, the determination of whether a railroad line has been abandoned under Indiana law is dependent upon whether, under federal law, the Board has granted the railroad company the authority to abandon the line and whether that authority is subject to a trail-use condition.  Ind. Code §§ 32-23-11-6(a)(2)(A), 32-23-11-7.  When the NITU (and, therefore, the trail-use condition) expired on November 8, 2013, the requirements for abandonment under Indiana law were satisfied:  Indiana Southwestern had the authority to abandon its lines; the rails, switches, and ties were removed from the lines; and there was no trail-use condition in effect.  Accordingly, under state law, the lines were considered to be abandoned.  Normally, such an abandonment would have resulted in the extinguishment of the railroad-purposes easements.  See Lewellen, 682 N.E.2d at 782.  However, the Board possesses exclusive and plenary authority to regulate railroad abandonments, see 49 U.S.C. § 10501(b) (2006); Kalo Brick & Tile Co., 450 U.S. at 319-21, and has promulgated a regulation providing that a line is not fully abandoned until the railroad company files a notice of consummation, 49 C.F.R. § 1152.29(e)(2) (2010).  This regulation preempts Indiana law.[44]  As a consequence, the federal government was

---

[44]  Presumably, in most circumstances, Indiana law will not conflict with federal law because railroad companies that obtain the authority to abandon their lines from the Board and remove the tracks from the lines either consummate the abandonment or execute a trail-use agreement.  This case presents an atypical situation in which the railroad company takes neither course of action.

responsible for extending the railroad-purposes easements from the date the Board issued the NITU until the date Indiana Southwestern's authority to abandon its lines expired. After that date, Indiana Southwestern, not the federal government, was responsible for the continuation of the easement since the decision to fully abandon the lines was solely within its control.[45] Therefore, the federal government has not permanently taken plaintiffs' parcels.[46]  Accord Navajo Nation v. United States, 631 F.3d 1268, 1274 (Fed. Cir. 2011) ("A takings claim must be predicated on actions undertaken by the United States, not [a third party].").

In sum, defendant is liable to pay plaintiffs just compensation for a temporary categorical taking that lasted from the date the Board issued the NITU, May 23, 2011, to the date Indiana Southwestern's authority to abandon its railroad lines expired, January 7, 2014—a period of 960 days (2.63 years).

## V.  DAMAGES:  PRINCIPAL AMOUNT OF JUST COMPENSATION

The final task for the court is to determine the amount of just compensation due to plaintiffs for the temporary categorical taking. Plaintiffs devote fewer than two pages in their opening posttrial brief to this topic. They reproduce a chart summarizing the amounts of just compensation calculated by their expert, Mr. Matthews, in three different scenarios (a permanent taking, a temporary taking from May 23, 2011, to October 1, 2018, and a temporary taking from May 23, 2011, to November 8, 2013) and aver that defendant did not refute Mr. Matthews's testimony by offering its own damages evidence or expert testimony. But they do not describe the applicable legal standard or explain how the evidence in the trial record satisfies that standard. Defendant, in the fewer than two pages it devotes to the topic, provides a legal standard and asserts that plaintiffs have not satisfied that standard in general terms, but limits its assertion to the agricultural parcels at issue. Neither party revisits the issue of calculating just compensation in their responsive posttrial briefs. Nor did the parties address just compensation during closing arguments. Notwithstanding the deficiencies in the parties' submissions, the court must provide a complete analysis of the amount of just compensation due to plaintiffs.

### A.  Legal Standard

Just compensation, as described in the Fifth Amendment, "means the full monetary equivalent of the property taken." United States v. Reynolds, 397 U.S. 14, 16 (1970). In other words, the owner of the property taken "is to be put in the same position monetarily as he would have occupied if his property had not been taken." Id. For a temporary taking, "the just compensation to which the owner is entitled is the value of the use of the property during the temporary taking, i.e., the amount which the owner lost as a result of the taking." Yuba Nat.

---

[45]  Alternatively, an interested third party could try to force Indiana Southwestern to abandon the railroad lines by initiating adverse abandonment proceedings before the Board.

