# In the United States Court of Federal Claims

No. 14-135L

(Filed: May 20, 2021)

```
*****************************
JEFFREY MEMMER, GILBERT         *
EFFINGER, LARRY GOEBEL AND      *
SUSAN GOEBEL, OWEN HALPENY,     *
MATTHEW HOSTETTLER, JOSEPH      *
JENKINS, MICHAEL MARTIN AND RITA*
MARTIN, McDONALD FAMILY FARMS   *
OF EVANSVILLE, INC., REIBEL FARMS,*
INC., JAMES SCHMIDT AND ROBIN   *   Motion for Reconsideration; Rails-to-Trails;
SCHMIDT,                        *   Indiana Law; Extent of Taking; Cost-to-
                                *   Cure Damages
              Plaintiffs,       *
                                *
v.                              *
                                *
THE UNITED STATES,              *
                                *
              Defendant.        *
*****************************
```

Thomas S. Stewart, Kansas City, MO, for plaintiffs.

David L. Weigert, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

      In this Trails Act case, plaintiffs own real property adjacent to railroad lines in southwestern Indiana. The court held a trial, after which it concluded that defendant was liable to pay all but one plaintiff just compensation for a temporary taking resulting from defendant's authorization of the conversion of the railroad lines into recreational trails via a Notice of Interim Trail Use or Abandonment ("NITU"). See generally Memmer v. United States, 150 Fed. Cl. 706 (2020). Thereafter, plaintiffs timely filed a motion for reconsideration of the court's determination of the extent of the taking, and the parties identified a dispute regarding whether one of the plaintiffs, Joseph Jenkins, is entitled to cost-to-cure damages. The parties have fully briefed both issues. As explained below, the court denies plaintiffs' motion for reconsideration and concludes that Mr. Jenkins is not entitled to cost-to-cure damages.

## I. PLAINTIFFS' MOTION FOR RECONSIDERATION

In their motion for reconsideration, plaintiffs contend that the court erred, as a matter of law, in concluding that the taking triggered by the issuance of the NITU by the Surface Transportation Board ("Board") ceased upon the expiration of Indiana Southwestern Railway Company's ("Indiana Southwestern") authority to abandon its lines.  Specifically, they maintain that because Indiana Southwestern abandoned its lines under state law while the NITU was pending and then declined to file the federally mandated notice of consummation of abandonment after the NITU expired, the regulation requiring the filing of the notice prevents the vesting of their state law property interests and thus prolongs the taking.  Defendant responds that plaintiffs are merely reasserting arguments raised in their posttrial briefs, and that in any event, plaintiffs' position lacks merit.

A motion for reconsideration under Rule 59(a) of the Rules of the United States Court of Federal Claims ("RCFC") is a request for extraordinary relief and is not to be used by a dissatisfied party to relitigate the case.  See Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004); Four Rivers Invs., Inc. v. United States, 78 Fed. Cl. 662, 664 (2007); Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999), aff'd per curiam, 250 F.3d 762 (Fed. Cir. 2000) (unpublished table decision).  Consequently, such a motion "does not provide an occasion for a party 'to raise arguments that it could have raised previously, but did not'" or to "reassert arguments that the Court already has considered." Four Rivers Invs., Inc., 78 Fed. Cl. at 664 (quoting Browning Ferris Indus., Inc. & Subsidiaries v. United States, No. 05-738T, 2007 WL 1412087, at *1 (Fed. Cl. May 10, 2007)).  However, the court may grant a motion for reconsideration if the moving party establishes, as relevant here, a clear error of law in the underlying decision.  Biery v. United States, 818 F.3d 704, 711 (Fed. Cir. 2016).  "The decision whether to grant reconsideration lies largely within the discretion of the [trial] court." Yuba Nat. Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990); accord Biery, 818 F.3d at 711.

As an initial matter, the court agrees with defendant that in their motion for reconsideration, plaintiffs are advancing arguments they previously raised, or should have raised, in their posttrial briefs.  A comparison of plaintiffs' summary of their argument before and after the court issued its trial decision supports this conclusion.  In their opening posttrial brief, plaintiffs contended:

> Plaintiffs' reversionary interests are still being blocked.  The governmental action(s) which block[] the Plaintiffs' reversionary interests in this case are the issuance of the NITU, which originally triggered the taking, in combination with the requirement to consummate abandonment under 49 C.F.R. § 1152.29(e)(2) when state law abandonment has already occurred.