[46]  Because this case does not present the scenario in which an ongoing temporary taking might ripen into a permanent taking—as in Balagna v. United States, 138 Fed. Cl. 398 (2018), in which the NITU remained pending after five years while a trail-use agreement was being negotiated—there is no need to fashion a unique remedy as plaintiffs request.

Res., Inc. v. United States, 904 F.2d 1577, 1580-81 (Fed. Cir. 1990). "The usual measure of such loss of use "is the fair rental value of the property for the period of the taking."[47] Id. at 1581; accord Kimball Laundry Co. v. United States, 338 U.S. 1, 7 (1949) (holding, when "it was known from the outset that this taking was to be temporary . . . , that the proper measure of compensation is the rental that probably could have been obtained").

There is no set method for calculating fair rental value. See Am.-Hawaiian S.S. Co. v. United States, 124 F. Supp. 378, 381 (Ct. Cl. 1954) ("The ascertainment of value is not controlled by rigid rules or artificial formulae; what is required is a 'reasonable judgment having its basis in a proper consideration of all relevant facts.'" (quoting Standard Oil Co. of N.J. v. S. Pac. Co., 268 U.S. 146, 156 (1925))), judgment entered, 130 Ct. Cl. 818 (1955); see also Yaist v. United States, 17 Cl. Ct. 246, 257 (1989) ("The court may use its judgment in selecting the method to determine fair market value."). Furthermore, although "the 'conventional' method" of valuing an easement "is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed[,]' . . . there may be appropriate alternative valuation methods for the taking of an easement." Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1364 (Fed. Cir. 2012) (quoting United States v. Va. Elec. & Power Co., 365 U.S. 624, 632 (1961)); see also Balagna, 138 Fed. Cl. at 404 (observing that "the case law is not well developed with respect to valuing temporary takings in the rails-to-trails context"). Regardless of how it is calculated, fair rental value must account for the physical condition of the property at the time of the taking. See Rasmuson v. United States, 807 F.3d 1343, 1345-46 (Fed. Cir. 2015) ("[T]he fair market value of the land includes the physical remnants of the railway that would have remained on the landowners' property but for the issuance of the NITUs. . . . [A] 'before' calculation that does not take into account the costs of removing the physical remnants of the railway will result in an artificially inflated value and yield a windfall to the landowner.").

"The landowners have the burden of establishing the value of the railway corridor, which is a question of fact." Id. at 1345.

## B. Findings of Fact

Plaintiffs presented the appraisal reports and testimony of an expert appraiser, Mr. Matthews, to support their claim for just compensation. Mr. Matthews explained that determining just compensation for a temporary taking triggered by a NITU is a two-step process: estimating the lost rent for the duration of the taking and then discounting the rent to its present value. Tr. 344-45, 348-49 (Matthews); cf. id. at 362 (stating that because railroad companies typically used only a narrow strip of land within a railroad corridor to construct the railroad, much of the corridor has a rental value without needing any curative measures).

---

[47] Just compensation for a permanent taking is normally measured by the fair market value of the property taken, in other words, what a willing buyer would pay to a willing seller for the property. United States v. 50 Acres of Land, 469 U.S. 24, 29 & n.1 (1984); Yuba Nat. Res., Inc. v. United States, 821 F.2d 638, 641 (Fed. Cir. 1987). "[T]emporary reversible takings should be analyzed in the same constitutional framework applied to permanent irreversible takings . . . ." Yuba Nat. Res., Inc., 821 F.2d at 641.

There are several methods for estimating lost rent.  One method is to determine the market value of a temporary easement by comparing sales of parcels unencumbered by a temporary easement to sales of parcels encumbered by a temporary easement, id. at 345, and then applying a rate of return to estimate rent, id. at 318-19.  The difficulty with this approach is that the difference in sales prices between the two types of parcels is likely to be nominal, and an appraiser would not consider the existence of the easement when estimating the sales price of an encumbered parcel.  Id. at 345-46.