Pls.' Posttrial Br. 62.  Similarly, plaintiffs contend in their motion for reconsideration:

> [S]tate law abandonment occurred during the pendency of the NITU, the government's regulation requiring the consummation of abandonment under federal law after state law abandonment already occurred amounts to the continuation of the taking, and the Plaintiffs' reversionary interests are still being

blocked by the combination of the NITU and the regulation requiring consummation under federal law.

Pls.' Mot. 2.  There is no substantive difference between the two summaries.  Moreover, in articulating the three reasons why they consider the court's conclusion that the taking was temporary to be legally erroneous, plaintiffs reassert arguments they advanced in their posttrial briefs:

| Motion for Reconsideration | Posttrial Briefs |
| --- | --- |
| "In this case, the railroad's failure to consummate abandonment necessarily means that the taking continued long beyond the expiration of the NITU.  The Plaintiffs' reversionary interests are still being blocked under these facts because the governmental regulation requiring the railroad to consummate abandonment under federal law means that the Plaintiffs' reversionary interests are still being blocked because state law abandonment has already occurred."  Pls.' Mot. 6. | "After the railroad made their decision to abandon during the summer of 2010, . . . the [Board] . . . granted permission to abandon in the NITU on May 23, 2011, and the railroad has failed to consummate abandonment after the NITU expired on November 11, 2013. . . . Since [Indiana Southwestern] has intentionally failed to consummate abandonment after state law abandonment has occurred, the taking is continuing and the Plaintiffs' reversionary interests are still being blocked."  Pls.' Posttrial Resp. 47-48. |
| "[I]t is the Board's continuing jurisdiction over the line, obviously due to the railroad's failure to consummate abandonment after state law abandonment has already occurred, that is the taking—that is no different than the [Board's] continuing jurisdiction over the line when a trail use agreement is reached, because that is exactly what railbanking is."  Pls.' Mot. 7. | "The fact that federal law abandonment has not occurred but the government is still maintaining jurisdiction over the corridor, despite the fact that state law abandonment has occurred, is exactly why the taking is still continuing under the Trails Act."  Pls.' Posttrial Br. 80. |

| | |
|---|---|
| "The federal preemption of state law, which the federal government has a right to do, is exactly why there is a taking when the NITU is issued and is exactly why the taking continues when the Plaintiffs' reversionary interests are still being blocked." Pls.' Mot. 7. | "[T]he government has the power to preempt abandonment [by issuing a NITU] but the blocking of Plaintiffs' reversionary interests results in a taking whether federal law preempts state law on the issue of abandonment or whether the railroad has actually consummated abandonment under federal law or not. . . . [T]he taking is continuing because the Plaintiffs' reversionary rights are still being blocked . . . ." Pls.' Posttrial Resp. 43. |

In short, plaintiffs are merely attempting to relitigate the issue of the extent of the taking, which is a sufficient reason to deny their motion for reconsideration.

However, the court would also deny plaintiffs' motion for reconsideration on the merits. To begin, plaintiffs' characterization of the court's conclusion regarding the effect of Indiana Southwestern's failure to file a notice of consummation of abandonment reflects an apparent misreading of the court's decision. The court did not, as plaintiffs assert, state that Indiana Southwestern's failure to file such a notice affected "whether a taking occurred." See Pls.' Mot. 5-6. Indeed, the court clearly stated throughout its decision that a taking in a Trails Act case is triggered by government action that prevents the vesting of state law property interests. See Memmer, 150 Fed. Cl. at 716, 729, 751; accord id. at 752 (quoting the proposition in Navajo Nation v. United States, 631 F.3d 1268, 1274 (Fed. Cir. 2011), that "[a] takings claim must be predicated on actions undertaken by the United States, not [a third party]"); see also id. at 748 ("[T]he Board's issuance of the NITU injured plaintiffs by compelling the continuation of Indiana Southwestern's easements—despite Indiana Southwestern's expressed intent to abandon the lines—and preventing them from acquiring fee simple interests in the underlying land."). In contrast, the court observed, a railroad company's actions (or inaction) affect only the extent of the taking, in other words, whether the taking is permanent or temporary. See id. at 750 ("In Trails Act cases, the railroad company's actions subsequent to the Board's issuance of a NITU dictate the extent of the taking and, therefore, the amount of just compensation owed by the government. . . . First, when the issuance of a NITU leads to a trail-use agreement and, therefore, the conversion of a railroad-purposes easement to a trail, the taking is permanent because the adjacent fee owners are prevented indefinitely from using the land burdened by easement. Second, when the issuance of a NITU does not lead to a trail-use agreement, the NITU expires, and the railroad company decides to fully abandon its line by filing a notice of consummation, the taking is temporary because the adjacent fee owners recover the land burdened by easement upon the abandonment by operation of state law." (citations omitted)). Consistent with these unambiguous statements, the court concluded that after the deadline for finalizing abandonment expired without Indiana Southwestern filing the required notice of consummation of abandonment, the federal government no longer controlled the continuation of the railroad-purposes easements since neither the NITU nor the regulation requiring the filing of a notice of consummation of abandonment remained operative. Id. at 752.