Another method is to determine lost rent by identifying rents for parcels similar to the subject parcel (in other words, with the physical remnants of a railroad line) and adjusting those rents to account for differences between those parcels and the subject parcel.  Id. at 344, 549.  Mr. Matthews rejects this method because there is "[n]ot much data out there," id. at 549, and it does not account for damages (such as the need to use point rows) caused by the taking, id. at 319, 549, which must be taken into consideration when ascertaining just compensation, id. at 339, 564, 569; accord id. at 551-52 (stating that although damages are difficult to appraise, they must be considered for an appraisal to be valid), 569 (stating that failing to ascertain damages "would make the appraisal void").

A third method, used by Mr. Matthews, is to derive lost rent from the market value of the parcel—in essence, determining just compensation for a permanent taking and then applying a rate of return to estimate rent.  Id. at 318-19, 339, 548.  Under this method, the first task is to ascertain the market value of the subject parcel on the date of the taking, assuming that the parcel is unencumbered by an easement (the "before" condition).  Id. at 317, 341, 368, 496, 560.  Market value can be determined using a cost approach, an income approach, or a comparable sales approach.  Id. at 320-22, 383.  In this case, Mr. Matthews used the comparable sales approach.  Id. at 321, 383.  He identified sales of parcels that were the most similar to the parcels owned by plaintiffs and then adjusted the sales prices to account for differences between the parcels on factors such as the date of the sales, market conditions, soil quality, parcel shape, amount of tillable land, topography/flood potential, highest and best use, location, and availability of utilities.  Id. at 321-22, 327-35, 385-86, 452, 554-56.  Based on this data, he calculated the average value of land per acre, multiplied that amount by the number of acres in the subject parcel (which included the railroad corridor), and then subtracted the amount, if any, of the cost to cure.[48]  See, e.g., id. at 386-87, 391-92; see also id. at 488-89 (stating that the parcel is appraised in the physical condition that existed on the date of the taking, which includes any remnants of the railroad bed that might need to be removed to use the land), 523 (stating that because an appraiser must assume that the railroad corridor has been reclaimed and is being used in the "before" condition even though the corridor has not been reclaimed, the cost to cure must be subtracted from the value of the parcel).  The resulting amount was the estimated value of the

---

[48]  For the agricultural parcels, the cost to cure is the cost to convert the railroad corridor into tillable land.  Tr. 355, 390-93 (Matthews); see also supra Section III.B.3 (describing Mr. Matthews's conclusions regarding the cost to convert the corridors into tillable land, Mr. Kliebenstein's opinion that such a conversion was economically feasible, and Mr. McCarty's opinion that such conversions are not quick or easy).  There are no conversion costs for the residential parcels.  Tr. 363 (Matthews); accord PX 20 at 26; PX 21 at 27; PX 22 at 27.

subject parcel in the "before" condition.  See, e.g., id. at 392.  The following table sets forth the amounts determined by Mr. Matthews to estimate the value of plaintiffs' parcels in the "before" condition:

| Parcel Owner | Acres | Per-Acre Value | Total Value | Cost to Cure | Indicated Value |
|---|---|---|---|---|---|
| Severed Parcels | | | | | |
| The Goebels | 133.870 | $8400 | $1,124,500 | $1750 | $1,122,800 |
| The Martins | 287.820 | $7000 | $2,014,740 | $16,300 | $1,997,400 |
| McDonald Family Farms | 115.720 | $8150 | $943,100 | $1900 | $941,200 |
| Nonsevered Parcels | | | | | |
| Mr. Halpeny | 36.010 | $8700 | $313,287 | $6500 | $306,800 |
| Mr. Memmer | 90.355 | $9700 | $876,500 | $1300 | $875,200 |
| Reibel Farms, Inc. | 117.830 | $9100 | $1,072,253 | $2000 | $1,070,300 |
| Wooded Parcels | | | | | |
| Mr. Effinger | 62.450 | $7000 | $437,200 | $0 | $437,200 |
| The Schmidts | 20.000 | $7500 | $150,000 | $0 | $150,000 |
| Improved Residential Parcel | | | | | |
| Mr. Jenkins | 0.250 | $27,000 | $6800 | $0 | $6800 |

See PX 14 at 28; PX 15 at 36; PX 16 at 36; PX 17 at 28; PX 18 at 28; PX 19 at 36; PX 20 at 26; PX 21 at 27; PX 22 at 27.