Plaintiffs' argument that "[i]t simply cannot be that state law abandonment occurred and yet no taking occurred," Pls.' Mot. 6, is not persuasive. A taking did occur in this case—triggered by the issuance of the NITU, which blocked the vesting of plaintiffs' state law property interests by prolonging the railroad-purposes easements. See Memmer, 150 Fed. Cl. at 750; accord Caquelin v. United States, 959 F.3d 1360, 1367 (Fed. Cir. 2020). Under the binding precedent of the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." Caldwell, 391 F.3d at 1233-34 (emphasis added). Indeed, the Federal Circuit has never held that the regulation requiring a railroad company to file a notice of consummation of abandonment—which is effective (1) as soon as the Board publishes its notice in the Federal Register indicating that a railroad company filed a notice of exemption from abandonment proceedings and (2) regardless of whether the Trails Act is invoked—"operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests," id. at 1233, either independently or in conjunction with an expired NITU.[1] Consequently, the court is precluded from holding that the regulation serves as the basis for a taking, as plaintiffs urge. See Pls.' Mot. 10 ("[T]he regulation requiring consummation of abandonment after state law abandonment has occurred is a taking just like when a railroad corridor is railbanked."). When the NITU expires, and a railroad company is no longer able to finalize its abandonment, the taking ends.[2] See Memmer, 150 Fed. Cl. at 752; see also Caldwell, 391 F.3d at 1235 (observing that a "taking may be abandoned . . . by the termination of the

---

[1] Plaintiffs observe that "[a]t the end of every NITU, the NITU states that if the railroad is unsuccessful in negotiating a trail use agreement, it can then consummate the abandonment under federal law," and thus conclude that "the regulatory process associated with the Trails Act intervenes and blocks [their] reversionary rights under state law." Pls.' Reply 18. Although the regulatory abandonment process can technically be described as being "associated with the Trails Act," any suggestion that the regulation requiring the filing of a notice of consummation of abandonment is unique to situations in which an abandonment is delayed due to the issuance of a NITU is erroneous. As reflected by the evidence in the trial record, when the Board publishes a notice in the Federal Register acknowledging the filing of a notice of exemption from abandonment proceedings, an action it takes regardless of whether the Trails Act will be invoked, it states the requirement that a notice of consummation of abandonment must be filed within one year to finalize the abandonment. Memmer, 150 Fed. Cl. at 732-33.

[2] Moreover, it might be contended that once Indiana Southwestern lost the authority to fully abandon its lines, the requirements for abandonment under Indiana law were no longer satisfied. As explained in the trial decision, (1) the Indiana abandonment statute's requirement for a "certificate of public convenience and necessity relieving the railroad" company of its obligation to furnish service on the line is satisfied by "the document issued by the Board that authorizes abandonment—the . . . notice recognizing that a railroad company has invoked a class exemption," Memmer, 150 Fed. Cl. at 749; (2) "by issuing the NITU, the Board authorized Indiana Southwestern to abandon the lines, relieving it of its common carrier obligation to provide rail service," id.; and (3) "Indiana Southwestern's authority to abandon the lines expired" when the company failed to file a notice of consummation of abandonment after the expiration of the NITU, id. at 752.

NITU"); Barclay v. United States, 443 F.3d 1368, 1374 (Fed. Cir. 2006) ("Federal law dictates when abandonment occurs.  Thus, [the plaintiff] is incorrect that state law governs the timing of the abandonment.  Abandonment cannot occur until authorized by federal law, and the NITU precludes abandonment and the reversion that would follow if abandonment were consummated."[3]).