The second task is to ascertain the market value of the land within the railroad corridor in the "before" condition by multiplying the average value of land per acre by the number of acres in the corridor, and then, for the agricultural and wooded parcels, subtracting from that amount any cost to cure.  Tr. 394 (Matthews).  The following table sets forth the amounts determined by Mr. Matthews to estimate the value of the land within the corridor in the "before" condition:

| Parcel Owner | Acres | Per-Acre Value | Total Value | Cost to Cure | Indicated Value |
|---|---|---|---|---|---|
| Severed Parcels | | | | | |
| The Goebels | 3.190 | $8400 | $26,800 | $1750 | $25,000 |
| The Martins | 5.480 | $7000 | $38,400 | $16,300 | $22,100 |
| McDonald Family Farms | 1.920 | $8150 | $15,600 | $1900 | $13,700 |
| Nonsevered Parcels | | | | | |
| Mr. Halpeny | 2.010 | $8700 | $17,500 | $6500 | $11,000 |
| Mr. Memmer | 1.605 | $9700 | $15,569 | $1300 | $14,300 |
| Reibel Farms, Inc. | 1.050 | $9100 | $9555 | $2000 | $7600 |
| Wooded Parcels | | | | | |
| Mr. Effinger | 1.560 | $7000 | $11,000 | $0 | $11,000 |
| The Schmidts | 2.770 | $7500 | $20,800 | $0 | $20,800 |

| Improved Residential Parcel | | | | | |
|---|---|---|---|---|---|
| Mr. Jenkins | 0.050 | $27,000 | $1400 | $0 | $1400 |

See PX 14 at 29; PX 15 at 37; PX 16 at 37; PX 17 at 29; PX 18 at 29; PX 19 at 37; PX 20 at 26; PX 21 at 27; PX 22 at 27.

The third task is to ascertain the market value of the property assuming that, on the date of the taking, the trail has been built and is being used (the "after" condition). Tr. 317, 341-42, 367, 395, 495-98, 502, 561 (Matthews). To determine this value, Mr. Matthews used the same sales as comparators and adjusted the sales price on the same factors he used in the "before" condition. Id. at 335, 397, 459, 465-66. The only substantial difference in adjustments between the "before" and "after" conditions was the parcel shape adjustment for the three agricultural parcels severed by a railroad line because in the "before" condition there were no point rows, but in the "after" condition, point rows are necessary. Id. at 335-36, 396-97. Based on this data, Mr. Matthews calculated the average value of land per acre, multiplied that amount by the number of acres in the subject parcel (which excluded the railroad corridor), id. at 395-96, and then, for the improved residential parcel, subtracted the cost to cure damages arising from the existence of the trail (the construction of a privacy fence), id. at 467-68. The resulting amount was the estimated value of the subject parcel in the "after" condition. Id. at 397-98. The following table sets forth the amounts determined by Mr. Matthews to estimate the value of plaintiffs' parcels in the "after" condition:

| Parcel Owner | Acres | Per-Acre Value | Total Value | Cost to Cure | Indicated Value |
|---|---|---|---|---|---|
| Severed Parcels | | | | | |
| The Goebels | 130.68 | $8200 | $1,071,600 | $0 | $1,071,600 |
| The Martins | 282.34 | $6750 | $1,905,800 | $0 | $1,905,800 |
| McDonald Family Farms | 113.80 | $7800 | $887,600 | $0 | $887,600 |
| Nonsevered Parcels | | | | | |
| Mr. Halpeny | 34.00 | $8700 | $295,800 | $0 | $295,800 |
| Mr. Memmer | 88.75 | $9700 | $860,900 | $0 | $860,900 |
| Reibel Farms, Inc. | 116.78 | $9100 | $1,062,700 | $0 | $1,062,700 |
| Wooded Parcels | | | | | |
| Mr. Effinger | 60.89 | $7000 | $426,200 | $0 | $426,200 |
| The Schmidts | 17.23 | $7500 | $129,200 | $0 | $129,200 |
| Improved Residential Parcel | | | | | |
| Mr. Jenkins | 0.20 | $27,000 | $5400 | $1600 | $3800 |

See PX 14 at 34; PX 15 at 42; PX 16 at 42; PX 17 at 34; PX 18 at 34; PX 19 at 42; PX 20 at 30-31; PX 21 at 31-32; PX 22 at 31-32.