The reconsideration decision in Farmer's Cooperative Co. v. United States provides further support for the court's holding.[4]  That case involved a series of four NITUs: the first NITU covered two railroad corridors, the second NITU covered one of the two corridors, and the third and fourth NITUs covered the other corridor.  Farmer's Coop. Co. v. United States, 98 Fed. Cl. 797, 800-01, recons. denied, 100 Fed. Cl. 579 (2011).  There was a three-month gap between the vacatur of the first NITU and the issuance of the second NITU, and a four-month gap between the vacatur of the first NITU and the issuance of the third NITU.  Id.  Upon the vacatur of the first NITU, state law requirements for abandonment were satisfied, and during the gap in time between the first two NITUs, the railroad company did not file a notice of consumption of abandonment.  Id. at 806.  However, the court did not, in its original merits decision, address either of these facts in reaching its conclusion that there were two temporary takings, one spanning from the issuance of the first NITU to the expiration of the second NITU, and the other spanning from the issuance of the first NITU to the expiration of the fourth NITU.[5]  Id. at 806-07.

In their motion for reconsideration, the plaintiffs in Farmer's Cooperative observed that notwithstanding the railroad company's obvious intent to abandon the two railroad corridors, the company did not file a notice of consumption of abandonment after the expiration of the NITUs for either corridor, and therefore the corridors remained under the jurisdiction of the Board.  100 Fed. Cl. at 581.  They argued that the "ongoing jurisdiction" of the Board "constitute[d] a permanent taking, rather than a temporary one."  Id.  The court rejected this argument:

---

[3] It is in this sense that the court used the term "preempts" in its trial decision.  See Memmer, 150 Fed. Cl. at 752.

[4] Neither party mentioned this decision, or the underlying merits decision, in their posttrial briefs.

[5] This court's conclusion that the temporary taking ended on the deadline for the railroad company to file a notice of consumption of abandonment, rather than upon the expiration of the NITU, is in conflict with the holding of Farmer's Cooperative.  See also Balagna v. United States, 145 Fed. Cl. 442, 444 (2019) (holding, in a case in which the deadline for filing a notice of consumption of abandonment had not yet expired, that "the taking effected by the NITU's issuance ends upon the NITU's expiration").  Defendant, in its response to plaintiffs' motion for reconsideration, suggests that the court should amend its trial decision to hold that the taking ended when the NITU expired.  However, as plaintiffs note, defendant did not move for reconsideration of the court's decision, and therefore its suggestion is not properly before the court.

> In a rails-to-trails takings case, the issue is not whether [Board] jurisdiction continues or whether the railroad retains a property interest upon the expiration of a NITU, but whether the Government has taken any action that forestalls the vesting of the underlying landowners' property rights. With the expiration of all of the NITUs applicable to the two rail corridors, there is no longer any action by the United States to which Plaintiffs can point that impedes the realization of any property interests they would otherwise obtain under state law.

Id. at 583. Although it recognized the plaintiffs' "quandary," the court remarked that it was not its "province to . . . address how [the plaintiffs] might best extricate themselves from the consequences of the railroad's failure to file the requisite notice of consummation, even though its abandonment of the rights-of-way seems evident under state law." Id. at 584.

Finally, the court must address plaintiffs' contention, raised throughout their motion for reconsideration, that the Preseault decisions compel the conclusion that the regulation requiring the filing of a notice of consummation of abandonment triggered a taking in this case. See Pls.' Mot. 6 ("[S]tate law abandonment prior to the NITU is one of the independent prongs of the test for liability for a rails-to-trails taking as definitively established as prong 3 of Preseault II."), 8 ("[T]he notion that federal preemption of railroad abandonments somehow precludes a taking was directly rejected in Justice O'Connor's concurring Opinion in Preseault I, and that principle was then adopted by the Federal Circuit in Preseault II and all of its progeny."), 10 ("[T]he rule of law specifically identified by Justice O'Connor in Preseault I [is] that a taking occurs under the federal regulation requiring consummation of federal law abandonment after state law abandonment has occurred."). The Preseault case involved the conversion of a railroad corridor to a trail in Vermont. See Preseault v. Interstate Com. Comm'n ("Preseault I"), 494 U.S. 1, 9-10 (1990); Preseault v. United States ("Preseault II"), 100 F.3d 1525, 1529-31 (Fed. Cir. 1996) (en banc). The issue before the United States Supreme Court ("Supreme Court") in Preseault I was the constitutionality of the statute permitting such conversions, and the Court ultimately concluded that the statute was constitutional. 494 U.S. at 4-5. In a concurring opinion, Justice O'Connor sought to "express [her] view that state law determines what property interest petitioners possess and that traditional takings doctrine will determine whether the government must compensate petitioners for the burden imposed on any property interest they possess." Id. at 20 (O'Connor, J., concurring); accord id. at 21 ("Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the [Interstate Commerce Commission's] recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim.").