The fourth task is to determine the diminution of value of the parcel attributable to the taking by subtracting the market value of the parcel in the "after" condition from the market value of the parcel in the "before" condition. Tr. 398 (Matthews). This diminution of value is then allocated between the previously calculated market value of the land taken and the damages

to the remainder of the parcel.  Id. at 373-74, 398, 568.  The following table sets forth the amounts used by Mr. Matthews to calculate the diminution of value of the parcels, as well as his allocation of the diminution of value:

| Parcel Owner | "Before" Value | "After" Value | Difference | Market Value of Land Taken | Damages |
|---|---|---|---|---|---|
| Severed Parcels | | | | | |
| The Goebels | $1,122,800 | $1,071,600 | $51,200 | $25,000 | $26,200 |
| The Martins | $1,997,400 | $1,905,800 | $92,600 | $22,100 | $70,500 |
| McDonald Family Farms | $941,200 | $887,600 | $53,600 | $13,700 | $39,900 |
| Nonsevered Parcels | | | | | |
| Mr. Halpeny | $306,800 | $295,800 | $11,000 | $11,000 | $0 |
| Mr. Memmer | $875,200 | $860,900 | $14,300 | $14,300 | $0 |
| Reibel Farms, Inc. | $1,070,300 | $1,062,700 | $7,600 | $7,600 | $0 |
| Wooded Parcels | | | | | |
| Mr. Effinger | $437,200 | $426,200 | $11,000 | $11,000 | $0 |
| The Schmidts | $150,000 | $129,200 | $20,800 | $20,800 | $0 |
| Improved Residential Parcel | | | | | |
| Mr. Jenkins | $6800 | $3800 | $3000 | $1400 | $1600 |

See PX 14 at 35; PX 15 at 43; PX 16 at 43; PX 17 at 35; PX 18 at 35; PX 19 at 43; PX 20 at 31; PX 21 at 32; PX 22 at 33.

The final task is to apply a rate of return to the components of the diminution of value to determine the amount of annual rent lost due to the taking.  Tr. 349-50, 399-400, 549 (Matthews).  Mr. Matthews used a rate of return of 3.5% for the agricultural parcels, id. at 350, a rate of return of 5% for the wooded parcels, id. at 352, and a gross rent multiplier of 17 for the improved residential parcel, PX 22 at 36.[49]  The following table sets forth the amounts used by Mr. Matthews to calculate plaintiffs' annual lost rent:

| Parcel Owner | Market Value of Land Taken | Annual Rent for Land Taken | Damages | Annual Rent for Damages |
|---|---|---|---|---|
| Severed Parcels | | | | |
| The Goebels | $25,000 | $875 | $26,200 | $917 |
| The Martins | $22,100 | $774 | $70,500 | $2468 |
| McDonald Family Farms | $13,700 | $480 | $39,900 | $1397 |

---

[49]  The gross rent multiplier is derived from an analysis of "sales and listing of rental properties in Posey County" and reflects the ratio of rent to sales price.  See PX 22 at 36.

| | | | | |
|---|---|---|---|---|
| Nonsevered Parcels | | | | |
| Mr. Halpeny | $11,000 | $385 | $0 | $0 |
| Mr. Memmer | $14,300 | $501 | $0 | $0 |
| Reibel Farms, Inc. | $7,600 | $266 | $0 | $0 |
| Wooded Parcels | | | | |
| Mr. Effinger | $11,000 | $550 | $0 | $0 |
| The Schmidts | $20,800 | $1040 | $0 | $0 |
| Improved Residential Parcel | | | | |
| Mr. Jenkins | $1400 | $82 | $0 | $0 |

See PX 14 at 39; PX 15 at 47; PX 16 at 47; PX 17 at 39; PX 18 at 39; PX 19 at 47; PX 20 at 35; PX 21 at 36; PX 22 at 37.