After the Supreme Court issued its decision, the plaintiffs filed a takings suit in this court. See Preseault II, 100 F.3d at 1530. On appeal, the Federal Circuit concluded that the federal government was liable to pay plaintiffs just compensation. Id. at 1529. In the section of that decision captioned "The Property Interests," the Federal Circuit observed that the parties "sharply dispute[d]" whether the plaintiffs "possess[ed] the property interest they claim [was] taken." Id. at 1533 (quoting Preseault I, 494 U.S. at 20 (O'Connor, J., concurring)). It then stated that there were three "determinative issues" bearing upon whether the plaintiffs had such a property interest:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.[6]

Id. (footnote added). With respect to the third inquiry, the plaintiffs maintained that because "under Vermont law the original easements were abandoned, and thus extinguished, in 1975 . . . , the State could not, over ten years later in 1986, have re-established the easement even for the narrow purposes provided in the original conveyances without payment of the just compensation required by the Constitution." Id. at 1544-45. The Federal Circuit agreed, but observed that "the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized, use." Id. at 1549. Then, in the section of the decision captioned "The Taking," the Federal Circuit indicated that there were two ways in which a taking might occur under the facts presented: (1) if the railroad-purposes easements existed at the time the federal government authorized the use of the railroad corridor as a trail, the authorization would "effect a taking of a new easement for [the] new use," or (2) if the railroad-purposes easements were abandoned (and therefore extinguished) under state law before the federal government authorized the use of the railroad corridor as a trail such that the plaintiffs owned the underlying property in fee simple, the authorization constituted a "taking of the right of exclusive possession that belonged to the [plaintiffs] as an incident of their ownership of the land." Id. at 1550-51.

Applying the Preseault precedent to this case, the court concluded that Indiana Southwestern acquired easements over most of the parcels at issue, that those easements were for railroad purposes, and that the easements had not been abandoned prior to the NITU. See Memmer, 150 Fed. Cl. at 724-27. With respect to the third inquiry of the property-interest test, the court stated:

> The trial record lacks any evidence that Indiana Southwestern or its predecessors abandoned the easements, or that the easements were otherwise terminated, prior to the issuance of the NITU. Thus, the court concludes that at the time of the alleged taking, the parcels held in fee simple by adjacent landowners were encumbered by the easements.

---

[6] The "alleged taking" was not a NITU, but was instead the conversion of a railroad corridor to a trail, because the agreement to allow the corridor to be used as a trail predated the Interstate Commerce Commission's order allowing the discontinuation of railroad service. Preseault II, 100 F.3d at 1549-52; see also id. at 1552 ("Whether, at the time a railroad applies to abandon its use of an easement limited to railroad purposes, a taking occurs under an [Interstate Commerce Commission] order to 'railbank' the easement for possible future railroad use, and allowing in the interim for use of the easement for trail purposes, is a question not now before us. We offer no opinion at this time on that question.").

Id. at 727.  Because the court determined that the railroad-purposes easements were not abandoned prior to the issuance of the NITU, the alternative basis described by the Federal Circuit in Preseault II for concluding that a taking occurred—abandonment under state law before the government authorized the conversion of a rail corridor into a trail—was not implicated.  Although the requirements for state law abandonment were satisfied prior to Indiana Southwestern regaining the ability to consummate its abandonment,[7] the federal government did not grant new trail-use authority (in other words, a new NITU) that would constitute a new taking of plaintiffs' state law property interests.  The court therefore held that the taking concluded once the federal government was no longer responsible for prolonging the railroad-purposes easements.  Id. at 752.  This holding does not conflict with the decisions in Preseault I and Preseault II.