Once the annual lost rent for the two components is estimated, the second step to determining the principal amount of just compensation is to discount that rent to its present value. Tr. 400, 488, 494 (Matthews). The multiplier used by Mr. Matthews for the agricultural parcels accounted for the number of growing seasons lost due to the taking and a 3.5% discount rate. Id. at 351, 400; see, e.g., PX 16 at 46 (indicating that Mr. Matthews used a multiplier of 2.8997 because "the present value of $1.00 paid at the beginning of the period for three years, discounted at 3.5%[, has] the net present value of $2.8997"); see also Tr. 350-51 (Matthews) (stating that the discount rate was the same as the rate of return because all that is being valued is land without depreciable assets). Because Mr. Matthews was calculating just compensation for a temporary taking spanning from May 23, 2011, to November 8, 2013, he determined that the number of lost growing seasons was three. Tr. 351 (Matthews). The multiplier used by Mr. Matthews for the wooded parcels accounted for a taking of 900 days (2.47 years) and a 5% discount rate. PX 20 at 34; PX 21 at 35; see, e.g., PX 20 at 34 (indicating that Mr. Matthews used a multiplier of 2.2654 because the "the present value of $1.00 paid in years 1 & 2 with year three a partial payment of $0.47, discounted at 5.0%[, has] the net present value of $2.2654"). And the multiplier used by Mr. Matthews for the improved residential parcel accounted for a taking of 900 days (2.47 years) and a 3.5% discount rate. PX 22 at 36; see PX 22 at 36 (indicating that Mr. Matthews used a multiplier of 2.3236 because the "the present value of $1.00 paid in years 1 & 2 with year three a partial payment of $0.47, discounted at 3.5%[, has] the net present value of $2.3236"). The just compensation due to the landowner is the present value of the lost rent plus (1) any costs to reclaim the railroad corridor in excess of the lost rent attributable to the land taken or (2) any costs to cure the damages caused by the existence of the trail. See, e.g., PX 16 at 44-45; PX 22 at 36-37; see also Tr. 552-53 (Matthews) (defining "excess cost to cure" damages). The following table sets forth the amounts used by Mr. Matthews to calculate the present value of plaintiffs' lost rent and total just compensation; for the wooded and residential parcels, certain cells are empty because Mr. Matthews assumed that the duration of the taking was 2.47 years (900 days) rather than, as the court has determined, 2.63 years (960 days):

| Parcel Owner | Present Value Factor | Present Value of Rent for Land Taken | Present Value of Rent for Damages | Excess Cost to Cure / Cost to Cure | Total Just Compensation |
|---|---|---|---|---|---|
| Severed Parcels | | | | | |
| The Goebels | 2.8997 | $2500 | $2700 | $0 | $5200 |
| The Martins | 2.8997 | $2200 | $7200 | $0 | $9400 |
| McDonald Family Farms | 2.8997 | $1390 | $4000 | $500 | $5900 |
| Nonsevered Parcels | | | | | |
| Mr. Halpeny | 2.8997 | $1100 | $0 | $0 | $1100 |
| Mr. Memmer | 2.8997 | $1451 | $0 | $0 | $1500 |
| Reibel Farms, Inc. | 2.8997 | $800 | $0 | $0 | $800 |
| Wooded Parcels | | | | | |
| Mr. Effinger | - | - | - | $0 | - |
| The Schmidts | - | - | - | $0 | - |
| Improved Residential Parcel | | | | | |
| Mr. Jenkins | - | - | - | $1600 | - |

See PX 14 at 39; PX 15 at 47; PX 16 at 47; PX 17 at 39; PX 18 at 39; PX 19 at 47; PX 20 at 35; PX 21 at 36; PX 22 at 37.