In short, plaintiffs have not identified a clear error of law requiring the court to alter its conclusion that defendant is liable for a temporary taking that ceased when Indiana Southwestern's authority to abandon the lines ended, which constitutes an alternative basis for denying their motion for reconsideration.

## II.  COST-TO-CURE DAMAGES

The other posttrial issue that the court must resolve is whether one of the plaintiffs, Mr. Jenkins, is entitled to cost-to-cure damages as part of his just compensation.  In its trial decision, the court indicated that the principal amount of just compensation owed to Mr. Jenkins needed to be recalculated to account for a temporary taking lasting 2.63 years.  Id. at 760.  In a subsequently filed joint status report, the parties disagreed on the principal amount due to Mr. Jenkins:  plaintiffs contended that the proper amount is $1802 and defendant contended that the proper amount is $202.  The $1600 difference between the two amounts represents the cost to cure the damages that would be caused by the construction of a trail, as determined by plaintiffs' expert appraiser, David Matthews.  Because the parties had not addressed this issue in their posttrial briefs or during closing arguments, the court afforded them the opportunity to brief the issue in conjunction with the briefing on plaintiffs' motion for reconsideration.

To calculate the principal amount of just compensation owed to each plaintiff, Mr. Matthews used the accepted approach of comparing the value of a parcel before and after the government's imposition of an easement and then adding any damages caused by the imposition of the easement.  See id. at 754-58 (describing Mr. Matthews's approach), 759 (observing that Mr. Matthews's approach has been endorsed by the court and defendant in other cases).  Mr. Matthews, in valuing plaintiffs' parcels in the "after" condition, presumed that a trail would be constructed and determined the cost to cure any damages caused by the trail's existence.  Id. at 756.  The parties dispute whether it is appropriate to award such damages given that a trail-use agreement was not executed and a trail was not constructed.

---

[7] Defendant, in its response to plaintiffs' motion for reconsideration, maintains that the court erred in concluding that the state law abandonment requirements were satisfied.  However, as noted previously, defendant did not seek reconsideration of the court's decision, and therefore its contention is not properly before the court.

Plaintiffs maintain that it was proper for Mr. Matthews to include the cost to cure the damages caused by the existence of a trail in the principal amount of just compensation owed to Mr. Jenkins. They assert that under the appraisal standards applicable in Trails Act cases, a parcel must be valued with the assumption that a trail was built, and the compensation owed to the landowner must include damages caused by the existence of the trail. Plaintiffs further assert that in accordance with these standards, Mr. Matthews determined that the damage caused by a trail running along the rear boundary of Mr. Jenkins's residential parcel could be cured by the construction of a privacy fence, and concluded that Mr. Jenkins was entitled to recover the cost for such construction. Defendant responds that Mr. Jenkins is not entitled to cost-to-cure damages because he did not suffer a permanent loss of value to the remainder of his property as a result of the taking, and because the cost to build the privacy fence is more than the damages owed for the diminution of value caused by the taking.

During trial, Mr. Matthews testified that he calculated the principal amount of just compensation owed to plaintiffs in accordance with the appraisal standards and guidance set forth in the Interagency Land Acquisition Conference's Uniform Appraisal Standards for Federal Land Acquisitions ("Yellow Book").[8] See Tr. 479-82 (Matthews). See generally JX 38 (the Yellow Book). In particular, Mr. Matthews explained that under those standards, (1) a parcel must be valued in the "before" and "after" conditions as of the date of the taking, Tr. 357-58, 495-97 (Matthews); (2) he was required to assume, when determining the value of a parcel in the "after" condition, that the trail had been built, id. at 317-18, 496-97, 500, 560-61; and (3) compensation owed to a landowner must account for damages caused by the existence of the trail, id. at 339, 564, 567-69. See also PX 22 at 36 ("At the time of the taking, . . . it was not understood that the take would be temporary and so the motivations of the parties involved would reflect the assumption that it was a permanent take. Thus it is assumed the property owner would construct a privacy fence along the rear property line to mitigate the loss of privacy and potential trespass from rail/trail traffic."). Compliance with these requirements, he explained, would ensure that a landowner was fully compensated for the federal government's appropriation of the property underlying the railroad-purposes easement. See id. at 318 (explaining that his approach "allows the appraiser to measure any damages or benefits" caused by the taking, and that an appraiser who did not account for damages or benefits would "not have measured the total impact on the property"), 339 ("[I]f you just take the rent loss, it does not address damages or benefits. It says in the Yellow Book you need to address damages and benefits. [Only measuring rent loss] underestimates the property.").