## C.  Conclusions of Law

Through Mr. Matthews's expert appraisal reports and testimony, plaintiffs presented evidence of the fair rental value of their parcels.  In response, defendant argues that "[p]laintiffs have not presented a valuation that comports with" the following "fundamental principles," Def.'s Posttrial Br. 68:  (1) the proper measure of damages for a temporary taking is fair rental value; (2) fair rental value is "the price that a willing lessee would pay to a willing lessor, for the period of the [temporary] taking," Heydt v. United States, 38 Fed. Cl. 286, 309 (1997); and (3) fair rental value is an objective standard.  Defendant contends that the portions of the railroad corridor adjacent to the agricultural parcels were not suitable to be farmed on the date the Board issued the NITU, that no reasonable farmer would lease the corridor for a temporary period, and, consequently, that the corridor had no fair rental value.

Defendant, in contending that no reasonable farmer would have leased the railroad corridor as-is on May 23, 2011, identifies a notable constraint in using fair rental value to measure damages for a temporary taking in a Trails Act case.  In general, the portion of a railroad corridor adjacent to a plaintiff's parcel is typically a short and narrow strip of land upon which the remnants of a railroad line are situated, the duration of the taking may be very short (conceivably, as short as 180 days), and on the date of the taking, the precise duration of the taking is unknown.  Thus, it is difficult to fathom that there would be a rental market for any such corridor.  Nevertheless, the owners of land underlying the corridor often could have and would have put the land to productive use but for the taking.  For example, an owner of an industrial or commercial parcel could build or expand a parking lot, an owner of a residential

parcel could reroute a driveway, or a farmer could plant more crops. Thus, the fact that no one would want to lease the parcels burdened with the physical remnants of a railroad line does not mean that the parcel lacks value. And the goal of just compensation is to put a landowner in the same position that she would have been in absent the taking by providing her with the amount lost due to the taking. Consequently, the lack of an actual willing lessee cannot be fatal to plaintiffs' claim for just compensation. See United States v. Miller, 317 U.S. 369, 374 (1943) ("Where, for any reason, property has no market resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety." (footnote omitted)). Plaintiffs owning agricultural parcels lost three growing seasons on the corridor due to the taking and should be compensated for that loss.

The method of valuation used by Mr. Matthews allowed him to estimate fair rental value of a railroad corridor in the absence of an active rental market for such land: applying a rate of return to the value of the land taken. This method, which the court and defendant have endorsed in other cases, see Hardy v. United States, 141 Fed. Cl. 1, 59-60 (2018), vacated in part on other grounds, 965 F.3d 1338 (Fed. Cir. 2020), provides an acceptable method of estimating fair rental value. Accord Am.-Hawaiian S.S. Co., 124 F. Supp. at 381.

With respect to the agricultural parcels, Mr. Matthews demonstrated that even accounting for the physical condition of the land, the land would generate income for the farmers; Dr. Kliebenstein opined that it was economically feasible for the farmers to convert the land; and plaintiffs testified that they would farm the land if given the opportunity to do so. Although Mr. McCarty testified on behalf of defendant that converting a railroad corridor into tillable land might not be quick or easy, he did not provide an opinion with respect to the time or effort required to convert the corridor running along or through the agricultural parcels at issue. Thus, the court has no basis to disturb Mr. Matthews's determination that these plaintiffs would lose all three growing seasons affected by the taking (2011, 2012, and 2013). Furthermore, nothing in the trial record provides a basis for rejecting the use of Mr. Matthews's method to estimate the fair rental value of the wooded and residential parcels.

Using his valuation method, Mr. Matthews determined the principal amount of just compensation due to each plaintiff. Defendant does not challenge the data underlying Mr. Matthews's calculations (such as the highest and best use of the parcels, the comparable sales, the adjustments, the costs to cure, the rates of return, or the discount rates) or Mr. Matthews's calculations themselves. Thus, plaintiffs have satisfied their burden of proving a principal amount of just compensation for a temporary categorical taking spanning from May 23, 2011, to January 7, 2014, for the plaintiffs who own agricultural parcels, as follows:[50]

---

[50] Although Mr. Matthews assumed that the temporary taking spanned from May 23, 2011, to November 8, 2013, his calculations are not affected by the longer takings period determined by the court because he used the number of growing seasons rather than the number of years, and the number of lost growing seasons is not different.

| Name | Just Compensation |
|---|---|
| The Goebels | $5200 |
| The Martins | $9400 |
| McDonald Family Farms | $5900 |
| Mr. Halpeny | $1100 |
| Mr. Memmer | $1500 |
| Reibel Farms, Inc. | $800 |