Mr. Matthews is a knowledgeable and experienced appraiser, and the evidence in the trial record reflects that his cost-to-cure-damages analysis conforms to the appraisal standards set

---

[8] A complete description of Mr. Matthews's approach is set forth in the court's trial decision. See Memmer, 150 Fed. Cl. at 754-60. This section includes only the facts relevant to the cost-to-cure-damages issue, which are derived from the transcript of testimony elicited during trial ("Tr.") and the exhibits admitted into evidence as part of the trial record ("PX" or "JX"). Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness.

forth in the Yellow Book.[9]  However, Mr. Matthews's adherence to those standards does not mean that they should be applied to the facts of this case as a matter of law.

A taking in a Trails Act case accrues on the date the Board issues the NITU.  See Caldwell, 391 F.3d at 1235.  Although it may not be known whether the taking will be permanent or temporary when the NITU is issued, id. at 1234, an appraiser must still use that date when determining the value of the property taken, Tr. 357-58, 495-97 (Matthews); JX 38 at 20-21.  In most cases, landowners are awarded just compensation, either by the court or through settlement, after the NITU has expired and it is known whether the taking is permanent (due to the execution of a trail-use agreement) or temporary.  In other words, events occurring after the date of valuation affect the amount of just compensation a landowner will be paid.

In this case, Indiana Southwestern and the putative trail sponsor did not execute a trail-use agreement during the pendency of the NITU, the NITU expired on November 8, 2013, and Indiana Southwestern did not file a notice of consummation of abandonment by the January 7, 2014 regulatory deadline.  Thus, to the extent that the taking was temporary and ended on or before January 7, 2014, an adjacent landowner would not have been injured by the existence of a trail—indeed, after January 7, 2014, there was no possibility that a trail could be constructed as a result of the issuance of the NITU.  Because the purpose of just compensation is to put a landowner "in the same position monetarily as he would have occupied if his property had not been taken," United States v. Reynolds, 397 U.S. 14, 16 (1970), it would be improper to award Mr. Jenkins compensation for mitigating damages he did not incur.  Accordingly, the principal amount of just compensation owed to Mr. Jenkins is $202.

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiffs' motion for reconsideration and **AWARDS** Mr. Jenkins a principal amount of just compensation of $202.  In accordance with the court's conclusions in its trial decision, the contents of the parties' November 16, 2020 joint status report, and the analysis set forth above, defendant is liable for the following principal amounts of just compensation:

| Property Owner | Principal Amount of Just Compensation |
|---|---:|
| Gilbert Effinger | $1322.00 |
| Larry Goebel and Susan Goebel | $5200.00 |
| Owen Halpeny | $1100.00 |
| Joseph Jenkins | $202.00 |

---

[9]  In this regard, it is worth noting that defendant did not offer an expert opinion to counter that of Mr. Matthews.

| | |
|---|---:|
| Michael Martin and Rita Martin | $9400.00 |
| McDonald Family Farms of Evansville, Inc. | $5900.00 |
| Jeffrey Memmer | $1500.00 |
| Reibel Farms, Inc. | $800.00 |
| James Schmidt and Robin Schmidt | $2500.00 |
| Total | $27,924.00 |

In addition, as set forth in its December 1, 2020 order, interest shall be calculated on the principal amount of just compensation for the duration of the taking (from May 23, 2011, to January 7, 2014) using the Moody's Aaa rate, compounded annually, and for the period following the taking until judgment is paid at 3.65%, compounded annually.

By **no later than Thursday, June 3, 2021**, the parties shall file a joint status report indicating, in accordance with the court's rulings, (1) the amount of interest due to each property owner for the period spanning May 23, 2011, to January 7, 2014; and (2) the amount of interest due to each property owner from January 8, 2014, to June 17, 2021. The court will then direct the entry of an RCFC 54(b) judgment to dismiss the claim of Matthew Hostettler and award the remaining plaintiffs all aspects of just compensation except for the "costs, disbursements, and expenses" permitted under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c).[10]

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge

---

[10] In that same order, the court will stay proceedings on costs and direct the parties to file a joint status report regarding further proceedings either seventy days after the entry of judgment or ten days after the judgment is no longer appealable, whichever is later.