For the plaintiffs who own wooded or residential parcels, Mr. Matthews's determination of just compensation was based on a temporary taking lasting 2.47 years rather than 2.63 years. Thus, the principal amounts due to Mr. Effinger, the Schmidts, and Mr. Jenkins for the temporary taking need to be recalculated.[51]

## VI. DAMAGES: INTEREST AND COSTS

In addition to the principal amount of just compensation, plaintiffs are entitled to receive (1) interest on that principal amount and (2) reimbursement for their costs. Specifically, with respect to the former, "the Fifth Amendment's reference to 'just compensation' entitles the property owner to receive interest from the date of the taking to the date of payment as a part of his just compensation." United States v. Thayer-W. Point Hotel Co., 329 U.S. 585, 588 (1947). With respect to the latter, Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 provides:

> The court rendering a judgment for the plaintiff in a proceeding brought under [28 U.S.C. § 1491] awarding compensation for the taking of property by a Federal agency . . . shall determine and award or allow to such plaintiff, as a part of such judgment . . . , such sum as will in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c) (2006).

The parties did not address interest or costs during trial, in their posttrial briefs, or during closing arguments. The court cannot direct the entry of final judgment pursuant to RCFC 58 until all three components of just compensation—principal, interest, and costs—are determined.

---

[51] This task should take little effort since it requires only the determination of a new present value factor (substituting 2.63 years for 2.47 years), multiplying that value by the annual rent for the land taken, and, for Mr. Jenkins, adding the cost to cure. Indeed, it appears that for Mr. Effinger, the new present value factor would be 2.4036 and the present value of lost rent would be approximately $1322; for the Schmidts, the new present value factor would be 2.4036 and the present value of lost rent would be $2500; and for Mr. Jenkins, the new present value factor would be 2.4679 and the present value of lost rent would be approximately $202.

Further, to the extent that the parties wish to defer proceedings on costs, the court will not direct the entry of judgment pursuant to RCFC 54(b) until the appropriate interest rate and compounding frequency are determined.[52]

## VII.  CONCLUSION

As set forth in more detail above, the court concludes that (1) the plaintiffs who own property adjacent to the easements conveyed by the Type A and Type A-1 deeds—Mr. Halpeny; Mr. Memmer; Mr. Jenkins; the Goebels; McDonald Family Farms; the Martins; Mr. Effinger; and the Schmidts—and obtained through adverse possession—Reibel Farms, Inc.—have cognizable Fifth Amendment property interests; (2) defendant is entitled to judgment with respect to the claim of Mr. Hostettler, the portion of the claim of Reibel Farms, Inc. that derives from the Davis deed, and the portion of the Martins' claim that derives from the side track deed; (3) defendant is liable to pay just compensation to the plaintiffs with cognizable property interests for a temporary categorical physical taking; (4) the temporary taking spanned from May 23, 2011, to January 7, 2014; (5) the principal amount of just compensation due to the Goebels is $5200, the Martins is $9400, McDonald Family Farms is $5900, Mr. Halpeny is $1100, Mr. Memmer is $1500, and Reibel Farms, Inc. is $800; and (6) the award of just compensation shall include interest from the date of the taking and costs pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.

By **no later than Monday, November 16, 2020**, the parties shall file a joint status report in which they (1) set forth the principal amount of just compensation due to Mr. Effinger, the Schmidts, and Mr. Jenkins based on the court's rulings; (2) indicate whether they will stipulate to the appropriate interest rate and compounding frequency; and (3) propose a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge

---

[52]  In the now-vacated RCFC 54(b) judgment, the court adopted the parties' stipulation that interest was to be calculated on the principal amount for the duration of the taking using the Moody's Aaa rate, compounded annually, and for the period following the taking at 3.65%, compounded annually.  See also Tech. Coll. of the Low Country v. United States, 147 Fed. Cl. 364, 371 (2020) (holding that interest should be calculated using the Moody's rate and compounded quarterly); Hardy v. United States, 138 Fed. Cl. 344, 357 (2018) (same).